UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ORANGEBURG DIVISION

| | | |
|---|---|---|
| Burl Washington, | ) | Civil Action No. 5:16-3913-BHH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **OPINION AND ORDER** |
| | ) | |
| Federal Bureau of Prisons, Richard | ) | |
| Lepiane, Eve Ulmer, Estate of Dr. G. | ) | |
| Victor Loranth, and the United States, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

This is a civil action filed by federal prisoner Burl Washington ("Plaintiff"). Under Local Civil Rule 73.02(B)(2) (D.S.C.), pretrial proceedings in this action were referred to United States Magistrate Judge Kaymani D. West. This case was originally filed by Plaintiff *pro se* on December 14, 2016. *See Houston v. Lack*, 487 U.S. 266, 271 (1988) (holding *pro se* prisoner's pleading is deemed "filed" at moment of delivery to prison authorities for forwarding to district court). Since that time, Plaintiff has been appointed legal counsel (ECF Nos. 43, 82), and his current counsel filed a First Amended Complaint on March 6, 2018 (ECF No. 111), a Second Amended Complaint on June 6, 2018 (ECF No. 128), and the operative Third Amended Complaint on April 12, 2019 (ECF No. 197). The case is before the undersigned on Defendants' Motions for Summary Judgment (ECF No. 229—filed by Defendants Loranth, Lepiane, Ulmer, and the United States; and ECF No. 230—filed by the Federal Bureau of Prisons ("BOP")). Plaintiff filed a single Response in Opposition to both Motions on December 2, 2019. (ECF No. 235.) Defendants filed a Reply on December 9, 2019. (ECF No. 236.) The matter is ripe for review and the Court

now issues the following ruling.

## I. Background

### A. Allegations in Plaintiff's Third Amended Complaint

Plaintiff is a legally blind federal inmate,[1] previously housed at Federal Correctional Institution ("FCI") Williamsburg, FCI Estill, and FCI Edgefield, all within the geographical coverage of this Court. He is currently housed within the Federal Correctional Complex ("FCC") Butner, in Butner, North Carolina, in FCI Butner Medium. (Third Am. Compl. ¶ 5; *see also* ECF No. 229 at 1.) FCC Butner consists of four facilities: FCI Butner Low, FCI Butner Medium, FCI Butner Medium 2, and Federal Medical Center ("FMC") Butner. Since the filing of this case in December 2016, Plaintiff has been transferred between various BOP facilities nine times. (Third Am. Compl. ¶ 5.)[2] This case was filed pro se while Plaintiff was housed in South Carolina.

In his Third Amended Complaint Plaintiff sues the BOP, the United States, and three federal officials and employees, asserting: (1) he has been discriminated against because of his disability ("Rehabilitation Act claim") (*id.* ¶¶ 108–19); (2) he has been subjected to cruel and unusual punishment due to the BOP's inconsistent medical care and failure to provide the medical and personal assistance that he needs due to his

---

[1] In December 2005 Plaintiff was diagnosed with primary open-angle glaucoma ("POAG") and with increased intraocular pressure ("IOP") in his right eye. (Third Am. Compl. ¶ 11.) Vision in his left eye also decreased due to IOP. (*Id.* ¶¶ 14–16.)

[2] Plaintiff's first housing in South Carolina was at FCI Williamsburg in Salters, South Carolina. Thereafter, he was transferred to FCI Estill, where he was housed when this case was filed on December 14, 2016. On July 12, 2017, he was transferred to FCI Edgefield in Edgefield, South Carolina. On February 7, 2018, he was transferred to United States Penitentiary ("USP") Atlanta. On March 16, 2018, he was transferred from USP Atlanta to Federal Transfer Center ("FTC") Oklahoma City. Then, on March 26, 2018, he transferred to USP Canaan in Pennsylvania. Thereafter, he was transferred to FCI Loretto in Pennsylvania on March 30, 2018; back to FCI Canaan on April 27, 2018; to FTC Oklahoma City on May 8, 2018; to USP Atlanta on May 25, 2018; and finally, to FCI Butner on May 30, 2018. (Third Am. Compl. ¶ 5.)

blindness ("Injunctive Relief claim" and "*Bivens* claims") (*id.* ¶¶ 120–31); (3) he has suffered medical malpractice and violation of the Federal Tort Claims Act ("FTCA") due to a failure to provide medically necessary treatment, surgery, consultations, physical and occupational therapy, tools, assistance, and education necessitated by his condition, a failure to provide or exercise due care, and a failure to provide health care services (*id.* ¶¶ 139–56). Plaintiff seeks: declaratory and injunctive relief from Defendant BOP (Counts One and Two); damages and declaratory and injunctive relief from Defendants Dr. Richard Lepiane, Clinical Director FCI Estill, Eve Ulmer, nurse at FCI Estill, and the Estate of Dr. G. Victor Loranth, Clinical Director FCI Williamsburg, deceased[3] (Count Three); preliminary injunctive relief from the BOP (Count Four); and monetary damages against the United States (Count Five). Relevant allegations from the Third Amended Complaint are herein discussed in connection with the analysis of Defendants' Motions.

### B.    Relevant Medical Facts[4]

Plaintiff began experiencing problems with his eyes in the mid-2000s. By December 2005 he was diagnosed with POAG in his right eye. (Third Am. Compl. ¶ 11.) On or about April 11, 2006, Plaintiff's right eye visual acuity was measured at 20/200 and his left eye visual acuity was measured at 20/40. The IOP in his right eye was elevated but the IOP in his left eye was in normal range. (*Id.*) On April 19, 2006, Plaintiff was

---

[3] In the Statement of Facts section of their brief, Defendants note that Defendant Loranth died on August 31, 2015, and suggest that the court "should dismiss" the Estate of Loranth because "Defendant Loranth was not served as an individual and his estate was not served either." (ECF No. 229 at 22.) Plaintiff argues that this assertion is untimely, that "Defendants' counsel have consistently presented themselves as representatives of Defendant Loranth," and that Plaintiff would be prejudiced by the dismissal of this Defendant. (ECF No. 235 at 10, n.10.) Because Defendants' Motion for Summary Judgment includes arguments made on behalf of Defendant Loranth, the Court will consider those arguments in its analysis.

[4] Defendants provided facts only relevant to the time Plaintiff was in BOP custody in South Carolina. (ECF No. 229 at 6.)

arrested on the charges for which he is currently incarcerated, and he has remained in custody since that date.[5] (*Id.* ¶ 12.) Plaintiff was evaluated on August 1, 2006 and found to have glaucoma in both eyes. In August 2007, Plaintiff had borderline increased IOP in both eyes and significant loss of vision in his right eye. (*Id.* ¶ 13.) Plaintiff has undergone numerous surgeries on his eyes in an attempt to reduce his IOP, relieve pain, and preserve his remaining vision. (*Id.* ¶ 14.) Plaintiff had surgery on May 11, 2010 and was seen for follow-up on February 17, 2011, at which point the ophthalmologist noted that Plaintiff "continued to experience persistent pain and vision problems," his IOP remained high, and visual acuity in his right eye was "so reduced that he could only sense hand motion." (*Id.* ¶¶ 15–16.) Medical records from April 2011 indicate that visual acuity in Plaintiff's left eye had begun to deteriorate and was measured at 20/70. (*Id.* ¶ 16.) Plaintiff underwent surgeries to install drains in his eyes to control his IOP. A drainage device was implanted in his right eye in February 2012 and in his left eye in March 2012. (*Id.* ¶ 19.) By June 2012, the visual acuity in Plaintiff's left eye measured 20/100 and in July 2012 his "right eye visual acuity was so impaired that he could only perceive light with that eye." (*Id.* ¶¶ 20–21.) By October 2012, Plaintiff's left eye visual acuity had reduced to 20/400. (*Id.* ¶ 22.) Plaintiff was seen by a glaucoma specialist on February 7, 2013, who noted that Plaintiff had advanced glaucoma and cataracts in both eyes. (*Id.* ¶ 24.) On July 22, 2013 a glaucoma specialist wrote a letter stating that Plaintiff "was legally blind, 'with complete loss of his central and peripheral vision of both eyes.'" (*Id.* ¶ 32.) However, because surgery to reduce the IOP in Plaintiff's left eye could also destroy what vision he had remaining in that eye, the specialist recommended surgery only as a last resort,

---

[5] Defendants indicate that Plaintiff entered BOP custody on January 6, 2009. (ECF No. 229 at 6.)

preferring instead to treat the IOP with topical medications. (*Id.*)

"[Plaintiff] arrived at FCI Williamsburg on October 25, 2013, with a history of vison loss bilaterally along with glaucoma, keratitis, and prior surgical procedures." (ECF No. 229 at 7.) On his arrival "his vision was at No Light Perception in his left eye (OS) and Light Perception in his right eye (OD)." (*Id.*) When he arrived at FCI Williamsburg, "[h]e received renewals of his current medications for glaucoma, including brimonidine tartrate Ophth .2% (eyedrop), Latanoprost Ophth Soln 0.005% (eyedrop), Timolol Maleate Ophth Soln 0.5% (eyedrop), Tears, Ophth Oint 3.5 GM (eyedrop), Tears, Artificial (Polyvinyl Alcohol 1.4%) (eyedrop), and Methazolamide 25 MG Tab (tablet) . . . ." (*Id.* (internal citations to medical record omitted).) Plaintiff underwent cataract removal surgery on July 23, 2014. (Third Am. Compl. ¶ 42.) On August 28, 2014, doctors noted that the glaucoma in Plaintiff's left eye was inadequately controlled and seemed to be progressing. (*Id.* ¶ 46.) "The specialist recommended an increase in one of his medications, methazolamide, to three times daily, darker sunglasses, and diode laser surgery for glaucoma in his left eye." (ECF No. 229 at 14 (internal citations to medical record omitted).) A June 10, 2015 letter from Dr. David Tremblay of the MUSC Storm Eye Institute "informed prison officials that [Plaintiff] was legally blind in both eyes and had difficulty performing routine activities, such as walking around and administering his medications." (Third Am. Compl. ¶ 60.) Dr. Tremblay noted that it "was medically necessary[] that [Plaintiff] receive the assistance of a nurse, sitter, or proctor to help with ambulation."

Plaintiff was transferred to FCI Estill on September 9, 2015, evaluated by the clinical director, and "found to have blindness in both eyes secondary to end stage glaucoma, along with other medical needs." (ECF No. 229 at 22–23.) On October 18,

2016, Plaintiff's glaucoma specialist recommended laser surgery to reduce Plaintiff's IOP in both eyes. (*Id.* at 31.) Plaintiff had surgery on his left eye for glaucoma and increased IOP on February 22, 2017. (*Id.* at 34.) He had surgery on his right eye for glaucoma and increased IOP on March 14, 2017. (*Id.*)

## II.    Standard of Review

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A party seeking to show that a fact cannot be or is genuinely disputed must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are

irrelevant or unnecessary will not be counted." *Id.* at 248.

III. **Discussion**

A. **Motion for Summary Judgment on Count Three and Count Five (Defendants Loranth, Lepiane, Ulmer, and United States)**

1. **Eighth Amendment Violation**

The government is "obligat[ed] to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). This obligation arises from an inmate's complete dependence upon prison medical staff to provide essential medical service. *Id.* The duty to attend to prisoners' medical needs, however, does not presuppose "that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Id.* at 105. Instead, it is only when prison officials have exhibited "deliberate indifference" to a prisoner's "serious medical needs" that the Eighth Amendment is offended. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994); *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).

Deliberate indifference to a serious medical need requires proof that each Defendant knew of and disregarded the risk posed by the Plaintiff's objectively serious medical needs. *Farmer*, 511 U.S. at 837. In cases involving the denial of or the delay in providing medical treatment to a prisoner, the prison official must know of and disregard an objectively serious condition, medical need, or risk of harm. *See Sosebee v. Murphy*, 797 F.2d 179, 182–83 (4th Cir. 1986) (holding issues of material fact existed where record contained evidence that defendant guards were aware prisoner's condition had worsened, intentionally ignored the situation, and refused to seek medical assistance). The Fourth Circuit defines a serious medical need as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would

easily recognize the necessity for a doctor's attention." *Iko v. Shreye*, 535 F.3d 225, 241 (4th Cir. 2008) (quotation marks and citation omitted). A medical condition is also serious if a delay in treatment causes a lifelong handicap or permanent loss. *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).

As an initial matter, the Court finds that Plaintiff has submitted sufficient evidence via medical records to establish that his diagnosis and treatment for glaucoma qualifies as a serious medical need. (*See generally* ECF Nos. 229-3, 232, 233, 235-28.)

Addressing whether Drs. Loranth and Lepiane exhibited medical indifference to Plaintiff's serious medical need, Defendants argue Plaintiff failed to establish these Defendants acted with the requisite culpable state of mind for deliberate indifference. (ECF No. 229 at 47.) Defendants cite Plaintiff's medical records, arguing that Plaintiff has received proper and adequate medical treatment for his mental health and medical needs. (*Id.* at 49.) Defendants contend "the medical records demonstrate that he was closely followed on numerous occasions by Defendants Lepiane and Loranth, who reviewed his medical history and evaluated his condition and symptoms." (*Id.* at 43.) Defendants note Plaintiff was seen by Loranth and Lepiane and other FCI Williamsburg and FCI Estill staff on a "plethora of occasions" for his eye care needs. (*Id.* at 44.) Defendants contend Lepiane and Loranth "discussed each step of the process with [Plaintiff] and referred him to glaucoma specialists and optometrists on multiple occasions for treatment, including surgical intervention." (*Id.* at 44.) Defendants indicate Plaintiff had surgery on July 23, 2014, but he refused his post-operative follow up appointments and refused to take his medications as prescribed. (*Id.*) Defendants further contend Plaintiff received training with a mobility specialist but the training was cancelled after three sessions

because Plaintiff did not properly participate in the training. (*Id.*) Defendants state Dr. Lepiane also offered Plaintiff braille classes but he refused to sign the application. (*Id.*) Although Defendants acknowledge that there was an unknown delay between Plaintiff's specialist appointments from August 24, 2014 to January 25, 2015, Defendants argue Loranth referred Plaintiff for surgery on August 28, 2014. (*Id.*) Defendants further contend that Loranth was not directly responsible for scheduling specialist appointments. (*Id.*) Defendants argue Plaintiff's disagreement with Defendants' medical treatment is not an actionable constitutional claim. (*Id.*) Defendants claim Plaintiff was not denied access to his medications by Defendants, but rather refused to accept the medication as provided. (*Id.* at 45.) Defendants argue that even if Loranth and Lepiane were "incorrect in their assessments that Plaintiff did not need inmate companions or medication administration assistance, this still does not meet the objective standard for an Eighth Amendment violation." (*Id.*) Defendants claim Loranth's response to Plaintiff's condition "evinced a conservative course of treatment that emphasized consistent monitoring and referral to the specialist." (*Id.* at 49.) Defendants claims Plaintiff's disagreement with this course of treatment does not amount to deliberate indifference. *Id.*

Finally, Defendants cite to Plaintiff's expert, Dr. Amy Kotecha ("Kotecha"), and allege she stated that there was no doctor, nurse, or medical provider for the BOP that was incompetent or intentionally tried to provide deficient medical care. (ECF No. 229 at 48.) Defendants also claim Kotecha opined that there was no evidence that any BOP medical professionals did not follow their oath as health professionals or intentionally harmed Plaintiff. (*Id.*) Defendants also contend Kotecha "could not impute liability or identify any one person who should be held responsible for Plaintiff's vision loss." (*Id.*)

In his response, Plaintiff argues Lepiane was aware Plaintiff had glaucoma and was legally blind. (ECF No. 235 at 7.) Plaintiff also alleges that Lepiane knew Plaintiff had end-stage glaucoma and that if Plaintiff did not receive his medication his IOP could worsen and result in him becoming totally blind. (*Id.*) Plaintiff contends that despite having this knowledge and noting that Plaintiff needed significant help because of his blindness, Lepiane instructed other medical professionals to not administer eye drops to Plaintiff. (*Id.*) Plaintiff also contends that Lepiane was made aware as early as May 2016 that Plaintiff's IOP in his left eye was extremely elevated and that prompt action was needed to lower his eye pressure or Plaintiff would lose the rest of his vision in his left eye. (*Id.* at 8.) Plaintiff argues that despite this knowledge Lepiane failed to arrange for Plaintiff to visit a glaucoma specialist to address this issue until October 18, 2016. (*Id.*) Plaintiff also notes that Lepiane recommended that Plaintiff be transferred to a federal medical center because he recognized that FCI Estill lacked the resources to care for an inmate like Plaintiff. (*Id.*) Plaintiff states that the request was denied in July 2016, and despite being instructed to resubmit the request if he could not obtain help from the State Commission for the Blind, Lepiane did not resubmit the transfer request. (*Id.*) Furthermore, Plaintiff notes that the State Commission for the Blind informed FCI Estill officials by March 2016 that it could not provide Plaintiff with help with his activities of daily living ("ADLs"). (*Id.*)

In regard to Loranth, Plaintiff alleges Loranth was well-aware Plaintiff was visually impaired and struggled to perform ADLs, did not have a companion, and was struggling to navigate FCI Williamsburg alone. (ECF No. 235 at 10–11.) Plaintiff contends that despite this knowledge, Loranth ordered Plaintiff to receive his prescriptions at health services and it was Plaintiff's responsibility to get to health services on his own, four times

a day, to receive his medications. (*Id.* at 11.) Plaintiff also cites an encounter when he complained on a Friday about eye pain that he described as 10/10, and Loranth refused Plaintiff treatment and told Plaintiff that he would be seen the following Monday. (*Id.*) Plaintiff alleges Loranth was dismissive of his condition on numerous occasions, "which informed his recommendations and treatment of Plaintiff as well as decisions by the regional and central offices that reviewed [Plaintiff's] grievances with respect to his medical care." (*Id.*) Plaintiff further cites an email where Loranth noted Plaintiff was not blind, threatened to write Plaintiff up for malingering, and opined Plaintiff did not need an inmate companion. (*Id.*) Plaintiff also cites a letter written by outside ophthalmologist Dr. David Tremblay to prison officials. (*Id.*) In this June 10, 2015 letter, Dr. Tremblay stated Plaintiff "'has significant difficulty with ambulation, medication administration and routine daily activities.'" (*Id.* (quoting ECF No. 235-24).) Dr. Tremblay also noted it was "'absolutely necessary that [Plaintiff] receive the medications prescribed'" and assistance with ambulation. (*Id.* at 12.) Dr. Tremblay finally stated that these statements were "'not recommendations'" but were "'medically necessary.'" (*Id.*) Plaintiff contends that Loranth determined that he "would not follow the 'medically necessary' directives from the outside specialist." (*Id.*)

Addressing Nurse Ulmer, Defendants contend there is no evidence to support the allegations that Ulmer acted with deliberate indifference to Plaintiff's medical needs by changing his prescription glasses or refusing to administer medication. (ECF No. 229 at 45.) Defendants assert Ulmer followed BOP procedures and the instructions of higher-level medical providers in treating Plaintiff. (*Id.*)

In response, Plaintiff argues that Ulmer was aware of Plaintiff's serious medical

needs, yet on numerous occasions she refused Plaintiff his medications and necessary assistance. (ECF No. 235 at 9.) Plaintiff also contends Ulmer altered Plaintiff's prescription for sunglasses to prevent him from receiving the appropriate glasses. (*Id.* at 10.) Plaintiff acknowledges that Ulmer describes her encounters with Plaintiff differently, saying Plaintiff refused to take his medications from her, but Plaintiff argues this creates a question of fact. (*Id.*)

Plaintiff also argues that Defendants' reliance on Plaintiff's expert is misplaced because expert testimony that a doctor exhibited deliberate indifference is not required for a *Bivens* claim. (*Id.* at 12 (citing *Miltier v. Beorn*, 896 F.2d 848, 852 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837).) Plaintiff also cites statements from Kotecha concerning the delay in care and failure to assist with medication and contends that when Kotecha's testimony is viewed in the light most favorable to Plaintiff, there is a question of fact whether Defendants exhibited deliberate indifference. (*Id.*)

In their Reply, Defendants contend that none of the medical records or deposition transcripts indicate Loranth, Lepiane, or Ulmer refused to provide Plaintiff with medical care or acted to harm Plaintiff. (ECF No. 236 at 4.) Defendants allege that the record shows Plaintiff was "seen by these medical Defendants on a nearly daily basis, referred to multiple specialists, offered instruction on self-administration of his eyedrop medications, offered disability accommodations for his activities of daily living, and housed at Care Level 2 and 3 institutions appropriate to his medical needs." (*Id.*) Defendants also contend that there are innumerable occasions where Plaintiff refused medical treatment and instructions on self-administration and independent living provided

by Lepiane, Loranth, and Ulmer. (*Id.*) Defendants argue they offered medical treatment that they believed was appropriate to Plaintiff's needs. (*Id.*) Defendants assert that Lepiane and Loranth saw Plaintiff administer his own medication and complete his ADLs on his own and therefore they believed Plaintiff could do these tasks. (*Id.* at 4–5.) Defendants argue Lepiane and Loranth did not refuse to provide Plaintiff treatment, but "instructed medical staff to educate Plaintiff on self-administration in order to assist him with independent living skills and attempted to defuse his malingering behaviors." (*Id.* at 5.)

On reply Defendants also argue that Lepiane and Loranth did not intentionally refuse to send Plaintiff to a specialist. (*Id.*) Defendants contend that neither of these Defendants were directly involved in calling the specialist to schedule Plaintiff's appointment. (*Id.*) Defendants assert that whether these Defendants were correct in their medical assessment of Plaintiff's medical needs is not a factor in evaluating medical indifference. (*Id.* at 5–6.) Defendants also reference the letter from Dr. Tremblay and argue Plaintiff did not obtain an expert opinion or additional evidence from Dr. Tremblay to explain the context of his letter and therefore Dr. Tremblay's letter should not be given the level of credence Plaintiff attempts to give it. (*Id.* at 6.) Although Defendants concede that medical expert testimony is not required for a *Bivens* case, they argue that the experts' opinions provide even more support for their position that Plaintiff failed to establish deliberate indifference by Defendants. (*Id.* at 7.) Defendants allege that these claims by Plaintiff are more appropriately construed under his malpractice or negligence claims. (*Id.* at 7–8.) Defendants also contend that Ulmer did not refuse to administer Plaintiff's eye drops in an attempt to harm Plaintiff or act with reckless disregard to his

medical needs, but that she was following the instructions of Lepiane. (*Id.* at 5.) Defendants also argue that Ulmer did not have the authority to change Plaintiff's prescription for sunglasses. (*Id.*)

Having reviewed the record before the Court the undersigned finds that Defendants' failure to timely schedule Plaintiff's medical appointments and assist Plaintiff with the administration of his eye drops, in conjunction with evidence that Defendants were aware that a delay in medical treatment and improper administration of Plaintiff's eye drops could result in pain for Plaintiff and a diminishment of Plaintiff's vision, creates a question of fact concerning whether Plaintiff was unconstitutionally denied medical treatment. *See Farmer*, 511 U.S. at 842 ("[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."). Accordingly, summary judgment is denied as to this claim.

### 2. FTCA Claim for Negligence and  Medical Malpractice

The FTCA provides for a limited waiver of the Government's sovereign immunity from suit by allowing a plaintiff to recover damages in a civil action for loss of property or personal injuries caused by the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

Under the FTCA, the court must determine liability in accordance with the

substantive tort law of the state "where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Accordingly, because Plaintiff alleges a claim for medical malpractice concerning the medical treatment he received while he was housed in BOP facilities located in South Carolina, the substantive law of South Carolina controls. A medical malpractice claim requires a plaintiff to allege that a physician's or some medical personnel's care deviated from generally accepted medical practices and procedures. *See Dumont v. United States*, 80 F. Supp. 2d 576, 581 (D.S.C. 2000) ("In order to establish liability in a medical malpractice case, plaintiff must prove by a preponderance of the evidence the following: (a) What the recognized and generally accepted standards, practices and procedures are in the community which would be exercised by competent physicians in the same specialty under similar circumstances. (b) The physician or physicians and/or hospital personnel in question negligently deviated from the generally accepted standards, practices, and procedures. (c) Such negligent deviation from the generally accepted standards, practices, and procedures was a proximate cause of the plaintiff's injury. (d) The plaintiff was injured." (citations omitted)).

In support of his medical malpractice claim, Plaintiff offers an expert report and testimony from ophthalmologist Dr. Amy Kotecha, who opined that the BOP deviated from the standard of care in two instances. (ECF No. 235 at 13.) First, Dr. Kotecha testified that the delay of medical care from August 24, 2014 to January 25, 2015 was too long given Plaintiff's eye pain and severe aggressive glaucoma, which contributed to Plaintiff's eye pain and loss of vision. (*Id.* at 13–14 (citing Kotecha Dep. 29:1-17, ECF No. 235-27).) Second, Dr. Kotecha testified that Defendants should have provided Plaintiff with an assistant to administer his eye drops after Dr. Tremblay's June 10, 2015 letter stating

Plaintiff no longer had enough vision to accurately administer his own eye drops. (*Id.* at 14 (citing Kotecha Dep. 84:20–85:15).)

Defendants move for summary judgment on Plaintiff's medical malpractice claim. (ECF No. 229 at 54–55.) Addressing Plaintiff's first ground of medical malpractice, Defendants contend that although Dr. Kotecha opined that "the BOP was negligent in not scheduling the appointment from August 28, 2014, to January 25, 2015, Dr. Kotecha admitted that she could not say to a reasonable degree of medical certainty that [Plaintiff's] vision would have been any different if the alleged delay had not occurred or that anybody in the BOP caused his visual acuity to be lessened." (*Id.* at 55 (citing Kotecha Dep. 57:15–22, 58:4–20, ECF No. 229-11).) Defendants state that she also opined there is a possibility that, despite everything the BOP did, Plaintiff's visual acuity would be precisely where it is today regardless of what happened in his medical case. (*Id.* (citing Kotecha Dep. 56–58).) Defendants further argue that Dr. Kotecha could not impute liability or identify any one person who should be held responsible for Plaintiff's vision loss. (*Id.* (citing Kotecha Dep. 55–56, 68–69, 71).)

Defendants also offer an expert report from their own expert, Dr. Lane Ulrich, who found no evidence of negligence by the United States or any other BOP medical provider. (ECF No. 229 at 54–55 (citing Ulrich Report, ECF No. 229-3).) Specifically addressing the delay in treatment, Defendants state "Dr. Ulrich noted there was no record as to when MUSC called to schedule the next appointment." (*Id.* at 55 (citing Ulrich Report 33:2-5).) Defendants also cite to Plaintiff's medical records and argue that BOP staff completed their required actions to schedule an appointment with a specialist on August 28, 2014, and there is no evidence the delay was caused at the institutional level. (*Id.* at 56 (citations

omitted).) Defendants contend that Dr. Ulrich did not find that Plaintiff suffered any additional harm or damages by not having an appointment during the timeframe between appointments. (*Id.* (citing Ulrich Report 33:1-3).)

In response, Plaintiff references Dr. Kotecha's report which notes that "'[o]n 8/24/14 Dr. Nutaitis at MUSC recommended a repeat diode laser [surgery] for Mr. Washington's left eye.'" (ECF No. 235 at 14–15 (quoting Kotecha Report, ECF No. 235-28 at 5).) Plaintiff then cites to Defendants' expert report to establish that Plaintiff did not receive the recommended surgery until February 22, 2017. (*Id.* at 15.) Plaintiff notes that Dr. Kotecha characterized this delay in receiving surgery as being "'detrimental to [Plaintiff's] glaucoma and his pain.'" (*Id.* (citing Kotecha Dep. 82:11-84:5).) Plaintiff also contends Dr. Kotecha indicated that the lack of medical records from August 24, 2014, to January 25, 2015, indicates that Plaintiff was not receiving appropriate medical care for his glaucoma during this period, "which resulted in a delay of care that breached the standard of care and contributed to his loss of vision and eye pain." (*Id.* (citing Kotecha Dep. 86:13-87:14).)

Addressing Defendants' claim that Dr. Kotecha cannot impute liability on any one person for Plaintiff's vision loss, Plaintiff points out that he also claims the delay caused significant eye pain. (ECF No. 235 at 15.) Plaintiff argues that Dr. Kotecha explained that the reason she could not identify any one person to hold responsible for the delay was because she did not know who in the BOP was responsible for ensuring Plaintiff had timely scheduled appointments. (*Id.* at 15–16 (citing Kotecha Dep. 70:3-19, ECF No. 235-27). Plaintiff contends it is clear that whoever had the responsibility to ensure the timely and proper scheduling of appointments failed to do his or her job, and Defendants have

identified Loranth as the responsible party. (*Id.* at 16.) Plaintiff further claims Defendants do not have any evidence as to when Loranth made the request to approve or schedule surgery except for a December 12, 2014 note on the Seven Corners[6] website that a specialist consultation was needed. (*Id.* at 17.) Plaintiff argues that although Defendants suggest that Dr. David Massa (the Chronic Care Provider at FCI Williamsburg) sent a request to Seven Corners on August 28, 2014, to schedule the appointment with MUSC, Defendants' referenced form does not support this claim. (*Id.*) Plaintiff contends that the identified form was completed by Seven Corners, not Dr. Massa, upon its review of the August 28, 2014 MUSC medical record. (*Id.*) Plaintiff further argues that "when the appointment was finally scheduled on January 8, 2015, Dr. Nutaitis requested that the entire evaluation process be restarted 'due to the length of time from last appt.'" (*Id.* (quoting Brown Decl. ¶ 8, ECF No. 229-13).) Plaintiff claims this shows that Defendants took so long to schedule his surgery that the doctor who was performing the surgery could not do so without reevaluating Plaintiff. (*Id.*) Plaintiff also alleges that Dr. Kotecha "clearly testified that she believes this delay in care 'contributed to [Plaintiff's] eye pain as well as glaucoma progression and vision loss.'" (*Id.* at 18 (quoting Kotecha Dep. 32:13-17).) Plaintiff argues that he is not required to demonstrate that the BOP's actions were the sole cause of his glaucoma progression, eye pain, and vision loss to demonstrate proximate cause. (*Id.*) Plaintiff contends that he only needs to show that it is at least one of the first, concurring causes of his injuries and that the BOP's negligence most probably caused Plaintiff to suffer eye pain, glaucoma progression, and vision loss. (*Id.* (citing *Small v. Pioneer Machinery, Inc.*, 494 S.E.2d 835, 843 (S.C. Ct. App. 1997); *Ellis v. Oliver*,

---

[6] Seven Corners, Inc. contracts with the BOP to provide physicians on an as-needed basis to examine and treat federal inmates. (ECF No. 229 at 14.)

473 S.E.2d 793, 795 (1996)).) Plaintiff asserts that Dr. Kotecha's testimony that the delay contributed to Plaintiff's injuries is sufficient. (*Id.*)

Turning to Plaintiff's second ground for medical malpractice, Defendants argue that Plaintiff's own actions in refusing medication and treatment led to the escalation of his vision loss and pain. (ECF No. 229 at 56.) Defendants assert that Dr. Kotecha admitted that the BOP attempted to work with Plaintiff to get him to use the eye drops. (*Id.*) Defendants contend that FCI Williamsburg and FCI Estill's medical staff worked to educate Plaintiff on how to self-administer the eye drops and also purchased an eye drop assistive device on November 10, 2016. (*Id.* at 57.) Defendants reference Lepiane's treatment notes and explain that medical staff took Plaintiff's request for medical assistance seriously and that Lepiane wanted Plaintiff to learn to instill his eye drops because Plaintiff would not always have a nurse to administer the drops. (*Id.*) Defendants allege that Dr. Kotecha conceded there were struggles in medication compliance because Plaintiff was noncompliant. (*Id.* (citing Kotecha Dep. 71:17–72:1).) Defendants also claim that staff did administer Plaintiff's eye drops during SHU[7] rounds when he had difficulty. (*Id.*) Defendants contend that Dr. Kotecha admitted that Plaintiff had to share some of the blame for his increased visual pain and loss of visual acuity because of his non-compliance. (*Id.* (citing Kotecha Dep. 62:8-14).) Defendants also argue that Dr. Kotecha did not opine that Plaintiff receiving his eye drops at slightly different times from the set pill line hours, or the recommended time at bedtime, was a breach of the standard of care. (*Id.* at 58 (citing Kotecha Dep. 60:12–62:1).)

---

[7] Plaintiff was placed in the SHU (Special Housing Unit) at FCI Estill on January 13, 2016, "after he requested protective custody and reported that he did not feel safe on the compound." (ECF No. 229 at 24 (citing Third Am. Compl. ¶ 71).)

In response, Plaintiff argues "there is clearly a dispute of material fact as to whether Washington ever refused medication and treatment" alleging that Plaintiff "testified repeatedly that he never refused any medications since being in the custody of the BOP and has never purposely missed or refused an appointment." (ECF No. 235 at 19 (citations omitted).) Plaintiff acknowledges Dr. Kotecha testified that Plaintiff's medical records indicate Plaintiff was noncompliant; however, Plaintiff argues that Dr. Kotecha did not state the extent to which Plaintiff's "alleged noncompliance did not help his visual acuity, and she did not absolve the BOP of responsibility for failing to provide [Plaintiff] with appropriate assistance." (*Id.* at 19–20.) Plaintiff argues Defendants' own witnesses indicate assistance provided to Plaintiff at various BOP facilities was substandard. (*Id.* at 20.) Plaintiff cites testimony from Lepiane that noted most BOP institutions did not do anything to help Plaintiff learn how to self-administer his medication. (*Id.* (citing Lepiane Dep. 90:9-21, ECF No. 229-7).) Plaintiff also cites testimony from Lepiane that the only institution where Plaintiff could be provided with adequately trained inmate companions was at an FMC, and none of the South Carolina facilities where Plaintiff was housed were FMCs. (*Id.*) Plaintiff states another witness testified that FCI Estill was not equipped for a Care Level 3 or 4 inmate and Plaintiff is a Care Level 3 Inmate. (*Id.* (citing Bradley Dep. 30:21–31:4, 46:3–6, ECF No. 235-31).)

The undersigned finds that based on the record before the Court there is a genuine issue of material fact as to whether the BOP committed medical malpractice in the delay of providing Plaintiff with medical care and in failing to provide Plaintiff with assistance in administering his eye drops. Put simply, there is conflicting record evidence as to whether the BOP was responsible for the August 24, 2014 to January 25, 2015 delay in medical

care. The record evidence is also in conflict as to whether Plaintiff's eye pain and vision loss was proximately caused by the BOP's failure to provide Plaintiff with assistance to administer his eye drops or by Plaintiff's refusal of his medication. Accordingly, Defendants' motion for summary judgment on this claim is denied.

**B. Motion for Summary Judgment on Count One, Count Two, and Count Four (Defendant BOP)**

Defendants move for summary judgment on Plaintiff's claims for declaratory and injunctive relief in Counts One and Two and for a preliminary injunction in Count Four. (ECF No. 230 at 2.) In Count One, Plaintiff asserts that he has been discriminated against because of his disability (the Rehabilitation Act ("RA") claim). (ECF No. 197 at 31–34.) In Count Two, Plaintiff claims he was subjected to cruel and unusual punishment due to the BOP's inconsistent medical care and failure to provide him with the medical and personal assistance that he needs because of his blindness. (*Id.* at 34–35.) Plaintiff seeks a permanent injunction in Counts One and Two asking the Court to "force Defendants to comply with their obligations" under the Rehabilitation Act and the Eighth Amendment. (*Id.*) In Count Four Plaintiff seeks a preliminary injunction against the BOP related to its "[f]ailure to house [him] in an appropriate facility." (*Id.* at 36–37.)

**1. Exhaustion of RA Claim**

Defendants argue that Plaintiff's RA claim should be dismissed because he failed to properly exhaust his administrative remedies. (ECF No. 230 at 27.) Although Defendants concede Plaintiff exhausted his administrative remedies with the BOP regarding his disability discrimination claim under the RA, Defendants contend that Plaintiff was also required to complete the Department of Justice ("DOJ") procedures with the BOP Equal Employment Opportunity ("EEO") Office before seeking judicial review of

his RA claim. (*Id.* at 23–25.) Defendants state Plaintiff did not complete his remedies with the EEO before filing his case, and therefore his claim in Count One should be dismissed. (*Id.* at 22–27.)

This Court previously addressed Defendants' arguments concerning Plaintiff's failure to properly exhaust his administrative remedies as it relates to Plaintiff's RA claims. (*See* ECF No. 191 at 6–12.) In rejecting Defendants' arguments, the Court cited to language in the Rehabilitation Act that enables a private right of action in the prisoner litigation context and to Section 504 of the Rehabilitation Act under which Plaintiff brings Count One, and found these sections do not make any mention of exhaustion requirements. (*Id.* at 9–10.) The Court denied Defendants' motion explaining that it is was

> not convinced that Rehabilitation Act exhaustion is "jurisdictional" in the prisoner litigation context, and is more persuaded that [the] type of exhaustion at issue for prisoners seeking relief under section 504 of the Rehabilitation Act is "non-jurisdictional."

(*Id.* at 11.)

Courts may exercise their discretion to excuse a non-jurisdictional exhaustion requirement where "the litigant's interests in immediate review outweigh the government's interests in the efficiency and administrative autonomy that the exhaustion doctrine is designed to further." *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992) (citation and quotation marks omitted). Courts have excused such judicially-imposed exhaustion requirements where (1) resorting to administrative procedures would be futile, (2) administrative remedies would be inadequate, or (3) application of the exhaustion requirement would leave an administrative decision unreviewed. *See*, *e.g.*, *Darby v. Kemp*, 957 F.2d 145, 147 (4th Cir. 1992), *overruled on other grounds by Darby v. Cisneros*, 509 U.S. 137 (1993).

Plaintiff references the Prison Litigation Reform Act ("PLRA") and contends that "'once a prison has received notice of, and had an opportunity to correct, a problem, the prisoner has satisfied the purpose'" of exhaustion under the PLRA. (ECF No. 235 at 23 (quoting *Wilcox v. Brown*, 877 F.3d 161, 167 n.4 (4th Cir. 2017).) Plaintiff cites his 2014 grievances and contends that prison authorities have been put on notice about the "discriminatory conditions that confront [Plaintiff]," and have been given an opportunity to remedy these conditions. (*Id*.) Plaintiff argues that "[t]hese opportunities have repeatedly been neglected by those at the highest levels of the BOP," and that another round of administrative review would be an exercise in futility. (*Id*.) Plaintiff asserts that his RA claim has been pending before the Court for years and the parties have engaged in substantial discovery; therefore, requiring Plaintiff to initiate a new lawsuit would frustrate the goals of the exhaustion requirement. (*Id*. at 24.)

Viewing the facts in the light most favorable to the Plaintiff, the undersigned finds Plaintiff has demonstrated a sufficient basis to excuse exhaustion of his RA claim because further exhaustion efforts would be futile at this stage. *See Hodges v. Shalala*, 121 F. Supp. 2d 854, 871 (D.S.C. 2000), *aff'd sub nom. Hodges v. Thompson*, 311 F.3d 316 (4th Cir. 2002) ("[T]he federal courts allow an exemption from an exhaustion requirement where the claimant can show, among other things, that a resort to administrative review would be futile."). Accordingly, the Court denies Defendants' Motion for Summary Judgment with respect to Plaintiff's Count One for failure to exhaust administrative remedies.

### 2. Analysis of Claims for Injunctive Relief

The issue of injunctive relief has been highly contested between the parties. Over

the objections of Defendants, this Court entered a Preliminary Injunction Order on November 20, 2018, directing the BOP to

> retain Plaintiff at the FCC Butner Medical Complex until the conclusion of this case. Transfer to an appropriate security level institution within the FCC Butner Medical Complex will be considered compliant with this Order. The Court leaves to BOP's medical judgment the general management of Plaintiff's medical care, but directs BOP to follow the instructions of Plaintiff's outside physicians as to medication administration and timing, and as to follow-up care as closely as reasonably feasible. Modification of those treatment directives, if based upon the reasonable medical judgment of qualified BOP ophthalmologists and vision specialists, will be considered compliant with this Order.

(ECF No. 169 at 21.)

Defendants contend Plaintiff's request for an injunction should be denied because he cannot meet the four factors for permanent injunctive relief.[8] (ECF No. 230 at 27–35.) Defendants argue Plaintiff's medical records establish that the BOP's medical staff is treating Plaintiff's medical needs appropriately and Plaintiff is receiving all the medical care and accommodations that he requested. (*Id.* at 28–29.) Defendants allege that Plaintiff's disagreement with the course of his medical treatment and his regular refusal to participate in his care are insufficient to support his request for a permanent injunction. (*Id.*)

Plaintiff argues that Defendants' Motion for Summary Judgment on his injunctive claims should be denied because a genuine issue of material fact exists as to Counts One and Two. (ECF No. 235 at 21–22.) In his response in opposition to summary

---

[8] Defendants cite case law from the Eighth Circuit to outline the factors Plaintiff must satisfy in order to secure permanent injunctive relief, namely: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. (ECF No. 230 at 27–28 (citing *Bridges v. Fed. Bureau of Prisons*, No. 18-CV-00494-GPG, 2018 WL 9458201, at *2 (D. Colo. Apr. 10, 2018); *Kitchen v. Herbert*, 755 F.3d 1193, 1208 (10th Cir. 2014)).)

judgment Plaintiff does not address his claim for a preliminary injunction contained in Count Four. Plaintiff notes that Defendants' Motion "does not appear to be an attempt to limit or dissolve the preliminary injunction granted by the Court on November 20, 2018 . . . . . Accordingly, Count [Four] will not be addressed further as it does not appear to be the target of the Motion for Summary Judgment on Injunctive Claims." (*Id.* at 22 n.15.) Plaintiff requests the opportunity to provide additional briefing should the Court interpret Defendants' Motion "as one to dissolve the existing preliminary injunction before the conclusion of the case[.]" (*Id.*)

A plaintiff seeking a permanent injunction must show that: (1) he has suffered irreparable injury; (2) the available legal remedies are inadequate to compensate for that injury; (3) the balance of hardships between plaintiff and defendant warrants an equitable remedy; and (4) the public interest would not be disserved by a permanent injunction.[9] *Herrera v. Finan*, 176 F. Supp. 3d 549, 568 (D.S.C. 2016), *aff'd,* 709 F. App'x 741 (4th Cir. 2017) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

### a. Irreparable Injury and Adequacy of Legal Remedies

Defendants argue that a review of Plaintiff's medical care and accommodations shows that Plaintiff will not suffer irreparable harm if he is denied a permanent injunction. (ECF No. 230 at 32.) Defendants claim Plaintiff does not meet the BOP criteria to be housed at an FMC and argue that Plaintiff's medical needs were not neglected in his current or past institutions. (*Id.* at 30.) Defendants admit that Plaintiff has been transferred several times but argue Plaintiff's own disciplinary infractions disrupted his placements.

---

[9] Although the factors referenced by Defendants are different from the factors used by the Fourth Circuit, the undersigned has nevertheless also considered Defendants' argument under that different standard when evaluating Plaintiff's request for permanent injunctive relief.

(*Id.* at 31.) Defendants also assert that Plaintiff has recently stated he would like to be transferred to an FCC in Virginia (FCC Petersburg) which is not a medical center. (*Id.*) Defendants contend that should the Court order the BOP to house Plaintiff permanently at FCC Butner or at another FMC, Plaintiff "would not be eligible to be housed at FCC Petersburg or any other institution at a later date." (*Id.* at 32.) Defendants argue Plaintiff is receiving timely, adequate medical care and assistance from BOP staff to accommodate his ADLs. (*Id.*) Defendants claim Plaintiff "is receiving nearly daily medical encounters at FCC Butner, is currently being treated by a glaucoma specialist, receiving medication administration multiple times daily from BOP staff, and has been offered multiple inmate companions assigned to assist with his ADLs, and mobility training, among other assistive devices." (*Id.*) Defendants further argue that Plaintiff's own behavior and refusal to accept medication, treatment, and disability accommodations have been detrimental to his medical conditions. (*Id.*)

In response, Plaintiff argues that the record is not settled that he is receiving timely and adequate medical care and assistance to accommodate his ADLs. (ECF No. 235 at 25.) He points out that his current accommodations are being provided under a Court order and notes that Defendants' expert conceded there is nothing to suggest that he would be receiving the same level of care had he not filed this lawsuit. (*Id.* (citing Ulrich Dep. 233:18-24, ECF No. 235-3).) Plaintiff contends that it is not clear if he would receive the same level of care and access to medical facilities if he was housed elsewhere. (*Id.* at 25–26.) Plaintiff also asserts that Defendants' own expert confirmed that "any 'delays in treatment or gaps in care . . . led to [Plaintiff's] disease progressing more quickly than it otherwise would.'" (*Id.* (quoting Ulrich Dep. 66:12-18).) Plaintiff cites a gap in care

recounted by Defendants that indicated Plaintiff was scheduled for an ophthalmology follow-up on April 11, 2019, but he was next seen by an ophthalmologist on October 22, 2019. (*Id.*) Plaintiff argues that "there remains a genuine issue of material fact as to whether he would be irreparably harmed if the Court does not issue a permanent injunction keeping him at FCC Butner or a facility of an equal or higher care level." (*Id.* at 26–27.) Plaintiff also contends that the existing legal remedies are inadequate to compensate him for past injuries to his vision. (*Id.* at 25.)

Addressing Plaintiff's deposition testimony that he would like to "'[t]ransfer to another institution—preferably Petersburg,'" Plaintiff argues that this request is not inconsistent with the relief sought in Counts One and Two. (ECF No. 235 at 27 n.16.) Plaintiff claims this statement was a "product of a desire to be closer to family, combined with frustration at the inadequate care currently being provided at FCC Butner, as at the time of the deposition he was 'sitting at Butner FMC and the hospital is right down the street and they're not taking care of me right now.'" (*Id.* (citing Washington Dep. 280:7-19, ECF No. 235-15).)

In reply, Defendants argue granting Plaintiff a permanent injunction is inconsistent with Plaintiff's deposition testimony that he wished to be transferred to FCC Petersburg (which is a Level 2 care facility) and with his assertions that he requires placement in a Level 3 or a Level 4 care facility. (ECF No. 236 at 8–9.) Defendants allege Plaintiff is classified a Level 2 inmate and is only placed at a Level 3 facility because of "continued issues with [him] accepting disability accommodations offered by BOP staff." (*Id.* at 9.)

It is well settled that any deprivation of constitutional rights "for even minimal periods of time" constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

An irreparable harm is also one "requiring a remedy of more than mere money damages." *Ford v. Reynolds*, 316 F.3d 351, 355 (2d Cir. 2003) (internal citations and quotation marks omitted). "[T]he mere fact that a plaintiff may recover damages does not negate his right to injunctive relief." *PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 128 (4th Cir. 2011) (citing *Lyons P'ship, LP v. Morris Costumes, Inc.*, 243 F.3d 789, 801 (4th Cir. 2001)). Where monetary damages are difficult to ascertain, remedies at law are generally inadequate. *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994).

Although Plaintiff is presently housed in an FCC that provides care for Level 3 inmates, Plaintiff has offered evidence that the treatment he received in his earlier placements was inadequate and inconsistent. (*See* Kotecha Report, ECF No. 235-28.) Further, although Defendants contend Plaintiff's current treatment is adequate and appropriate, Plaintiff has also shown that there is no evidence in the record to confirm that he will continue to receive this type of care absent a court order. Moreover, Plaintiff has established that, based on his prior experiences, a delay in care would result in pain and a further loss of vision. Accordingly, the potential injuries identified by Plaintiff are more than merely possible and are not too remote. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (stating that an injunction will not be issued if there is only a "possibility" of irreparable injury). The Court finds that Plaintiff has offered sufficient evidence to establish a question of fact as to whether he will suffer irreparable harm if he is denied a permanent injunction.

### b. Threatened Injury Outweighs Harm to the Opposing Party

Defendants contend Plaintiff has been offered all the medical care and disability

accommodations that he requested. (ECF No. 230 at 33.) They argue Plaintiff's refusal to accept the medical treatment provided by the BOP does not justify the harm that would be caused if the Court issued a permanent injunction requiring the BOP to keep him at a specific institution, especially if Plaintiff desires to be transferred elsewhere. (*Id.*) Defendants assert the BOP will be harmed by the Court entering a permanent injunction because the injunction will interfere with the orderly administration of its institutions by requiring an inmate remain at one specific prison complex. (*Id.*) Defendants further contend that prison officials are to be given deference regarding the execution of prison policies and practices. (*Id.*) Defendants argue the balance of equities does not tip in Plaintiff's favor and his request for a permanent injunction should be denied. (*Id.* at 34.)

In response, Plaintiff contends the balance of equities *does* tip in his favor because the BOP will not suffer significant harm if a permanent injunction is granted. (ECF No. 235 at 27.) Plaintiff acknowledges that the Court typically gives deference to prison officials' decision making as long as the officials are pursuing a rational penological objective. (*Id.* (citing *Wetzel v. Edwards*, 635 F.2d 283, 288 (4th Cir. 1980).) However, Plaintiff argues that the BOP's decision "to repeatedly transfer him to facilities incapable of managing his medical needs, depriving him of consistent access to his medications and access to necessary medical specialists, furthers no legitimate penological objective." (*Id.*) Plaintiff further contends Defendants' expert was not able to identify any evidence that Plaintiff received the benefit of an ophthalmologist, optometrist, low-vision specialist, or inmate companion during the periods he was transferred among different institutions. (*Id.* (citing Ulrich Dep. 254:12–255:3).) Plaintiff asserts BOP's actions caused him to experience not only increased pain, but permanent loss of vision.

(*Id.* at 28.) He argues that there is no evidence he would remain at a facility like FCC Butner after his litigation is resolved. (*Id.*) Plaintiff claims the BOP will not suffer harm by being forced to comply with its constitutional obligations. (*Id.*) Moreover, Plaintiff asserts there are only twenty-four blind inmates in BOP custody out of the total population of over 176,000 inmates, and the BOP has "numerous facilities that are designed to provide greater medical assistance than they have been willing to give [Plaintiff]." (*Id.*)

When considering the balance of hardships between the litigants and the impact on the public at large prior to issuing an injunction, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. "In granting injunctive relief, a court must also pay particular regard for the public consequences of employing the extraordinary remedy of injunction. Where the harms of a particular injunctive remedy outweigh the benefits, a court may decline to adopt it." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 201 (4th Cir. 2005).

The Court finds that Plaintiff has made a sufficient showing that a genuine issue of material fact remains as to whether the balance of hardships between Plaintiff and Defendants weighs in favor of granting Plaintiff permanent injunctive relief. Plaintiff introduced evidence showing that his medical care was inconsistent from the time he was transferred to the BOP's South Carolina prisons. (*See* Kotecha Report, ECF No. 235-28.) On the one hand, it is clear that the BOP has discretionary authority to determine where and under what circumstances a prisoner is house, and thus retains an interest in maintaining control over such matters of prison administration. However, Plaintiff also has a protectable interest in having his medical needs attended to while he is in BOP custody

and subject to its sole control over medical decisions on his behalf. The evidence shows that, prior to being housed at FCC Butner, Plaintiff's medical needs were at times left unmet and that his numerous transfers from one institution to another interfered with him receiving timely treatment from eye care specialists, medications, and assistance, despite notice provided to the BOP that these things were medically necessary. (*See* Kotecha Report, ECF No. 235-28; Tremblay Letter, ECF No. 229-1 at 40.) Accordingly, Plaintiff's interest in remaining at an institution with the appropriate care level to establish therapeutic relationships and access medically necessary services is significant. Additionally, there is no evidence that a directive to the BOP that it retain Plaintiff at his current location or a comparable facility would unduly burden the BOP or excessively intrude on its discretionary authority over prison management. The Court finds that it would be inappropriate to grant summary judgment in Defendants' favor on this factor given the record evidence.

### c. Affect on the Public Interest

Defendants contend the public interest factor does not weigh in Plaintiff's favor. (ECF No. 230 at 34.) Defendants claim Plaintiff is receiving the requested medical care and the Court would "set detrimental precedent by requiring that an inmate be housed at one location long term, without statutory authority." (*Id.*) Referencing Magistrate Judge West's first Report and Recommendation on the preliminary injunction issue, they argue the Court "should not 'improperly involve itself in matters of prison administration best left to the discretion of prison officials.'" (*Id.* (quoting ECF No. 67 at 10).)

In response, Plaintiff contends that, at most, the record shows continuing deficiencies in the care provided at FCC Butner and, at the least, the record contains

genuine issues of material fact as to the manner in which the care is provided. (ECF No. 235 at 29.) Plaintiff asserts Defendants cannot establish that the public does not have an interest in inmates being provided constitutionally sufficient medical care and treatment. (*Id.*) He claims it is "within the public interest to ensure that the health and safety of inmates housed within federal correctional facilities are not placed at risk by prison officials' disregard for the serious healthcare needs of inmates." (*Id.*) As such, Plaintiff argues a permanent injunction is required to ensure that "the BOP does not continue to disregard Washington's constitutional rights, as they have done time and time again." (*Id.* at 29–30.)

In reply, Defendants argue granting Plaintiff a permanent injunction is inconsistent with the purpose of the First Step Act[10] and with Plaintiff's deposition testimony that he wished to be transferred to FCC Petersburg, which is not a Level 3 or Level 4 care facility. (ECF No. 236 at 8–9.) Defendants assert Plaintiff is classified as a Level 2 inmate, and he is only placed at a Level 3 facility because of his "continued issues with accepting disability accommodations offered by BOP staff." (*Id.*)

The undersigned finds that the Court has jurisdiction to issue injunctive relief under the circumstances of this case. The Court previously explained:

> While it is true that BOP maintains discretion in deciding where to house federal inmates and what medical care they should receive, that discretion is not unbridled, in the sense that specific exercise of that discretion is still subject to review for compliance with federal law, here, the Eighth Amendment to the U.S. Constitution. In other words, even within categories of decision-making normally committed to agency discretion, there is a line where the scope of discretion stops and violations of constitutional rights begin. Accordingly, the Court joins other courts in concluding that it has the authority to remedy unconstitutional conduct, even when that authority infringes upon BOP's general discretion over inmate housing and medical

---

[10] Formerly Incarcerated Reenter Society Transformed Safely Transitioning Every Person Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018)

treatment. *See, e.g., Royer v. Fed. Bureau of Prisons*, 933 F. Supp. 2d 170, 180–82 (D.D.C. 2013) (holding that "Congress has not explicitly precluded review of constitutional claims" arising from BOP's housing determinations, and stating that review of such claims does not entail "reviewing the merits of BOP's decision as to where [the inmate] is housed, but [rather] the constitutionality of the conditions of confinement it places on him regardless of where he is housed" (emphasis in original)); *see also, Webster v. Doe*, 486 U.S. 592, 601 (1988) (holding that § 102(c) of the National Security Act precluded judicial review of the CIA Director's employment termination decisions, but did not preclude review of constitutional challenges based on those same termination decisions).

(ECF No. 169 at 5–6.)

The undersigned disagrees with Defendants' claim that granting Plaintiff's request for an injunction is inconsistent with the First Step Act because the designation of the place of Plaintiff's confinement is not reviewable under 18 U.S.C. § 3621(b) and 5 U.S.C. § 701(a)(1) and (2). Although 5 U.S.C. § 701(a) and 18 U.S.C. § 3621 generally preclude judicial review of BOP discretionary decisions, these statutes do not preclude judicial review of BOP actions that are alleged to be contrary to established federal law, the Constitution, or its statutory authority. *See Tapia v. United States*, 564 U.S. 319, 331 (2011) (finding that the BOP has plenary control over the place of a prisoner's confinement subject to statutory constraints); *Reeb v. Thomas*, 636 F.3d 1224, 1228 (9th Cir. 2011) (stating judicial review is available for allegations that BOP action is contrary to established federal law, violates the United States Constitution, or exceeds its statutory authority); *Khdeer v. Paul*, Civ. No. 18-2112 (ECT/BRT), 2018 WL 6919637, at *5 (D. Minn. Nov. 29, 2018), *report and recommendation adopted,* No. 18CV02112-ECT/BRT, 2019 WL 79318 (D. Minn. Jan. 2, 2019) ("Section 3625 generally precludes judicial review of BOP discretionary decisions, but it does not preclude judicial review for any allegations that the BOP's action is contrary to established federal law, violates the Constitution, or

exceeds statutory authority."). Accordingly, the undersigned finds this Court has jurisdiction to consider whether the exercise of the BOP's discretion concerning its housing decisions comports with constitutional standards.

Considering the arguments and evidence presented by the parties, the Court finds that a genuine dispute remains as to whether the public interest would be disserved by a permanent injunction. Prisoners have a constitutional right to adequate medical care while incarcerated. While it is true that the public has an interest in the efficient management of prison systems, that interest must give way where the provision of constitutionally-required care is in jeopardy. Courts have held that the discretion of prison officials must be tempered by constitutional considerations. *See Lato v. Attorney Gen. of U.S.*, 773 F. Supp. 973, 978 (W.D. Tex. 1991) (noting prison officials' discretion is "[s]ubject to constitutional requirements"). This is particularly true where, as here, the injunctive relief requested will not unduly increase prison expenses or restrict the prison's overall management discretion. Accordingly, the Court declines to grant summary judgment in Defendants' favor on this factor and finds that summary judgment is inappropriate on Plaintiff's request for permanent injunctive relief generally.

## IV.   Conclusion

For the foregoing reasons, Defendants' Motions for Summary Judgment (ECF Nos. 229 & 230)  are DENIED.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

February 3, 2019
Charleston, South Carolina