UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ORANGEBURG DIVISION

| | | |
|---|---|---|
| Burl Washington, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:16-03913-BHH |
| | ) | |
| vs. | ) | |
| | ) | |
| Federal Bureau of Prisons and the United States, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter is before the Court on the claims of Plaintiff Burl Washington ("Plaintiff"), a legally blind federal prisoner who was previously housed at Federal Correctional Institution ("FCI") Williamsburg, FCI Estill, and FCI Edgefield, which are all located in South Carolina. He is currently confined in FCI Butner Medium, within the Federal Correctional Complex ("FCC") Butner, in Butner, North Carolina. Plaintiff claims he was discriminated against because of his disability ("Rehabilitation Act claim") (3d Am. Compl. ¶¶ 108–19, ECF No. 197), and that he has been subjected to cruel and unusual punishment due to the Federal Bureau of Prisons' ("BOP") and the former Individual Defendants'[1] inconsistent medical care and failure to provide the medical and personal assistance that Plaintiff needs due to his blindness ("Injunctive Relief claim" and "*Bivens*

---

[1] The Court refers to Dr. Richard Lepiane, Nurse Eve Ulmer, and the Estate of Dr. G. Victor Loranth as the "former" Individual Defendants because Plaintiff's Eighth Amendment claims against them as individuals ("*Bivens* claims") were dismissed pursuant to the Court's August 26, 2022 ruling on their Federal Rule of Civil Procedure 12(c) motion for judgment on the pleadings. (ECF No. 320.) However, there is essentially complete overlap between the alleged conduct pertaining to Plaintiff's dismissed *Bivens* claims and his FTCA/Injunctive Relief claims, which proceeded to trial. Therefore, for ease of reference, the Court will continue to refer to Dr. Lepiane, Nurse Ulmer, and Dr. Loranth collectively as the "Individual Defendants" even though, as both a procedural and substantive matter, they have been dismissed as party defendants to this action. (*See id.* at 16.)

claims") (*id.* ¶¶ 120–38). As to the United States, Plaintiff alleges medical malpractice and violation of the Federal Tort Claims Act ("FTCA") through the Individual Defendants and BOP's alleged failure to (1) provide medically necessary treatment, surgery, consultations, physical and occupational therapy, tools, assistance, and education necessitated by Plaintiff's condition; (2) provide or exercise due care; and (3) provide health care services. (*Id.* ¶¶ 139–56.) A bench trial was held from August 23, 2022, through August 29, 2022. (ECF Nos. 318, 319, 321, 322, 323.)

Plaintiff's overarching theory of the case was that he has a chronic and progressive form of glaucoma that can be slowed through medications and surgical options, that reducing glaucoma-related eye pressure can reduce eye pain and limit damage to the optic nerve, that a gap in treatment from August 28, 2014 to January 25, 2015 denied him timely access to a vital laser surgery to his left eye, that a lack of assistance in administering prescribed eyedrops caused him to suffer additional eye pressure and vision loss, that the confinement facilities where he was housed prior to FCI Butner Medium were ill-equipped to manage his necessary medical care and accommodate his disability, and that as a result of Defendants' inability and/or refusal to provide him necessary treatment, care, and accommodations he suffered increased pain and more rapid vision loss. Defendants' general theory of the case was that Plaintiff himself hampered the BOP's persistent good faith efforts to implement the care to which he was entitled, that prisons only operate effectively when both staff and inmates follow established rules to ensure that inmates receive necessary care, that Plaintiff failed to follow prison rules and consistently rejected care and assistance if it was not offered or provided in the specific ways he wanted, in compliance with his specific requests, and in

his specified timing, that Plaintiff did not indicate he was unable to use the prescribed eyedrops on his own until he got to FCI Williamsburg, at which point he had already been using eyedrops for at least six years, that Plaintiff's response and behavior as to receiving disability-related assistance that he undoubtedly needed was to prohibit and sabotage the receipt of such assistance, that blindness does not in and of itself qualify an inmate for placement within a Federal Medical Center ("FMC"), and that Plaintiff's treatment and accommodations while incarcerated have been in accordance with the FTCA and the Rehabilitation Act. After thoroughly considering all of the testimony, relevant evidence of record, and the arguments of the parties, the Court concludes that Plaintiff failed to meet his burden of proof with regard to his FTCA claim, Rehabilitation Act claim, and Eighth Amendment Injunctive Relief claim. In support of that conclusion, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### A. Background

Plaintiff was diagnosed with open angle glaucoma in 2005, four years prior to entering BOP custody. Glaucoma is a serious medical condition and Plaintiff is legally blind. Plaintiff's vision was already substantially impaired when he entered federal custody. Plaintiff was prescribed eyedrops to help control his eye pressure as early as 2011.

### B. FCI Williamsburg

Plaintiff arrived at FCI Williamsburg on October 25, 2013. Plaintiff alleges Defendants ignored and disregarded the express instructions of Plaintiff's treating ophthalmologists during his confinement at FCI Williamsburg.

### 1. Daniel Whitehurst, RN

Daniel Whitehurst ("AHSA Whitehurst") is a United States Public Health Officer with approximately seven years of service in the U.S. Air Force and approximately fifteen years of service in the U.S. Public Health Service. From May 2012 through October 2015, AHSA Whitehurst served as the Assistant Health Services Administrator at FCI Williamsburg. In that role, he was responsible for managing fifteen to twenty nursing, pharmacy, and administrative staff, for health care budgeting, and for dictating health care operations within the facility. AHSA Whitehurst is a registered nurse, so in addition to his administrative duties, he would fill in from time to time in the clinical setting. AHSA Whitehurst explained that the medical doctors at FCI Williamsburg report to the facility Clinical Director, and ultimately to the Associate Warden and Warden of the facility. Dr. Loranth was the Clinical Director during Plaintiff's period of incarceration at FCI Williamsburg.

AHSA Whitehurst testified that all BOP facilities have a care level designation and that FCI Williamsburg was a Level 2 facility. Level 2 facilities are equipped to serve the medical needs of prisoners who take chronic medications and who require chronic care, such as prisoners with diabetes. This includes inmates that need at least one doctor's visit per year. However, Level 2 facilities are not equipped to serve inmates that need constant care, such as assistance with activities of daily living ("ADLs").

At FCI Williamsburg, facility staff is assigned to the pill line based on staffing level and pharmacy staff generally run the pill line. Pill line is called as housing units are called for meals, before breakfast, before lunch, and after count before dinner. Inmates show identification in pill line and a computer is used to track each inmate's medications;

4

inmates are assigned their own drawer, accessible to the staff, that keeps their medications. It is at each inmate's discretion as to whether they actually take the medications they receive; for example, they could take half of them, all of them, or none of them. Staff cannot force inmates to take their medications. The pharmacy consists of a service window with a small room; only one inmate is allowed at a time.

For inmates in the Special Housing Unit ("SHU"), staff print a medical record and bring it along to the SHU, so that they know what medications to administer to each inmate. Medications are hand charted in the SHU because there is no computer. AHSA Whitehurst testified that, regarding medications, it is within the discretion of treating BOP doctors whether to follow the recommendations of an outside provider and implement them internally. At FCI Williamsburg, there is a meeting every two or three weeks to determine whether a recommended referral to an outside provider was necessary or whether alternative options were appropriate. At these "utilization review meetings," facility medical staff look at the whole-inmate picture and it is ultimately up to the Clinical Director to approve or deny the consult in question. Dr. Loranth ultimately made the final decision on whether an inmate saw an outside provider. When an inmate comes back from an outside consultation, a nurse makes a notation in the inmate's record and the ordering provider, in turn, receives the notated information.

AHSA Whitehurst explained that the BOP Medical Designations Unit in Grand Prairie, Texas makes the decisions about the care level designation for BOP inmates. However, the Clinical Director or Health Services Administrator at a facility can submit for an individual care level designation to be changed if they believe it to be necessary.

AHSA Whitehurst is personally familiar with Plaintiff and knew that he was

designated as legally blind at FCI Williamsburg. During the relevant time period, there were one or two other legally blind inmates at FCI Williamsburg, out of a total population of 1,300 to 1,500 inmates. AHSA Whitehurst stated that if a legally blind inmate needed assistance travelling around the FCI Williamsburg compound the custody unit had a buddy program, but he was not certain what the procedure or policy was because it was a custody program not a medical program. AHSA Whitehurst reported to Commander Urrea, who was the Health Services Administrator ("HSA") during the relevant time period. He did not discuss Plaintiff's care level designation with Commander Urrea.

Regarding whether Plaintiff was able to navigate around FCI Williamsburg on his own, AHSA Whitehurst stated that he remembers circumstances where Plaintiff was approximately twenty-five feet away and called his name, which indicated to him that Plaintiff had some ability to see shapes and to recognize his surroundings, including people at a distance. AHSA Whitehurst observed Plaintiff going around the compound at times by himself and specifically going around the recreation yard. He testified that Plaintiff used to go to the recreation yard on his own and that AHSA Whitehurst and others observed Plaintiff walking around without using his blind-assistance cane, just carrying it. AHSA Whitehurst conceded that he also saw Plaintiff with another inmate escorting him at times. He did know whether Plaintiff was ever trained on using the cane. He did not know if Plaintiff was provided a talking watch, large print reading materials, or braille materials.

AHSA Whitehurst did not provide direct medical care to Plaintiff, but he met with him at medical open house sessions and helped direct him to care. During lunch AHSA Whitehurst would stand at main line for an hour to an hour and a half and help answer

6

any questions inmates might have. These are the times when AHSA Whitehurst had direct interaction with Plaintiff.

AHSA Whitehurst testified that Plaintiff was designated as a care Level 2 inmate while at FCI Williamsburg. Plaintiff was prescribed eyedrops for his glaucoma at the time. Eyedrops are usually self-carry medications, and at times Plaintiff's eyedrops were self-carry. At other times Plaintiff was required to go to pill line to retrieve his eyedrops, based on his physician's discretion.

During his time at FCI Williamsburg, Plaintiff was seen by outside providers at the Storm Eye Clinic ("Storm Clinic") of the Medical University of South Carolina ("MUSC"). Plaintiff's Exhibit 2259[2] was admitted and AHSA Whitehurst explained that this medical record pertained to a February 25, 2014 visit to MUSC, wherein cataract surgery was recommended. If such a referral to an outside provider was approved by internal review— a process including the periodic utilization review meeting and final approval from the Clinical Director, Dr. Loranth, described above (*supra* at 5)—the referral would be printed and transmitted, along with any accompanying medical documentation, to a third-party scheduler called, Seven Corners, which was the entity responsible for setting up the appointment and paying the outside provider. The cataract surgery on Plaintiff's right eye recommended in PE 2259 was ultimately approved and completed on July 23, 2014, as documented by Dr. Nutaitis of the Storm Clinic in his surgical notes. (*See* PE 2269.)

AHSA Whitehurst clarified that prison medical staff did not receive outside

---

[2] For ease of reference, the Court will refer to Plaintiff's exhibits as "PE" with the exhibit number, and to Defendants' exhibits as "DE" with the relevant exhibit number and the bates number in parentheses. The use of these labels corresponds to the manner in which the parties referred to the documents, and specific pages within the documents, at trial. Except where explicitly noted, all references to exhibits in this Order pertain to exhibits that were duly admitted into evidence.

provider's dictated medical notes (*e.g.*, PE 2269) on the same day that those medical records reflect they were made. Rather, prison medical staff would receive, for example, handwritten discharge papers provided in person at the time of the outside procedure. Post-operative instructions on such discharge papers would be received by a BOP nurse, who would write a BOP medical note and send it to the relevant BOP physician for co-signing. On any outside medical trip, BOP staff would provide a manila envelope with the referral and other relevant paperwork to the escorting officers. For safekeeping, prisoners are not permitted to have the paperwork. Upon return, the escorting officers would give the trip packet, now inclusive of any discharge papers, to the nurse for entry of relevant data into the electronic medical record. The hard copy of the trip packet would be placed in the BOP physician's—here, Dr. Massa—mailbox so that he could see it the next day and reference the electronic note back to the hardcopy paperwork.

PE 2270, a post-operative BOP medical note for Plaintiff's July 2014 cataract surgery, included an instruction for Plaintiff to use three different eyedrops, one drop each, four times a day. The instructions included a direction to wait five (5) minutes between drops. AHSA Whitehurst did not know whether Plaintiff had a watch at the time, so he could not presume whether Plaintiff had a way of precisely tracking the five-minute gap between drops.

In PE 2298, the BOP pharmacist noted that Plaintiff reported to medical staff that he ran out of his eyedrops every month. According to the note, Plaintiff represented that he ran out of the eyedrops because he could not tell how many eyedrops were hitting his eyes. AHSA Whitehurst was not aware of this report by Plaintiff at the time. As to whether AHSA Whitehurst would have any reason to disagree with Plaintiff's assertion regarding

difficulty putting in the eyedrops, AHSA Whitehurst clarified that he had seen other medical notes where Plaintiff was clearly able to distinguish the color on different bottle tops—for example, at one point Plaintiff stated, "I don't want the one with the red top." If Plaintiff was having difficulty administering the drops on his own, the medical staff would have had to make an assessment and go to the Clinical Director for an instruction regarding whether to send Plaintiff to pill line to ensure that he was getting his drops effectively, or to continue Plaintiff on a self-administration regimen. Plaintiff's statement regarding the difficulty he experienced administering his eyedrops was entirely subjective, so AHSA Whitehurst could not affirm its truth or falsity.

In PE 2273, a BOP medical record dated July 30, 2014, Dr. Loranth described Plaintiff as being "inappropriate" in the use of his eyedrops because he continued to request refills. Accordingly, Dr. Loranth instructed Plaintiff to be seen "QID" at the Health Services Unit ("HSU"), which meant that he would be seen four times per day for nurses to administer his eyedrops. AHSA Whitehurst testified that, in his experience, most eyedrops can be self-administered if the patient is taught the correct procedure. In the BOP setting, it is ultimately the Clinical Director or the treating physician's decision whether a patient self-administers medications or has BOP staff administer medications. In this case, the decision was made by Dr. Loranth.

AHSA Whitehurst was not aware whether or not Plaintiff had a companion to help him get to the HSU to be seen QID. He stated that he does not recall having any conversations with Dr. Loranth about Plaintiff having a companion. Nor does he remember ever having a conversation with Plaintiff about an inmate companion.

AHSA Whitehurst testified that after the July 2014 cataract surgery on his right eye,

an additional surgery was recommended for his left eye. However, the response to this recommendation was complicated by issues that BOP medical personnel were already having with Plaintiff's follow-up care pertaining to his right eye. Specifically, Plaintiff did not attend his follow-up appointment the day after cataract surgery due to an issue that he instigated, and he was not compliant with his eyedrops as directed.

AHSA Whitehurst was confronted with PE 2286, an August 28, 2014 medical record written by Dr. Nutaitis, which states that the glaucoma in Plaintiff's left eye was inadequately controlled and that failing to have surgery in that eye risked worsening of the glaucoma. Dr. Nutaitis recommended an increase in one of Plaintiff's medications, methazolomide, to three times daily, darker sunglasses, and diode laser surgery for glaucoma in Plaintiff's left eye. AHSA Whitehurst stated that BOP staff had an issue with Plaintiff the month prior when Plaintiff refused his trip for follow-up care pertaining to the surgery on his right eye. He testified that if BOP medical staff sends someone out for surgery, they want to make sure the patient is going to take his medications as prescribed and be engaged in his own care. He explained that the August 28 visit was a continuation of the outside referral for both eyes and so it ended up functioning as both a follow-up of the July 23 cataract surgery and an evaluation of Plaintiff's left eye. After surgery was recommended at the August 28 visit, it would be up to a medical provider at FCI Williamsburg to determine whether to accept that recommendation, and then it would need to go through scheduling. The Clinical Director typically makes a determination about the general range of time in which a recommended surgery should be scheduled, such as thirty, sixty, or ninety days, depending on how emergent the situation is. Then the referral is sent to Seven Corners (*see supra* at 7) and they do their best to get it

scheduled. Availability and timing also depends on the outside provider, in this case Storm Clinic. It further depends on the medical needs of other inmates who may also be pending surgery and need to be scheduled. AHSA Whitehurst did not know the internal timeframe determination that was given to Seven Corners as he was not presented with the referral and associated notes pertaining to the surgery proposed for Plaintiff's left eye.

AHSA Whitehurst testified that the process of Plaintiff receiving the recommended surgery would be "two-fold"—first, the Clinical Director would decide whether Plaintiff would get the surgery, then Seven Corners would schedule it. In PE 2273, Dr. Loranth noted that Plaintiff was being very difficult to handle. AHSA Whitehurst explained that administrative notes of this kind are sometimes included in the medical record in order to give the rest of the medical staff a heads-up about a particular prisoner's behavior. AHSA Whitehurst stated that PE 2273 was not his medical note, that he is not a physician, and that Dr. Loranth was the Clinical Director; however, he concluded that Dr. Loranth's comments in PE 2273 were likely associated with the aftermath of Plaintiff's right-eye cataract surgery because, the day after that surgery, Plaintiff refused his follow-up trip and was argumentative. AHSA Whitehurst can remember two instances in which he discussed with Dr. Loranth strategies about treating Plaintiff and Plaintiff's behavior with respect to his medical treatment—first, a discussion about Plaintiff not going on his medical trip the day following cataract surgery, and second, a subsequent trip to Storm Clinic for surgery when Plaintiff refused to have the surgery done. AHSA Whitehurst had to notify Dr. Loranth that Plaintiff refused surgery while Plaintiff was at MUSC.

In PE 2275, a BOP medical record dated August 1, 2014, Dr. Loranth documented his suspicion that Plaintiff was manipulating his medication to cause his eye pressure to

fluctuate. AHSA Whitehurst does not remember ever having a conversation with Dr. Loranth about this comment or Dr. Loranth's perspective on Plaintiff's behavior. In PE 2296, a BOP medical record dated March 16, 2015, Dr. Loranth stated that Plaintiff's complaints were to be taken with a grain of salt. AHSA Whitehurst conceded that Dr. Loranth was responsible for deciding whether Plaintiff got the recommended eye surgery, that the ophthalmologist at MUSC indicated Plaintiff's eye pressures were not adequately controlled, and that Dr. Loranth was not an ophthalmologist.

PE 2301, a May 19, 2015 medical note by Dr. Tremblay of the Storm Clinic, reflects that Plaintiff had still not received the eye surgery recommended in August 2014, and recommends again that glaucoma surgery be performed on Plaintiff's left eye. In PE 2302, a BOP medical record dated May 20, 2015, Dr. Loranth indicated that he would write a consultation for the recommended surgery. AHSA Whitehurst testified that this would then be sent to Seven Corners for scheduling, but the eventual availability of the surgery would depend on Dr. Tremblay's schedule. For security reasons, BOP medical staff avoid telling inmates the date of their follow-up appointments, so, when scheduling the surgery, BOP (through Seven Corners) would not have used either of the specific dates referenced by Dr. Tremblay in PE 2301 as dates that he was available, because those dates were in the medical record and potentially could have been known by Plaintiff ahead of time. AHSA could think of two cases off the top of his head where medical trips went badly, and one that caused death, so the security concerns related to scheduling were real.

AHSA Whitehurst agreed that the span of time between the end of August 2014 and middle of May 2015 was approximately eight or nine months, and that this was longer than the general time frame in which surgery is scheduled, which, if the outside provider

is able to accommodate the BOP patient within the provider's schedule, is often two to three months. However, AHSA Whitehurst clarified that he did not know what the original time parameter was, that he did not know what the conversation was between Seven Corners and Storm Clinic, and that he did not know what was going on between August 2014 and May 2015—for example, whether BOP medical staff was sending Plaintiff to the in-house optometrist to check his eye pressures.

AHSA Whitehurst was confronted with PE 2305, a June 10, 2015 (Wednesday) letter from Dr. Tremblay, which states that it is medically necessary for Plaintiff to receive assistance with ambulation, and which recommends that a proctor, sitter, or nurse be offered to assist Plaintiff in the prison setting. AHSA Whitehurst clarified that this letter never came through BOP medical the way that outside paperwork normally would (*see supra* at 8), but rather was presented by Plaintiff directly to BOP staff in the SHU on June 13, 2015 (Saturday), three days after Plaintiff refused surgery at the Storm Clinic on June 10. AHSA Whitehurst testified that Dr. Tremblay's office called him on the day the surgery was supposed to take place and informed him that Plaintiff was demanding various requests be met or he would not consent to the surgery. AHSA Whitehurst further testified that the things stated and recommended in the letter match the very things Plaintiff was demanding on June 10, as relayed to AHSA Whitehurst by Dr. Tremblay's office on the phone. Thus, AHSA Whitehurst and BOP medical staff were left to conclude that Dr. Tremblay may have provided the letter to Plaintiff to appease him. Otherwise, the contents of the letter seemed to contradict what Dr. Tremblay's office communicated to AHSA Whitehurst on the day of surgery, which was that Plaintiff was demanding his requests be granted and that his argumentativeness prevented the surgery from

13

occurring. Ultimately, Dr. Tremblay ran out of time due to Plaintiff's insistence that his demands be met, and Storm Clinic was unable to complete the surgery because they had to attend to other scheduled patients.

AHSA Whitehurst stated that he has never, over the course of his career with the BOP, seen anything like this before, where an inmate produces a medical letter given to the inmate directly. The BOP medical staff first questioned why Plaintiff kept the letter for three days and did not inform them of it, and second questioned why MUSC did not inform the BOP that they had given Plaintiff such a letter. The June 10, 2015 letter caused a lot of problems inside the BOP medical department because the staff was confused by the contradiction between the information provided by Storm Clinic on the day of surgery— which characterized Plaintiff's insistence on certain conditions as "demands" and described Plaintiff using his refusal to complete the surgery as coercion to obtain those conditions—and the contents of the letter apparently conceding Plaintiff's demands. It was a very frustrating letter to receive because the presumption was that if Plaintiff really cared about his care, and about his eyes, he would want the surgery to move forward so that the problems he had been experiencing could be resolved. On the following Monday, Dr. Loranth tried to contact Dr. Tremblay to get clarification about the letter, and BOP medical staff tried to get ahold of the Storm Clinic to ask why they called the day of surgery to report Plaintiff's unreasonableness but then wrote him the letter anyway.

In response to whether he had information to contradict the assertion that the recommendations in the letter were medically necessary, AHSA Whitehurst noted that a call from a physician's office to BOP medical staff stating that a patient is demanding certain conditions is a red flag, because such demands do not pertain to the clinical

14

treatment of the patient's health issue. In this situation, BOP medical staff were trying to care for Plaintiff's vision and trying to facilitate the treatment necessary to decrease progression of Plaintiff's disease, including coordination of an appointment for surgery at a renowned eye clinic. In AHSA Whitehurst's view, Plaintiff was trying to dictate his own medical care, and, other than questioning whether the letter was given to Plaintiff to appease him in an attempt to accomplish the surgery, AHSA Whitehurst did not know what the mindset was behind the letter. For AHSA Whitehurst, Plaintiff's demand for the letter or to have certain conditions met prior to assenting to surgery was highly irregular and did not demonstrate the normal demeanor of someone who is looking out for their own medical care.

In PE 2306, a BOP medical record dated June 15, 2015 (Monday), Dr. Loranth stated that he did not agree with Dr. Tremblay's assessment of Plaintiff in the June 10 letter. As far as AHSA Whitehurst knows, there was no subsequent letter sent by Dr. Tremblay providing different recommendations than those in his June 10 letter.

When asked to offer further comment about why Dr. Tremblay's letter was so irregular and possibly unprofessional, AHSA Whitehurst stated that in his view it just did not really make sense—on the one hand Storm Clinic was telling BOP medical how bad Plaintiff was being, how difficult he was being, even demanding a specific medication before he would consent to the surgery, but on the other hand Storm Clinic still gave Plaintiff the letter conceding his demands. For these reasons, AHSA Whitehurst was inclined not to give as much credence to the June 10 letter as he normally would to a doctor's letter. The irregularity of Plaintiff possessing the letter himself and producing it only when he wanted to was another red flag. AHSA Whitehurst has never encountered

another situation where an inmate was demanding certain things before the inmate would sign a consent for surgery. In his experience, most patients want to have their surgery done because they have been waiting for a long time.

AHSA Whitehurst testified that whether Plaintiff had a talking watch, large print materials, or braille were all matters of educational assistance and not matters that would be handled by the medical staff. For that reason, he may not know the details of what educational assistance was provided to Plaintiff. AHSA Whitehurst indicated that there are a number of factors that come into play when determining whether a prisoner should self-carry his medications or obtain those medications through the pill line. For example, if the medication is a controlled substance, the prisoner must get it through pill line. If the medical staff believes that a prisoner is not taking his medication appropriately—such as incidences where the prisoner hoards medication—the staff will take that into account when deciding whether to put the prisoner on pill line. The factors informing the decision include the type of medication, the purpose of the medication, potential side effects, and the prisoner's history of compliance. As to compliance specifically, AHSA Whitehurst testified that a patient's "buy-in" to compliance is very important. BOP medical staff try to encourage patient buy-in because they cannot force prisoners to engage in treatment. Rather, they try to help patients understand that the treatment plan is intended to help them, and hopefully improve their health.

AHSA Whitehurst expounded upon the utilization review meetings and how they were used to ensure that the medical department was on track in caring for any particular patient, including Plaintiff. The HSA, AHSA, Dr. Loranth, Dr. Massa, mid-level providers, and a representative from pharmacy would come together to discuss the whole-person

concept with regard to each patient at issue. In addition to deliberating about referrals, problems—such as a particular patient not coming to pill line—would be discussed. The idea was to make sure the entire medical staff was up to speed on what was happening for the patient and to bring all the different components in the health service unit together in the effort to get the patient's body in tune.

In DE 16 (5374), a BOP medical record dated June 10, 2015, AHSA Whitehurst documented his interaction with the Storm Clinic on the day that Plaintiff refused surgery:

> Received call from Dr Tremblays office this am after inmate Washington refused his eye surgery. The resident advised that Inmate Washington was very demanding and requested a letter requesting a proctor/ sitter to help him with his ADL's. They also stated that he would not have surgery until the physician advised certain medications. The physicians stated that it was very frustrating and that they gave Inmate Washington multiple chances to sign the consent for surgery but that he continually demanded certain things be done prior to any surgery. Finally, the physician decided that he could no longer delay the case due to other procedures that where scheduled. Requested that a letter be sent stating these facts.

(DE 16 (5374) (errors in original).) AHSA Whitehurst also had a previous situation in which Plaintiff's own behavior hindered his medical care, documented in DE 15 (5191). In July 2014, after the cataract surgery on Plaintiff's right eye, BOP medical staff had already scheduled him a follow-up appointment to check Plaintiff's eye pressures post-operatively. AHSA was called to the SHU to discuss Plaintiff's concerns with him and to try to encourage him to go on his medical trip. Plaintiff had already been in discussion with the SHU Lieutenant. As the custody staff were trying to get Plaintiff ready to go, he was asking for a winter coat. Coats are given out during certain parts of the year, when they are needed, and taken away during the warm portions of the year. AHSA Whitehurst explained that FCI Williamsburg is built on what is essentially a swamp, and it is very humid and hot in June, July, and August. Plaintiff did not just want to talk about the coat,

he wanted to talk about past medical care and a range of complaints.

AHSA Whitehurst testified that he tried his best nursing skills to repeatedly redirect Plaintiff. He told Plaintiff that he should center on the current problem at hand, which was that Plaintiff had undergone cataract surgery the day prior, that the eye doctor had set aside time for a follow-up appointment for Plaintiff, and that if they did not leave soon, they would not make it to the appointment in time. He explained that the BOP had staff assigned to take Plaintiff on the trip and that they had to leave soon or Plaintiff would lose the trip. AHSA Whitehurst stated that the conversation became a long, drawn-out discussion for twenty or thirty minutes, and that the subject matter was circular, repeatedly coming back to the issue of the coat and Plaintiff's objections to his past medical care. In the end, BOP staff could not take Plaintiff to his appointment because of his argumentative demeanor regarding not being provided a coat and his past medical care. Due to limitations on custody staff, FCI Williamsburg only sent out a set number of trips per day from the institution—at the time, two in the morning and two in the afternoon. So, if AHSA Whitehurst were to arrange for Plaintiff to have an afternoon appointment after they missed the morning time slot, it would have taken medical care from another inmate who had an appointment scheduled in the afternoon. AHSA Whitehurst also would have had to obtain approval from the Storm Clinic by asking if they could still come, since they were beyond the originally scheduled slot. All of this demonstrates that the realities of working within the prison system are more complicated than the process of making what might seem to be simple scheduling adjustments in civilian life. Any time an inmate refuses care, BOP medical staff asks the inmate to sign a refusal form, which documents the inmate's refusal and informs the inmate of the potential health consequences of such

refusal. In this instance, Plaintiff refused to sign the refusal form.

AHSA Whitehurst was shown DE 15 (5182–83), a BOP medical record dated July 30, 2014, in which AHSA Whitehurst noted, "Nursing to advise inmate that eye ggts [drops] are 4x a day at pill line." When asked to clarify, AHSA Whitehurst explained that the outside provider called to inquire as to Plaintiff's missed follow-up appointment and the physician, Dr. Reynolds, was advised of Plaintiff's refusal. AHSA Whitehurst's July 30 medical note memorializes Dr. Reynolds' recommendations regarding eyedrop medications following the cataract surgery. However, whereas the recommendation was for eyedrops four times per day, such a recommendation would be adjusted to accommodate the controlled environment of the prison. In other words, due to factors like movement schedules, lockdowns, staff availability, and the fact that pill line only happens three times daily, this recommendation would have been adjusted to administration of Plaintiff's post-operative eyedrops three times per day. AHSA Whitehurst stated that BOP medical personnel correlate the medical care that is directed as best they can to the inherent limitations of the prison setting. In his view, when they make minor adjustments to chronic treatments, such as eyedrops, to accommodate those limitations it does not jeopardize the care that is required. In the case of an emergent situation, such as antibiotics for a life-threatening infection, BOP medical personnel are more willing to make changes to their normal practices.

AHSA Whitehurst testified that he had direct dealings with Plaintiff in the prison and personally observed him moving about the compound. AHSA Whitehurst does not remember Plaintiff having problems navigating around the compound. He cited the instance when Plaintiff called his name from approximately twenty-five feet away, and

stated it was highly irregular for someone who says they cannot see. He further stated that the BOP medical staff has observed those kinds of actions by Plaintiff on prior occasions, and that there was a common belief that Plaintiff is probably able to see more than he admits. However, AHSA Whitehurst confirmed that his belief regarding the level of Plaintiff's blindness would not affect whether he provided the care that Plaintiff deserved.

AHSA Whitehurst was questioned extensively about whether, after Plaintiff's left-eye surgery was recommended in August 2014, if a referral for surgery was approved prior to the May 2015 referral, such approval would be shown in Plaintiff's medical records (specifically, the electronic medical records repeatedly referenced and admitted throughout the trial). Plaintiff sought to establish the inference that if there was no record of Dr. Loranth approving a surgery prior to May 2015, it is likely that no such approval was given. The collective answer to the various iterations of the question was unclear. AHSA Whitehurst described a "referral management system" in the relevant computer program, wherein the reviewing physician, here Dr. Loranth, was presented with a queue of potential referrals, and explained that once a particular referral was electronically clicked off and signed, the referral moved from preauthorization to authorized. From there, AHSA Whitehurst would print the authorized referrals and take them to the utilization review meeting (*see supra* at 7) for final approval and transmission to Seven Corners via fax. It was unclear whether or how this stage of the paperwork would be represented in Plaintiff's medical record.

### 2. Plaintiff's Testimony Regarding FCI Williamsburg

Plaintiff Burl Washington is fifty-five years old and was born in Virginia. He is the

fifth of eight children, having four brothers and three sisters. He described his family as being close and providing a good support team for one another. Plaintiff stated that he was first diagnosed with glaucoma in 2005.

In 2005, Plaintiff remembers being in Missouri. He does not remember his eye pressures being high at that time. He was still moving around freely, driving a car, and had no real difficulty seeing or reading. Plaintiff stated that he took a fall in 1999, which led to arthritis throughout his body, which is painful and was giving him pain in 2005. Plaintiff stated that the pain he experiences from arthritis still gives him troubles now, and it is exacerbated when he feels cold. He further stated that the combination of being cold with the arthritis can be extremely painful, to the point where he probably could not get up out of the chair without assistance.

Plaintiff testified that in the time period between 2005 and when he was transferred to FCI Williamsburg in 2013 he had multiple surgeries on his eyes. His understanding at the time was that his glaucoma was a serious medical condition, but that it did not have to lead to blindness if treated properly. Plaintiff's biggest fear was going blind. He was accustomed to family reunions, outings, and trips, and he wanted to give the same opportunities to his kids, so the loss of his vision "would play a drastic part in that," and "being blind was not in [his] plans."

When asked how his vision changed between 2005 and the time he was transferred to FCI Williamsburg, Plaintiff stated that his eye pressure had increased and his vision had decreased, "probably more so from a cataract than glaucoma." He asserted that without going to the appropriate doctors, his eye disease was not diagnosed well, or at least very little information was passed to him. The changes going on with his vision

between 2005 and 2013 made him feel "hurt" and "sad."

Plaintiff was transferred to FCI Williamsburg on October 25, 2013. He remembers that Dr. Loranth and Dr. Massa were physicians there, and that HSA Urrea and AHSA Whitehurst were part of health services. Plaintiff stated that Dr. Loranth thought he was faking his blindness and described Dr. Loranth as hard to talk to. He further stated that he "wanted to believe" Dr. Loranth, because he did not want to be blind, and he hoped that Dr. Loranth was more right than "the doctors" (presumably referring to his treating ophthalmologists).

When asked to describe in layman's terms what his visual acuity was like while at FCI Williamsburg, Plaintiff first stated, "I didn't know. I didn't know what I was seeing." He went on to describe how, after already having been an inmate in the BOP for several years, he knew the arrangement of his cell "like the back of [his] hand." Some elements of the cell might be different, such as the toilet, sink, or locker being in a different corner, but because the room is only about eight feet by five feet, he was familiar with the layout. Plaintiff contrasted this familiarity with the "common area" of the prison, with which he was relatively unfamiliar. However, Plaintiff also testified that, "Inside of a prison setting, nothing moves. Nothing moves but people, period." The point of this testimony appeared to be that certain elements in the environment which Plaintiff was able to navigate to or around—*e.g.*, a trash can—would still be in the same place if he turned around and tried to navigate to or around them again.[3] Plaintiff stated, "So, when I got up and moved around—and what you're asking, what I thought I was seeing, I wasn't. I wanted to believe

---

[3] For the sake of clarity, the Court notes that Plaintiff's testimony was often rambling and only loosely responsive to the questions asked. In these findings of fact, the Court has done its best to distill the purpose of Plaintiff's testimony and what the Court understood Plaintiff to be attempting to communicate.

that my vision was still there. And I conducted myself like that. This is Williamsburg. This is me putting my best foot forward."

Plaintiff testified that the ophthalmologists at MUSC were great. He felt that he and Dr. Nutaitis had a great rapport with each other. Dr. Nutaitis educated him about his condition. Plaintiff stated that Dr. Nutaitis took the time to examine him, study his condition, and understand how it related to his circumstances holistically. He noted that Dr. Nutaitis conducted tests with electronics and machines, as well as placed him in a hall with other people to observe how Plaintiff interacted in that setting. Plaintiff asserted that Dr. Nutaitis prescribed medications and made recommendations according to those observations. Plaintiff stated that he knows Dr. Tremblay, and has spoken to him, but the ophthalmologist he has talked to most often is Dr. Nutaitis. Plaintiff's testimony and demeanor established that he had a clear preference for Dr. Nutaitis and wanted to be treated by him more than others.

When asked about his medications, Plaintiff stated that he was on at least three eyedrops while at FCI Williamsburg. He further stated that it was already difficult for him to take the eyedrops on his own when he got there, and the difficulty "was not because [he] could not do the eyedrops, it was because [he] couldn't do them properly." Plaintiff testified that he could not put the appropriate amount of medication in his eyes and would overmedicate his eyes. He further testified, "That would make the medication run out faster than the 30 days. The pharmacy would not refill the medication. They always told me it was too soon. That caused me to go week—2 weeks without the medication."

Plaintiff testified that the nurses at FCI Williamsburg were great, and they tried to educate him on the appropriate way to put in his eyedrops. He stated that this was the

case both at FCI McCreary and FCI Williamsburg. He further stated, "They tried to teach me. And in both cases, I learned it, but I could not maintain it. And that was the problem." Plaintiff asserted that he was able to administer the drops properly, but he had to have constant instructions and supervision to do so. He believes this was the case because of his limited vision, combined with the fact that he cannot feel it when a drop hits his eye due to the deterioration of the first few layers of his eyes. One of the instructions when administering the eyedrops is to not let the tip of the bottle touch your eye. Plaintiff asserted that he could literally write his name across his eye with the bottle top without feeling it, which created "a major problem for self-administering." However, once the medication started to overflow and touch areas that did have feeling, then he knew that it was in his eyes. Plaintiff asserted that this is what he communicated to the nurses and providers, "all of them," at the various institutions where he was confined.

When asked what his understanding was about what would happen to his eyes if he did not take the eyedrops the way he was supposed to, Plaintiff stated, "At Williamsburg . . . ." Whereupon a long, inexplicable pause occurred in Plaintiff's testimony as the courtroom sat in silence, after which pause, and after being prompted by counsel, Plaintiff resumed by saying, "No. It's not that it's difficult to answer, it's difficult—I'm—I'm—I'm making it difficult for myself, and I'm going to stop doing that." Plaintiff proceeded to give a lengthy, unresponsive answer, asserting that the problems with his eyedrops came about when he was still at FCI McCreary, before he got to FCI Williamsburg, and that he was the one who had to take the initiative to solve the problem of his medication running out early and his prescription not being refilled. According to Plaintiff, though, with the combination of the medical staff teaching him how to use the eyedrops and him

addressing the problem of his unfilled prescriptions with the staff, things were going relatively smoothly. Plaintiff highlighted that when he was "talking to Dr. Nutaitis, he had no worries. Nutaitis said he coming to get me, we going to fix this."

Plaintiff stated that while he was at FCI Williamsburg, taking the eyedrops that were prescribed was important to him. The staff had no difficulty taking him for his July 23, 2014 cataract surgery at MUSC. Plaintiff stated that he was allowed to bring his coat to the surgery that day, in order to help with the issues created by his arthritis when he gets cold. Plaintiff indicated that he even got approval from the Captain prior to the trip, and the Captain gave a standing order, months in advance, that if Plaintiff went out on a trip he could take the coat with him. He further indicated that it was a joke between him and the drivers because it was July. When asked about the situation that occurred the following day, July 24, 2014, where Plaintiff refused to go on a medical trip for his follow-up appointment, Plaintiff gave a rambling answer, spanning several pages of the transcript, centered around the fact that the prison staff would not allow him to take a coat and his informing the staff that he would not choose between care for his eyes and care for his arthritis. Plaintiff described being prepared for the trip and ready to go out the door when the transporter, with whom he was not familiar, would not give him a coat at his request. Plaintiff stated that after arguing about the coat for some time and making a phone call, the transporter took him back to the SHU and put him in the room where the inmates get their hair cut, rather than his cell. Plaintiff further described the staff setting up a video camera,[4] and his reaction: "I said okay, a video camera? So I started dancing."

---

[4] It is unclear how, if Plaintiff's visual acuity was light perception only in one eye and hand motion vision in the other, as documented below (*see, e.g.*, PE 2301 (Dr. Nutaitis May 19, 2015 note)), he was able to discern that the prison staff was allegedly setting up a video camera.

According to Plaintiff, after about twenty minutes passed the staff moved him to another cell and set up the video camera again. He stated that the Warden, the Associate Warden ("AW"), the SHU Lieutenant, AHSA Whitehurst, and perhaps one other person, were there and were trying to convince him that he did not need the coat and should prioritize treatment for his eyes, all while "the camera [was] rolling." Plaintiff further stated that this was part of a formal "refusal ceremony," with the "top people on the compound," not just unit officers. Plaintiff testified that when he continued to insist that he needed both the coat and the medical trip, "[t]hey eventually stop, turn the camera off and walk away. That's it. No refusal. Never, in the history."[5]

Plaintiff disagreed with Dr. Loranth's medical notes in PE 2275 and testified that he has never misused his eyedrops with the goal of increasing his eye pressure. His understanding is that pain and loss of vision result if his eye pressures remain high. As to Dr. Loranth's questioning whether Plaintiff was "blind," Plaintiff stated that in August 2014 he *was* blind, but he did not want to be blind. When he received a letter from a doctor at FCI McCreary saying that he was legally blind, he did not want to believe it. He further stated, "I refused to believe it, to be totally honest with you. And I'm trying to tell you I lived my life according to that at Williamsburg: I'm not blind. This cannot be happening. This is not going to define me. I am not going to be a blind inmate." Plaintiff testified that, at the time, he acted and talked like he could see, but it did not mean that he could.

As to Dr. Loranth's assertions that Plaintiff recognized people at a distance on the compound, and that he saw Plaintiff recognize the Warden at ten to fifteen yards (PE

---

[5] The Court notes that, other than Plaintiff's testimony, there is no evidence that this incident about the coat was video recorded. Nor is there evidence to corroborate Plaintiff's assertion that the Warden and Associate Warden of FCI Williamsburg were present for this exchange. In general, the Court found AHSA Whitehurst's testimony about this incident to be credible, and Plaintiff's testimony to be incredible.

2275), Plaintiff stated that he recognized the Warden by her voice, because she was a prominent person in the prison, and because she was telling him to backtrack out of a portion of the yard where no inmates were allowed to be except him, because he had been granted special permission.[6] Plaintiff testified that AHSA Whitehurst simply made up the story about Plaintiff recognizing him from twenty-five feet away. If Plaintiff did call to AHSA Whitehurst from a distance, Plaintiff speculated that he might have heard someone else say AHSA Whitehurst's name.

Regarding Dr. Loranth's direction that Plaintiff was to be put on pill line for his eyedrops because he was not responsible to handle the issue himself (PE 2275), Plaintiff agreed that he could not handle self-administering his eyedrops at that point. Plaintiff stated that he had difficulty getting to pill line. He further stated that he had an inmate companion to escort him at one point, but then "they took the inmate away from [him]." His inmate companions did not receive any formal training or guidance. Plaintiff testified that when he did not have an inmate companion, he got to pill line by "walk[ing] across the grass." Once he reached the building where he knew medical was located, he would slide down the brick wall until he found the right door. Plaintiff stated that he missed some pill lines at FCI Williamsburg because he did not have another inmate to help him get to medical on time. He further stated that once he did make it to medical, it would have been very helpful for a nurse to administer his eyedrops.

[6] Plaintiff's answer to counsel's question was, once again, very long, rambling, and largely non-responsive. In the middle of his description of recognizing the Warden, he stated, "she said go the other way, like I'm not allowed to walk here, which, she must not have gotten the memo. So I'm walking to her to pull the paper out, because of course I keep it because, it's priceless. That piece of paper is priceless. You want a [corrections officer] to say something just so you could flash it on them, man, if you don't read this." From his tone and demeanor, the Court understood Plaintiff to mean that he relished the opportunity to prove prison staff members wrong when he had been granted special exceptions to certain rules because of his legal blindness.

Plaintiff described two different time frames regarding administration of his eyedrops, one being when the medical staff tried to teach him how to use the drops, the other being when the staff was instructed to administer the drops for him. Plaintiff testified, "And when they were instructed to teach me, they did just that, they taught me. And like I said, it just—it just couldn't stick. And when they instructed the nurses to assist me with the administration of the eyedrops, they did just that three times a day appropriately, and I showed up, I got it. And sometimes the [corrections officer] would not let me make my way there. And when he didn't let me make my way there, those are the times that I wasn't able to get it."

Plaintiff believes he spoke with someone on the medical staff in the weeks following Dr. Nutaitis' August 2014 recommendation of the diode laser surgery (PE 2286), and that whoever he spoke with said the surgery should happen. Plaintiff stated that he never spoke directly with Dr. Loranth about the surgery recommendation. He further stated that he did not refuse the surgery at any point from August 28, 2014, through May 10, 2015. Plaintiff was not aware that Dr. Loranth was taking his complaints with a grain of salt (see PE 2296) in March 2015. When Plaintiff made it back to Dr. Nutaitis on May 19, 2015, he was in a lot of eye pain. At this point in the testimony, Plaintiff gave an extensive, rambling account of the interactions and conversations that he and Dr. Nutaitis allegedly had during the May 19 appointment. Plaintiff asserted that when he told Dr. Nutaitis the medical staff at FCI Williamsburg thought he was faking his blindness, Dr. Nutaitis put him in the hallway and told him to sit down "because he was checking on [Plaintiff] and [his] character." After observing how Plaintiff conducted himself in that setting, Dr. Nutaitis took Plaintiff into his office for a discussion and told Plaintiff that

"according to [his] test" Plaintiff was not faking his blindness. Plaintiff testified, "I said, well, I feel like I can see too. He said you're fooling yourself. He said you cannot see. I was like, man, I don't feel like that. He said you're fooling yourself. He said . . . the damage on your optic nerve is consistent with the damage of a blind person." Plaintiff further testified that he told Dr. Nutaitis the medical staff was not giving him the assistance that he needed regarding ambulation, and Dr. Nutatis responded, "[L]ook man, I know the warden. I'm going to write him a letter, man. And I'm going to tell them this that and the third. I'm going to tell them that you need assistance, you need help with your medication. You know what I mean?"[7]

Plaintiff denied refusing surgery on June 10, 2015. The Court found this denial, among a number of incredible aspects of Plaintiff's testimony, to be particularly incredible. Plaintiff gave a convoluted explanation for why the surgery did not proceed, including that he failed to follow Dr. Nutaitis' instruction not to eat before surgery and that he and Dr. Nutaitis were engaged in further conversations about the letter and how Plaintiff needed help at the institution. Plaintiff asserted that he never talked to Dr. Tremblay. Plaintiff stated that once he told Dr. Nutaitis he had eaten something the night before, "that is when he ended it." He asserted that the medical staff at FCI Williamsburg did not put him on NPO (nothing by mouth) status.

Plaintiff testified that, while at FCI Williamsburg, he was not given a pair of dark sunglasses, a full length blind-assistance cane, a talking watch, braille materials, or a safe/lock for his personal property. He also said that he did not have consistent access

---

[7] Not for the first time during Plaintiff's testimony, the Court felt that this portion was crafted by Plaintiff in an attempt to cure what he perceived to be damaging aspects of prior testimony from BOP witnesses. The Court found it to be deserving of little weight and credibility.

to trained inmate companions.

### 3. Consolidated Findings Regarding FCI Williamsburg

The preponderance of the evidence, along with reasonable inferences from that evidence, establish that Plaintiff demanded the June 10, 2015 letter from Dr. Tremblay, and used his refusal to consent to the diode laser surgery as leverage to obtain the letter. This letter is, in large part, the basis of Plaintiff's claim that it is medically necessary for him to receive ambulation assistance and to have a designated proctor, sitter, or nurse in the prison setting. There is no evidence that Dr. Tremblay, or any of Plaintiff's other outside providers, had the same or similar opportunity to observe Plaintiff's ability to navigate the compound or administer his eyedrops that Dr. Loranth, AHSA Whitehurst, and the rest of the BOP medical staff at FCI Williamsburg had on a day-to-day basis. The preponderance of the evidence supports a finding that Dr. Loranth did not agree with Dr. Tremblay's recommendations because BOP medical staff routinely observed Plaintiff successfully perform the tasks with which Dr. Tremblay's letter stated Plaintiff needed assistance. The testimony established that BOP medical professionals are not required to follow all recommendations from outside consultants and that the inherent constraints of the prison setting sometimes require adjustments in the timing or manner that recommended treatment is provided. It was not established by a preponderance of the evidence that Plaintiff's medical care at FCI Williamsburg was compromised, or fell below an acceptable level, due to such adjustments.

Plaintiff's assertion that the medical staff would not refill his eyedrop prescriptions if he ran out early was not credible. Rather, the evidence demonstrated that when Plaintiff was running out of his medications early, he was placed on pill line to ensure that he was

receiving them and to allow the medical staff the opportunity to observe whether he was administering them properly.

Plaintiff's allegations about a breach in the standard of care largely hinge on the gap in ophthalmological care that occurred after diode laser surgery for Plaintiff's left eye was recommended by Dr. Nutaitis in August 2014. But when Plaintiff eventually did go for surgery at the Storm Clinic in June 2015, he constructively refused the surgery by so extensively delaying Dr. Tremblay and the staff with his demands, that they could not conduct the surgery. It was not established by a preponderance of the evidence that Plaintiff's referral for diode laser surgery was intentionally delayed by Dr. Loranth or postponed as a retaliative measure. Rather, the preponderance of the evidence showed that Dr. Loranth, AHSA Whitehurst, and the rest of the medical staff at FCI Williamsburg reasonably concluded that Plaintiff's combative and sometimes bizarre behavior was sabotaging his own care. (*See, e.g.*, PE 2275 (Loranth August 1, 2014 medical note); *infra* at n.22.)

### C. FCI Estill

Plaintiff was transferred to FCI Estill in September 2015. Plaintiff alleges Defendants ignored and disregarded the express instructions of Plaintiff's treating ophthalmologists during his confinement at FCI Estill. Plaintiff further alleges that Defendants failed to provide him with the assistance he needed to administer his eyedrops and with the accommodations he needed to cope with his disability.

### 1. Richard Lepiane, MD

Dr. Richard Lepiane ("Dr. Lepiane") has served as the Clinical Director at FCI Estill since November 2014, which includes the entire time that Plaintiff was housed at FCI

Estill. Dr. Lepiane graduated from medical school in 1982 and finished residency in 1988. He is board certified in family practice. He does not have a medical specialty in eye care or glaucoma. He has treated glaucoma and eye disease, but he is not a specialist in those areas. As Clinical Director, Dr. Lepiane is responsible for all medical care that is performed at the facility, and he reports directly to the Associate Warden and the Warden. During the relevant time period, the medical staff at FCI Estill consisted of six to seven providers: Dr. Lepiane, two mid-level providers, two nurses, and one to two paramedics.

Dr. Lepiane stated that a very small percentage of the inmates at FCI Estill are blind. There were approximately 1,200 inmates at FCI Estill when Plaintiff was housed there. The majority of medications are not dispensed through the pill line, but there are certain medications that are required to be dispensed through pill line as stipulated by BOP policy. Inmates that receive eyedrops typically administer the eyedrops themselves, so long as they demonstrate that they can successfully administer them. If an inmate is instructed on how to self-administer eyedrops, they may be subsequently placed on pill line if the BOP medical staff finds that the inmate is not using the medications properly or is hoarding the medication. The purpose is to observe that the inmate is using the medications and to document such use. There are generally two pill lines per day at FCI Estill, one in the morning and one in the evening. The medical staff tries to confine the dispensing of medications to the two pill lines, but where a medication needs to be dispensed on a different schedule the staff makes special arrangements. Each inmate's medication is dispensed on an individualized basis, according to how the medication is prescribed. In the situation where Plaintiff needed to wait five minutes between individual eyedrops, he may have had to wait in the waiting room until the next drop was to be

administered. In the SHU, if an inmate is on pill line, a nurse will come and deliver the medication to the inmate's cell and watch them take or use the medication. Regarding outside provider consultations, Dr. Lepiane stated that the BOP medical staff takes the opinions of specialists into consideration and generally follows their recommendations.

Dr. Lepiane was asked to discuss PE 2301, a May 19, 2015 medical note written by Dr. Nutaitis of the Storm Clinic. In the note, Dr. Nutaitis indicates that Plaintiff's vision in his right eye was light perception only and in his left eye was hand motion. Dr. Lepiane explained that this generally describes Plaintiff's vision, and what the ophthalmologist thinks Plaintiff can perceive, but it does not necessarily tell you everything about the Plaintiff's vision. So, the note indicates that Plaintiff could perceive some light and maybe some colors in one eye and could make out some motions with the other eye, indicating some peripheral vision. Being legally blind means he could not read the big E on the vision chart. Dr. Lepiane had no reason to disagree with the findings of the ophthalmologist.

Dr. Lepiane was also asked to discuss PE 2305, a May 22, 2016 medical note written by Dr. Goulas of Goulas Eye Practice ("Goulas Eye"). In the note, Dr. Goulas indicates that Plaintiff's unaided visual acuity is light perception only in both eyes. Dr. Lepiane confirmed that Plaintiff was legally blind when he came to FCI Estill and remained legally blind at the time of Dr. Goulas' examination. The note reflects that Plaintiff's left eye has extremely elevated pressures and that he may lose the rest of his remaining vision if the pressure is not lowered. Dr. Lepiane testified that such eye pressure is typical of glaucoma. The note recommends that Plaintiff be provided assistance using his eyedrops. Dr. Lepiane stated that this recommendation is about a subjective issue and

constitutes Dr. Goulas' subjective opinion of what Plaintiff needs. Dr. Lepiane testified that the goal is to teach the patient to manage his own disease, whether he is self-administering the eyedrops or someone is helping to administer them, whatever needs to be done. He further testified that Plaintiff's eye pressures fluctuated all over the place because sometimes he used his eyedrops and other times he did not. The note recommends referral to an evaluation by a glaucoma specialist, but Dr. Lepiane clarified that Plaintiff was already seeing a specialist at Storm Clinic, and that the visit to Goulas Eye was simply an occurrence of another ophthalmologist evaluating him. Dr. Lepiane later explained that Goulas Eye was not really treating Plaintiff for his eye disease. Rather, it was Storm Clinic that was following Plaintiff's care, prescribing his eyedrops, and performing surgery. Dr. Lepiane thinks Plaintiff was sent to Goulas Eye when he was supposed to have gone to Storm Clinic, and it was a one-time thing.

Dr. Lepiane was questioned about PE 2036, a BOP medical record dated May 23, 2016, wherein Dr. Lepiane documented his review of the May 22 consult report from Dr. Goulas (PE 2035). With regard to the recommendation that Plaintiff see a glaucoma specialist, Dr. Lepiane explained that the consult was already written for the specialist, he approved it, and Plaintiff was scheduled for the trip to MUSC. This was already in process before Plaintiff even returned from Goulas Eye.

When asked about PE 2033, an October 18, 2016 medical note in which Dr. Nutatitis states that if Plaintiff did not receive his medications his eye pressure would stay uncontrolled, Dr. Lepiane testified that Plaintiff's eye pressures would fluctuate according to whether or not he used his eyedrops. When he was not using the eyedrops, and his pressures were higher, that was just the reflection of what Plaintiff was doing himself.

34

Dr. Lepiane testified that when assigning a care level, BOP staff try to pair an inmate with a facility that can provide the care and treatment the inmate will need. If an inmate's disease progresses or worsens, then the inmate's care level designation may increase. Level 1 is the lowest care level, and usually indicates an inmate that is healthy and does not require chronic medications; Level 4 is the highest care level, is relatively rare, and usually indicates an inmate that is in need of urgent treatment, such as a disease that is rapidly progressing or life threatening, and who needs to be transferred to a medical center immediately for continuation of care. BOP policy dictates that blindness is a Level 2 condition. However, if Dr. Lepiane felt, based on subjective criteria, that Plaintiff needed more care, he could possibly qualify for Level 3. Ultimately, care level classification is not the Clinical Director's decision, it is a BOP administrative decision. FCI Estill is a Level 2 facility. So, if an inmate's disease progresses to require Level 3 care, then FCI Estill staff submit a transfer request to move that inmate to a Level 3 institution. Level 3 institutions have 24-hour nursing staff.

In PE 2327, a BOP medical record dated March 7, 2016, Dr. Lepiane notes that Plaintiff was on a hunger strike. When an inmate is on a hunger strike, BOP medical staff attempt to find out what the inmate's concerns are to convince the inmate to eat. During this process, Plaintiff expressed, many times, his desire or felt need to be at a BOP medical center. So, Dr. Lepiane and the medical staff took that into consideration and decided to submit a transfer request for Plaintiff at that time. Dr. Lepiane testified that there are always two parts to every disease—the objective part, having to do with what the patient needs medically, including diagnosis, medications, etc., and the subjective part, having to do with what the patient reports he is needing, how he feels, and how he

is coping. Plaintiff's disease alone did not qualify him for Level 3 care, but his mannerisms and how he coped with his disease led Dr. Lepiane to believe that he needed to be at a facility that could provide greater care. Accordingly, Dr. Lepiane granted Plaintiff's request to seek transfer for him to a FMC. When questioned about the portions of the March 7 medical note that indicate Plaintiff's difficulties with ambulation around FCI Estill, his desire for an inmate companion, and his representation that he could not use his eyedrops, Dr. Lepiane testified that those were the subjective aspects the medical staff observed about how Plaintiff was coping with his disease. As to his ADLs, such as bathing, dressing, and cleaning, Plaintiff clearly demonstrated to the medical staff that he could do those things. By designating certain aspects of Plaintiff's reported condition as "subjective," Dr. Lepiane was not labelling them as invalid; they were an accurate assessment of how Plaintiff was coping with his disease. Therefore, Dr. Lepiane's opinion at the time was that Plaintiff needed more care than FCI Estill was able to provide, which is why he requested a transfer.

PE 2022 is a July 14, 2016 memorandum reflecting the BOP administrative decision denying Dr. Lepiane's transfer request. Dr. Lepiane testified that there are two parts to any such transfer request—first, being blind did not qualify Plaintiff for a transfer, and second, "I felt that he needed more attention; the Bureau felt differently." The BOP memorandum recommended that Plaintiff seek assistance from the State Commission for the Blind.

PE 2023 is a March 2016 email exchange that demonstrates FCI Estill HSA Regina Bradley's effort on Plaintiff's behalf to seek assistance from the Commission for the Blind, and the Commission's indication that they could not provide ADL training. Dr. Lepiane,

who discussed these communications with HSA Bradley at the time, explained that the Commission put BOP medical staff in contact with a contractor who was able to provide some training for Plaintiff down the road (*see infra* at 36). The main goal was to get someone to teach Plaintiff to use a blind-assistance cane. FCI Estill had no resources to do that, so the medical staff first reached out to the Commission, which subsequently put them in contact with the contractor. It took some time to set up this special arrangement, where an outside contractor was willing to come in and teach Plaintiff how to use the cane. The contractor's expertise was on the use of the cane only, and she came to give Plaintiff instructions on how to use it. The training was very unsuccessful. After the training was unsuccessful, Dr. Lepiane did not resubmit a transfer request because Plaintiff did not qualify. Nothing had changed for Plaintiff that would have changed the analysis of his care level at that point.

PE 2370 is a March 2017 letter from Dr. Nutaitis and Dr. Kammerdiener of MUSC, which recommends that Plaintiff have assistance administering his eyedrops because he has difficulty doing it himself. Dr. Lepiane testified that this is again, part of the subjective care of Plaintiff, and is based upon what he told his ophthalmologists during an outside visit. Dr. Lepiane explained that Plaintiff said, "I need help with my eyedrops," so the ophthalmologists wrote it in the record; they did not observe Plaintiff, they were not there every day to take care of him, but this recommendation represents what he subjectively told them and "coached them to write." Dr. Lepiane stated that this recommendation had nothing to do with the medical treatment of Plaintiff's disease. When confronted with the fact that the letter states that a failure to administer the medications could lead to permanent vision loss, Dr. Lepiane testified that BOP medical staff did everything they

could to help Plaintiff cope with his disease and keep his eye pressures down—they gave him the eyedrops, they gave him cups to assist in administering the eyedrops, they taught him to do it, he showed the staff that he could do it, but then he simply would not do it. Dr. Lepiane stated that Plaintiff was resistant in learning these things and he did not want to cooperate, which made it very difficult to manage him and establish a treatment plan.

Dr. Lepiane explained that at certain point, Plaintiff was placed on pill line so that the medical staff could watch him administer his medications. The medical staff suspected that Plaintiff was not using his eyedrops properly because they found a big stash of unused eyedrops in his locker. Dr. Lepiane stated that although Plaintiff showed he could do it, he was not doing it, and that this choice was likely reflected in his elevated eye pressures.

PE 2031 is a BOP medical record which lists Plaintiff's pill-line medications from October to December 2016. The entries on the record show, for each day, the medications Plaintiff was scheduled to receive, the times, and whether or not he received the medications at each opportunity. Any medications that were assigned to pill line would be shown on the record, any medications that were self-carry would not. Plaintiff's eye drops are not listed on this record, indicating that they were still on a self-administration regimen at this point.

PE 2032 is a similar medication administration record ("MAR") beginning in February 2017. The medications on this record have nothing to do with Plaintiff's eye disease, they were pain medications. Where the record reflects an "R" in a particular box, for a particular time on a particular day, it means that Plaintiff refused the medication at that time. It could be that Plaintiff did not need the medicine or that he just did not want it.

The MAR does not show the reason for the refusal. Where the record reflects "NS" in a particular box, it means that Plaintiff was a "no show" at the pill line for medication at that time. It is an inmate's responsibility to be there for pill-line medications. FCI Estill provided an inmate companion for Plaintiff at times, and Dr. Lepiane stated there were difficulties with that arrangement. The MAR would not reflect it if the reason Plaintiff did not show up to pill line was because his inmate companion was not there to help him. Dr. Lepiane stated that there were some inmates assigned to escort Plaintiff that wanted to do it, and others that were not as cooperative and did not want to do it. All the MAR can show is that Plaintiff did not show up for his medication, that is what the BOP medical staff are able to document.

Dr. Lepiane was questioned about the third page of PE 2032 (bates number 6143), a MAR from June 2017 that reflects Plaintiff was on pill line for artificial tears, two drops per eye, three times a day, as juxtaposed with PE 2033, Dr. Nutaitis' October 18, 2016 note, in which he prescribed artificial tears four times per day. Dr. Lepiane testified that artificial tears were for Plaintiff's comfort only, they did not treat his glaucoma. He further testified that artificial tears are generally a self-carry medication; inmates use them as needed. The BOP medical staff put Plaintiff on pill line in the attempt to ensure he was using them at least three times a day.

Through questioning Dr. Lepiane, Plaintiff sought to demonstrate that, whereas Dr. Nutaitis recommended artificial tears four times per day, Plaintiff would not have been able to access them four times per day in a pill line environment. Ironically, the MAR (PE 2032 at 3) shows that Plaintiff refused the artificial tears on almost every recorded occasion. Further, Dr. Lepiane confirmed that artificial tears can be obtained from the

prison commissary, are a comfort measure only, and Plaintiff did not need to receive them in the pill line environment. Under repeated questioning designed to show that FCI Estill could not accommodate four pill lines a day, Dr. Lepiane explained, once again, that FCI Estill generally has two pill lines a day, and that if an inmate needs medication four times per day, the medical staff makes special arrangements for that to occur. Such circumstances are handled on an individualized, case by case basis.

Dr. Lepiane was confronted with the second page of PE 2032 (bates number 6142), which shows that on June 14, 16, 17, 18, 24, and 25 of 2017, the 1300 hours (or 1:00 p.m.) entry is not completed for Brimonidine Tartrate, an eyedrop that was prescribed to be administered three times a day and intended to treat Plaintiff's glaucoma by lowering his eye pressure. Through this line of questioning, Plaintiff sought to demonstrate that, because there was no record for those particular time slots on those particular days, there is no way to tell whether Plaintiff received his medication at those times. Dr. Lepiane explained that the record speaks for itself and there is no way to know whether the nurse simply failed to document the result on those occasions, or what happened on those days. More importantly, and once again ironically, the record undisputedly demonstrates that Plaintiff affirmatively refused this very medication on the majority of days and time slots represented. (*See* PE 2032 at 2.)

When asked about Dr. Tremblay's recommendation that Plaintiff receive dark glasses (PE 2301 at 2), Dr. Lepiane stated that the BOP has contractors who make all the glasses and tints for prisoners. He further stated that Plaintiff was given the tint that the contractor could provide according to Bureau standards, and Plaintiff did not like the tint, so he refused the glasses.

40

In PE 2021, a BOP medical record dated March 4, 2016, Dr. Lepiane noted that Plaintiff had difficulty navigating the compound at FCI Estill without assistance. Dr. Lepiane testified that Plaintiff had difficulty ambulating on his own, so he was assigned a guide to help lead him around. FCI Estill does not have a trained inmate companion program, but inmates are assigned to help guide other inmates around if they need it. Plaintiff is one of those who was assigned an inmate to help guide him. When questioned about whether the companion had formal training, Dr. Lepiane stated that he did not need formal training; the companion was assigned to help Plaintiff and instructed on how to do so, and Plaintiff helped the companion along as well. The FMCs deal with inmate companion programs much more than a facility like FCI Estill, so they have more formal training of inmates. At FCI Estill, the medical staff works with the psychology department to find an inmate that is compatible with the inmate that needs a companion. That was sometimes very difficult to do for Plaintiff, but the staff did their best to provide a companion.

Dr. Lepiane was questioned about PE 2042, a BOP medical note entered by Nurse Jade Lloyd in March 2016 and co-signed by Dr. Lepiane. The note deals with a time when Plaintiff was on hunger strike. Dr. Lepiane explained that Plaintiff requested Nurse Lloyd to administer his eyedrops because he liked Nurse Lloyd. When confronted with the fact that the note shows Dr. Lepiane instructed Nurse Lloyd not to administer Plaintiff's eyedrops, Dr. Lepiane testified that the staff instructed Plaintiff on numerous occasions how to use his eyedrops—Nurse Lloyd did it, all the nurses did it. He further testified that, even though Plaintiff demonstrated that he could administer the eyedrops himself, and the staff gave him everything he needed to assist him, he did not want to do it. Plaintiff

liked certain nurses to do it, and he wanted them to do it for him. Accommodating such specific preferences was not part of FCI Estill medical staff's general procedure.

PE 2030, a BOP medical note entered by Nurse Chambers in November 2016, describes a situation in which Plaintiff was instructed on how to use the eye cups to assist with administration of the eyedrops. Nurse Chambers notes that Plaintiff stated he could see the medication going into his eye, but he could not tell how much was going in because he could not feel his eyeball. Plaintiff further stated that he could feel the medication running down his face, and that is how he knew he got the medication into his eye. When questioned about these statements, Dr. Lepiane testified that the medical staff watched Plaintiff administer the medication successfully and then sometimes he would tell them that he could not do it. He further testified that he did not know what else the medical staff could do when they watched Plaintiff administer the medication successfully, and then Plaintiff simply would not want to do it. Dr. Lepiane could not explain that behavior and stated, "That's up to Mr. Washington."

As to Dr. Nutaitis and Dr. Kammerdiener's recommendation that Plaintiff see a low-vision specialist (*see* PE 2370), Dr. Lepiane stated that he made a referral for the consultation but could not be sure if it took place without reviewing the records. He further stated that the Storm Clinic has a low-vision specialist, so if Plaintiff needed care in that regard, Storm Clinic could have arranged for him to have that care. Dr. Lepiane explained that assistance from a low-vision specialist does not treat Plaintiff's glaucoma, it is intended to help Plaintiff cope with his disease.

Dr. Lepiane did not know whether Plaintiff ever received any braille materials because he is not part of the education unit at the prison. He stated that Plaintiff had some

42

peripheral vision, so Plaintiff did not need braille. Dr. Lepiane further stated that Plaintiff never asked for braille and he does not think Plaintiff would have benefited by it. Dr. Lepiane testified that if Plaintiff would have needed braille, BOP would have provided it for him, but it did not seem like that was an interest, a desire, or a need of Plaintiff's at that time. Dr. Lepiane did not know whether Plaintiff ever received a talking watch, and whether or not Plaintiff received one was not his decision. Dr. Lepiane did not know whether Plaintiff ever received a special lock designed for blind inmates because he is not part of the custody unit. He also did not know whether Plaintiff ever received an alarm. Anything that goes outside or above normal inmate property must be approved by the prison administration and that is not in Dr. Lepiane's control.

When questioned about following the recommendations of outside specialists, Dr. Lepiane elucidated the distinction he made between recommendations pertaining to the objective and subjective aspects of Plaintiff's care. Dr. Lepiane testified that if the specialist makes specific medical recommendations, such as for surgery or for a particular medication to treat Plaintiff's disease, BOP medical staff follows those recommendations. If the recommendation is more subjective, the BOP medical staff take care of Plaintiff every day, so they take subjective recommendations into consideration as they observe Plaintiff's daily behavior and needs. Dr. Lepiane clarified that specialists may only see Plaintiff in their office for about fifteen minutes, and take whatever Plaintiff tells them at face value, whereas the BOP medical staff is able to observe how Plaintiff reacts and what occurs at the prison, not just what Plaintiff says during an appointment.

Dr. Lepiane confirmed that inmates have a right to refuse their medication. He stated that all medications have a cost and come out of the FCI Estill budget. If an

inmate—in the opinion of the medical provider—wastes, spills, or misuses medication, the BOP medical staff generally just accepts that and continues to provide the inmate with the medication. If an inmate is doing it on purpose, the staff can issue the inmate a citation, but it would have to be for something intentional. The medical staff generally try not to cite inmates for misusing medication because it does not help the inmates. The medical staff wants the inmates to take the medication, that is the goal.

Dr. Lepiane described an instance when the medical staff found that Plaintiff had a big supply of eyedrops in his locker, so they suspected that he was not taking his eyedrops. Dr. Lepiane stated that Plaintiff's disease was not straightforward in the way that glaucoma usually is, because usually patients with glaucoma are prescribed eyedrops, they use the eyedrops, the medication controls their eye pressures, and they see a specialist to make sure that their eye pressures are controlled. Plaintiff has seen specialists numerous times, they would ask if he was taking his medications, and he would probably tell them, "yes." His eye pressures were still way out of control. It was up to the specialists to determine whether that was due to Plaintiff not taking the medications or due to Plaintiff's disease.

Dr. Lepiane testified that if an inmate has a self-administer medication and has shown an ability to successfully use the medication, the inmate should not have to come to pill line for the staff to administer the medication, he should be able to do it on his own. This aligns with the rehabilitative purpose of prison. Plaintiff has had glaucoma for a long time, and he will probably need eyedrops for the rest of his life, so the BOP medical staff's job was to teach him how to use the eyedrops and how to cope with his disease. Plaintiff will not always be in prison or always have someone there to administer his eyedrops, so

the medical staff's goal was to teach him how to do it on his own. However, Plaintiff was often resistant to such instruction.

In DE 17 (5642),[8] a BOP medical record dated March 4, 2016, Dr. Lepiane noted that Plaintiff had difficulty ambulating around the FCI Estill compound and had been assigned a guide to lead him. When asked whether the medical staff ever took away the guide, Dr. Lepiane testified that they never did, but Plaintiff did not get along with certain inmates assigned to guide him and made claims that he was being inappropriately touched or groped by his inmate guides. Dr. Lepiane stated that Plaintiff was difficult and "nobody"—meaning his fellow inmates—wanted to work with him. The medical staff had a very hard time finding someone that was willing to be Plaintiff's guide. Nevertheless, Dr. Lepiane indicated that Plaintiff always had a guide. Plaintiff would use the inmate guide by placing his hand on the guide's shoulder and walking with him. The medical staff could observe Plaintiff walking around the compound and the orientation and mobility specialist gave additional instructions to Plaintiff's companions on how they should guide him, but Plaintiff would not follow the instructions given.

The orientation and mobility specialist was named Shirley Madison and was the contractor to whom BOP medical staff were referred by the State Commission for the Blind (*see supra* at 27). Dr. Lepiane met with Ms. Madison and talked with her several times. Ms. Madison came to FCI Estill two or three times to instruct Plaintiff, but communicated to the staff that it was a waste of time and stopped coming. DE 17 (5770–72) documents Ms. Madison's assessment of Plaintiff, wherein she recommends that Plaintiff not continue his training because he would not follow her instructions. She

---

[8] DE 17 (5642) is the same as PE 2021, so it was unnecessary for it to be separately admitted.

indicates that Plaintiff was untrainable, did whatever he wanted to do rather than what he was instructed to do, and was resistant to the training, such that she could not train him.

Regarding the transfer request that he submitted while Plaintiff was on hunger strike, Dr. Lepiane testified that he knew Plaintiff's disease was not a care Level 3 condition and did not qualify him to be transferred. It was Plaintiff's behaviors and the subjective complaints reported by Plaintiff that led Dr. Lepiane to believe he needed more care than the medical staff at FCI Estill could provide. Dr. Lepiane has had past transfer requests granted based upon an inmate's inability to perform ADLs, such as maintaining proper hygiene. However, Plaintiff was able to take care of himself, he was always dressed properly, and he demonstrated this ability on numerous occasions. The main issue was Plaintiff's claim that he could not administer his eyedrops. But the medical staff instructed him on how to use them, observed him do it confidently, then the next time he just would not do it and would complain that he could not do it. Dr. Lepiane stated that for this reason it was very, very difficult to make a care plan for Plaintiff, and he was very difficult to manage.[9]

In DE 18 (6069), a BOP medical record dated March 26, 2017, Dr. Lepiane documents administrative notes following Plaintiff's left eye surgery at the Storm Clinic on February 22, 2017. He notes that Plaintiff was seen for a follow-up appointment by the ophthalmologist on March 14, 2017, was stable post-operatively, and was continued on his five then-prescribed eyedrop medications. Dr. Lepiane further notes that the ophthalmologist at the Storm Clinic felt Plaintiff would benefit by an appointment with the low-vision specialist, Dr. Hill, also of the Storm Clinic. The March 26 note includes a

---

[9] During this portion of Dr. Lepiane's testimony, the Court observed that he was visibly exasperated.

consultation request for a visit with Dr. Hill written by Dr. Lepiane.

In DE 18 (6058–59), a BOP medical record dated May 5, 2017, Nurse Alexis Chambers documents an interaction between Plaintiff, Nurse Chambers, and Dr. Lepiane. Nurse Chambers called Plaintiff to the medical department to speak with Dr. Lepiane about a new plan for Plaintiff to receive his eyedrops. At this point, Plaintiff was being placed on pill line for his eyedrops because of the lack of success in getting him to administer the drops on his own. Nurse Chambers quotes Plaintiff as saying, *inter alia*, "I have no problem with [N]urse Chambers, but I refuse to have anyone else help me or watch me do anything," "I can not deal with your other staff members," "Ya'll can't tell me what kind of plan I'm going to do," and "This plan did not include me at all." (DE 18 (6058).) The May 5 note describes Plaintiff as continuing to argue with Dr. Lepiane about how Plaintiff did not want to come to medical to receive his eyedrops and did not want nurses other than Nurse Chambers to help him.

In DE 18 (6057), a BOP medical record dated May 5, 2017, Dr. Lepiane documents the same interaction with Plaintiff described by Nurse Chambers. He states that even though Plaintiff has had end stage glaucoma since 2009, has been using eyedrops on his own for many years, and has demonstrated the ability to successfully use the eyedrops at the time of the note, that Plaintiff simply chooses not to do so. Dr. Lepiane notes that Plaintiff keeps getting his outside ophthalmologist to write that he needs help applying his eyedrops, but really Plaintiff just wants someone to cater to him and to apply the eyedrops for him. Dr. Lepiane further notes that Plaintiff wants to pick and choose who applies his eye drops and who does not. The note states, "This is disturbing the order[ly] running of our medical dept." (DE 18 (6057).)

47

In DE 18 (6054), a BOP medical record dated May 9, 2017, Dr. Lepiane documents how Plaintiff refused to comply with the medical department's instructions about obtaining his eyedrops at pill line, and continued to be "very manipulative and very demanding." Dr. Lepiane notes that Plaintiff was told that if he wanted help with the eyedrops, the medical staff was willing to help him and instruct him, but he needed to be willing to work with them rather than against them.

In DE 18 (6048–50), a BOP medical record dated May 10, 2017, Nurse Eve Ulmer records how Plaintiff, upon coming to medical at 1030 hours for the staff to observe him putting in his eyedrops, said, "Let me see who is here today," and "I want Ms. ____ to put my eye drops in." Nurse Ulmer advised Plaintiff that he was there for the medical staff to observe him putting in the eyedrops himself, to which he responded, "No that was not the plan."

In DE 18 (5943–44), a BOP medical record dated June 27, 2017, Nurse Lloyd documents that after accepting his prescribed eyedrops, Plaintiff squeezed all of the bottles until medication ran down his face and onto his chest. Nurse Lloyd notes that numerous attempts were made to educate Plaintiff regarding the proper administration of the eyedrops, but Plaintiff was uncooperative and would not attempt the nurse's directions, preferring instead to squeeze the contents of the bottles until they were empty.

In DE 18 (5940–41), a BOP medical record dated June 28, 2017, Dr. Lepiane documents an extensive summary of the medical care provided to Plaintiff since he arrived at FCI Estill in September 2015. Dr. Lepiane divides the report into two parts, the first pertaining to Plaintiff's medical condition of end-stage glaucoma, and the second pertaining to Plaintiff's personal needs as a legally blind individual. Regarding Plaintiff's

48

eyedrops, Dr. Lepiane notes that at the time Plaintiff had been using eyedrops for eleven

years. Dr. Lepiane further notes:

> He is certain capable of administering his own eye drops. We have instructed and observed him using his eye drop properly on several occasions. We even obtained eye cup to help him with his eye drop administration. It is in his own best interest to learn to do this on his own. However inmate Washington continue to insist he need help with his eye drop and he wants other to do this for him. He has demonstrated that he can recognize his eye drop my the size of the bottle and the color of their caps Due to his insistent that he need help with his eye drops we elect to place him on pill line to assure that he was proper administering his eye drops. this has been a disaster. First the insistent that he could not make it to medical 3 times a day which was simple not true. His companion was willing to bring him to medical. Then he want to pick and chose who was to give him his eye drops. He has been acting up and has intentional squirted out all this eye drops wasting them. Inamte Washington has been uncooperative and has been very difficult to work it has been impossible to form any viable plan of treatment with him. We had done all that we can to help and assist inmate Washington with the prison environment. However he keep rejecting and sabotaging all our efforts to help him.

(DE 18 (5940–41) (errors in original).)

### 2. Eve Ulmer, RN

Eve Ulmer is a registered nurse by training and has been serving as a nurse at

FCI Estill for fourteen years, including the time period while Plaintiff was housed there.

Plaintiff is the only blind patient for whom Nurse Ulmer has provided care. FCI Estill had

one inmate that was totally blind come after Plaintiff left and that inmate stayed at FCI

Estill, though it is a care Level 2 facility. Nurse Ulmer is not aware whether that inmate

had glaucoma or any other eye disease. Nurse Ulmer was made aware by one of the

custody lieutenants that Plaintiff expressed concerns about feeling safe around her. This

occurred a few weeks or a month after Plaintiff arrived at FCI Estill but she did not know

anything about Plaintiff's concerns until the Lieutenant mentioned them.

Nurse Ulmer was aware that Plaintiff complained of difficulties self-administering

his eyedrops. At one point Plaintiff was directed to administer his own eyedrops in front of the medical staff. Nurse Ulmer does not remember the time frame when this directive came.

In PE 2029, a BOP medical note written by Nurse Kirstie Wooten when Plaintiff was on hunger strike, Nurse Wooten recounts that Plaintiff asked her to administer his eyedrops, she did so, and there appear to have been no problems with that arrangement in this instance. When confronted with this note, Nurse Ulmer stated that she really could not say if there were any problems because she was not there, and the note in question was Nurse Wooten's note.

Nurse Ulmer only became aware that Plaintiff requested braille materials when she "heard it through the grapevine." Plaintiff did not make such a request to her. He would have had to do that through his unit team. The medical department is not involved with braille. Nurse Ulmer also heard that Plaintiff requested some type of alarm or clock for the visually impaired. However, Nurse Ulmer clarified that the staff and inmates conduct scheduled moves at FCI Estill. Everything is announced on the hour, five minutes before the hour, or five minutes after the hour. Because everything is announced, everyone knows when to move. Nurse Ulmer is unaware whether Plaintiff had a cell mate while he was at FCI Estill. She is also unaware whether Plaintiff received a special lock for the blind.

In PE 2356, a hand-written BOP medical record dated January 18, 2017, the contract optometrist at FCI Estill notes that Plaintiff's eyes are sensitive to light, that the current tint of his glasses was not dark enough, and that Plaintiff should be provided with the darkest tint possible—namely, tint #4 gray. When asked whether she is qualified to

agree or disagree with the optometrist's medical opinions, Nurse Ulmer testified: "No. I don't do any of that. All I do is take the order, a piece of paper, and give it to the lady in the department that does the actual ordering of the glasses."

Nurse Ulmer was unaware whether Plaintiff had a companion specifically trained to assist visually impaired inmates while he was at FCI Estill. When asked how she observed Plaintiff getting around the FCI Estill compound, Nurse Ulmer stated that sometimes Plaintiff would walk with friends and sometimes he would walk alone. When asked whether the friends he walked with would guide Plaintiff around, Nurse Ulmer stated that it was not guiding, but walking side by side, "chitchatting as they walked along."

Nurse Ulmer testified that she knows Plaintiff well and provided care for him for a long time. The fact that Nurse Ulmer knows Plaintiff well is reflected by the number of medical notes that she prepared about her care of Plaintiff, which are in the record.

Nurse Ulmer was shown numerous BOP medical records that she prepared and asked to briefly state her recollection of the issues pertaining to Plaintiff's care on each occasion, which she did as follows: DE 16 (5336–37), September 26, 2015, observed Plaintiff pushing another inmate in a wheelchair to the pharmacy to pick up medications, whereupon Plaintiff maneuvered the wheelchair through the medical door and metal detector with no issues, demonstrating his ability to navigate; DE 16 (5333–35), September 27, 2015, treated Plaintiff for a burn on his arm that, by his statements, happened while he was ironing his clothes; DE 16 (5331), October 10, 2015, observed that Plaintiff came to the pharmacy by himself to ask that his medications be renewed for him because he was unable to see the computer; DE 17 (5648–49), March 2, 2016, saw Plaintiff in the SHU with the Lieutenant present and an officer at the door because Plaintiff

was complaining of pain in his tooth, also took wooden cane from Plaintiff as instructed by the HSA and Clinical Director because it was not documented when given; DE 17 (5624–26), March 6, 2016, checked on Plaintiff in the SHU during his hunger strike and noted no signs of distress, and although Plaintiff was asserting that he needed someone to administer his eyedrops because he has no feeling in his eyes and he hurts them when he does it, Dr. Lepiane directed that Plaintiff was to self-administer, and Nurse Ulmer received a report from SHU officers that they observed inmate putting his eyedrops in with no problems; DE 17 (5592), May 2, 2016, observed Plaintiff came to medical out of bounds from the recreation yard during insulin line, and he was instructed to leave because it was insulin line only and he was not permitted to be away from his unit, whereupon Plaintiff left, cursing and yelling about medication refill issues; DE 17 (5781), August 23, 2016, medical treatment refusal form that Plaintiff refused to sign when he refused to go on his outside trip to the ophthalmologist; DE 17 (5579), September 8, 2016, noted that the optometrist confirmed, by way of a note written on the back of the eyeglasses receipt, that the glasses received matched the glasses that were prescribed, because Plaintiff was complaining that there was a discrepancy between the two; DE 17 (5774), September 9, 2016, medical treatment refusal form that Plaintiff refused to sign when he refused to accept the glasses with gray tint that were prescribed; DE 17 (5566), September 19, 2016, observed, during an emergency on the recreation yard, Plaintiff maneuvering in the crowd without assistance and with no signs of distress; DE 17 (5557), October 24, 2016, noted that Plaintiff asked for the glasses that he previously refused, and signed for them with an X; DE 17 (5545–46), November 3, 2016, noted that Plaintiff did not show up for the 0630 pill line, so officer called on radio and learned Plaintiff was

on his way, but it was after 0700, Plaintiff was not visible on the yard, and Nurse Ulmer needed to leave for rounds at the SHU, when she returned Plaintiff was sitting in the lobby at medical with his companion, and when she offered Plaintiff his medication he said "I am not taking anything from you," whereupon Plaintiff was observed swiftly walking through the lobby to leave and had no issues navigating through a complicated scenario on his own[10]; DE 17 (5537–38), November 4, 2016, noted that Plaintiff came to the 0630 pill line after being called for and, upon seeing Nurse Ulmer, said, "I ain't taking nothing from you"; DE 17 (5534–35), November 7, 2016, noted the Plaintiff was called to come to pill line and refused to take his medication; DE 17 (5528), November 29, 2016, noted that Nurse Ulmer called Plaintiff's unit officer to inform him that Plaintiff was to come to pill line at 0630 and officer said he would tell Plaintiff, because Plaintiff had not been coming to pill line as required; DE 18 (6123–24), January 18, 2017, noted that while Plaintiff was at medical to see another provider he found out that the contract optometrist was present and Plaintiff wanted to see him, but Plaintiff did not want to wait and insisted on being seen right that minute even though there were two people ahead of him, when he was told he needed to wait he became upset and left the building, telling the Lieutenant and the HSA that he was being held hostage in medical, and when Plaintiff came back and was escorted to the optometrist, Nurse Ulmer heard Plaintiff saying that he was trying to do everything he could to save the last bit of his remaining vision, even though Plaintiff has a history of being noncompliant with his eyedrops, refusing his eyedrops, and refusing

---

[10] Nurse Ulmer testified that sometimes there are twenty to twenty-five inmates sitting in the medical lobby, people are halfway laying down with their feet out, and the doors are hard to open; she stated that while Plaintiff left swiftly, he was able to maneuver through the other inmates, forcibly open the first door, get through the sally port area, and physically turn the handle on the next door, which is very hard to open, all with no issues.

surgery; DE 18 (6121), January 19, 2017, reported Plaintiff was seen by the optometrist at his request and was advised he should consider surgical intervention to better control his glaucoma, Plaintiff was further advised that tint #4 gray was the darkest tint of glasses available, and Plaintiff requested that the lights be turned off in his cell when possible or that he be permitted to wear a stocking cap over his eyes to block the light; DE 18 (6119), January 30, 2017, noted Plaintiff's unit officer called to say Plaintiff complained of being out of medications, and although Plaintiff was instructed to come to sick call to retrieve more medications, he did not show up at sick call; DE 18 (6104–05), February 23, 2017, noted, during rounds in the SHU and while checking on Plaintiff who had eye surgery the day prior, that Plaintiff had refused pain medication from the pharmacy technician that morning, was laying face down in bed with a sheet hanging down from the top bunk, and put his arm out while stating "turn the light down," but was showing no signs of distress[11]; DE 18 (6102), February 24, 2017, noted that Plaintiff was standing at the door of his SHU cell during executive staff rounds with his night eye patch on (gauze pulled apart and hanging down), which was not intended to be worn during the day but only at night for one week following surgery, when Plaintiff inquired how long he had to wear the eye patch and about lifting things, whereupon Plaintiff was advised that he was supposed to wear the polarized glasses he had been provided during the day for one week, that the night eye patch and polarized glasses were for his protection, and that he was not to lift anything over five pounds or bend at the waist for one week, which instructions had been

---

[11] Nurse Ulmer testified that on this occasion she was checking on Plaintiff's welfare because he might not have needed the pain medication when the pharmacy technician came around earlier that day, but might have needed it while Nurse Ulmer was there since a significant time had passed. She further testified that she never, based on her many interactions with Plaintiff, decided to cease providing the medical care that he deserved. Rather, she treated Plaintiff the same as any other inmate. Nurse Ulmer has dealt with other difficult inmates as well, but she sees it as her job to provide medical care for them irrespective of that.

provided to him both during discharge from surgery at the hospital and upon his arrival back to FCI Estill; DE 18 (6099), February 28, 2017, observed, while checking on Plaintiff in the SHU during sick call rounds, that Plaintiff was not wearing the polarized glasses during the day as he was advised following surgery; DE 18 (6070), March 22, 2017, noted that, because Plaintiff had been complaining about his glasses not having a dark enough tint, Nurse Ulmer called and spoke to a UNICOR officer at FCI Butner to determine whether there had been a mistake, whereupon Nurse Ulmer was advised by the UNICOR officer that they offer tinting grades of #1 through #3, which is the professional standard, because a darker tint becomes a liability due to the chance of falling over things, all of which signified to Nurse Ulmer that the glasses provided to Plaintiff were the darkest tint permitted by the BOP; DE 18 (6048), May 10, 2017, recorded Plaintiff's behavior and statements when he came at 1030 for medical staff to observe him administering his eyedrops, whereupon Plaintiff said, "Let me see who is here today," "I want Ms. ___ to put my eyedrops in," and, after being advised that he was there for medical staff to observe him putting in his own eyedrops, "No that was not the plan"; DE 18 (6043), May 11, 2017, noted that Plaintiff did not come to medical as directed to have the staff observe him putting in his eyedrops[12]; DE 18 (6040), May 19, 2017, noted that Plaintiff did not show up for his 1200 "call out," which is a list established on the day prior showing the date and time that medical wants to see particular inmates, and he did not show up at 1300 when he was called for, which appointment was to give Plaintiff the glasses he had

---

[12] Nurse Ulmer testified that this record reflects a time when Plaintiff was on pill line to have the medical staff observe him administering his eyedrops, and that he was placed on pill line because he was noncompliant. He was not using his medications as he was supposed to be using them. Nurse Ulmer further testified that Plaintiff wanted to pick and choose who put the medications in his eyes or helped him with his medications, and that he wanted the younger nurses.

been requesting; DE 18 (6036), May 30, 2017, noted that Plaintiff's unit officer called to say that Plaintiff was complaining of not having his medications, but Plaintiff had been on call out to pick up his medications, which had already been filled five days prior; DE 18 (6026), June 8, 2017, noted that a SHU officer called medical and said that Plaintiff was asking for eyedrops, at which time artificial tears had been prescribed for Plaintiff three times a day, whereupon Nurse Ulmer took the tear drops to the SHU and went to Plaintiff's door with two officers, but Plaintiff refused the drops and refused to sign the refusal form, at which point an SHU officer asked Plaintiff why he said he wanted eyedrops but would not accept them now that medical staff was there to provide them, to which question Plaintiff did not respond; DE 18 (6021), June 9, 2017, noted that Nurse Ulmer took eyedrops prescribed to be used three times a day to Plaintiff in the SHU, and with the SHU Lieutenant present, Plaintiff refused the eyedrops, saying that he wanted a sealed bottle to be brought to him every day because he wanted to be sure that no one had contaminated his eyedrops, whereupon Plaintiff also refused to sign the refusal form; DE 18 (6008), June 12, 2017, noted another refusal of eyedrops delivered to Plaintiff in the SHU, and another refusal to sign the refusal form; DE 18 (6005), June 13, 2017, observed Plaintiff in his SHU cell, while wearing the 1.75 reading glasses prescribed for him by the BOP optometrist, look through several papers that were spread out on his bed, pick one up and hold it approximately twelve inches from his face, then put it down and look directly at the officer through the door window as he responded to the officers, which led Nurse Ulmer to believe that Plaintiff was sorting his mail and reading; DE 18 (6000), June 14, 2017, noted that when Nurse Ulmer attempted to deliver #3 gray tint glasses (darkest tint permitted by the BOP) that had been ordered for Plaintiff by the optometrist, he refused

to sign for them, got back in his bed, and pulled the covers over his head; DE 18 (5993), June 15, 2017, noted that, per the nurse conducting the SHU insulin line, Plaintiff asked her to bring him the glasses that Nurse Ulmer offered him the day prior, that a refusal form was completed and witnessed by two officers when Plaintiff refused to take the glasses, that the glasses are the same prescription as the glasses issued to Plaintiff in August 2016, and that, per the Clinical Director, Plaintiff does not get to pick and choose who brings his glasses to him; DE 18 (5988), June 16, 2017, noted another refusal of eyedrops delivered to Plaintiff in the SHU, with an officer standing at the door as a witness; DE 18 (5975), June 20, 2017, recorded that Nurse Ulmer received a "cop out," which is a form that an inmate can use to send a request to another department at the institution, in which Plaintiff stated to the SHU Lieutenant that he was being denied his glasses after he clearly requested the glasses, even though Plaintiff refused the glasses and refused to sign the refusal form just a few days prior; DE 18 (5970), June 21, 2017, noted the SHU Lieutenant called to advise that Plaintiff was asking for the glasses that he earlier refused, whereupon Nurse Ulmer delivered the glasses to Plaintiff's room, and Plaintiff refused to sign for the glasses but did take the glasses; DE 18 (5963), June 22, 2017, noted that Nurse Ulmer took Plaintiff his eyedrops at 1300 in the SHU, whereupon Plaintiff stated, "I do not want them, I want the yellow bottle," refused the eyedrops, and refused to sign the refusal form; DE 18 (5951), June 23, 2017, Paramedic G. Wiggins noted that he asked Plaintiff in the SHU if he was going to take his medication that evening, Plaintiff responded by asking if the seals on the eyedrop bottles were already broken, Paramedic Wiggins informed him that they were and that it had already been explained to him why this was the case, and Plaintiff would not verbally refuse the

medication after being asked several times, but simply walked away to his bunk; DE 18 (5947), June 26, 2017, noted that Plaintiff squeezed out all bottles of eyedrops into his eyes until the bottles were empty and the liquid was running down his chest, whereupon Plaintiff shook each bottle and said, "Look officer she gave me empty bottles," and the officer observed that Plaintiff did the same thing over the weekend; DE 18 (5946), June 26, 2017, noted that Nurse Ulmer took Plaintiff his eyedrops at 1300 in the SHU, and Plaintiff was constantly spinning as he talked, stating that he would not use the eyedrops until it had been verified that his yellow-top drops have been refilled; DE 18 (5942), June 28, 2017 (morning), noted that Plaintiff refused to get out of bed and come to the door for his eyedrops, and refused to sign the refusal form; DE 18 (5939), June 28, 2017 (afternoon), noted that Nurse Ulmer took Plaintiff his eyedrops in the SHU, whereupon Plaintiff took the Brimonidine drops and used so much that the medication was running down the front of his shirt, and after handing the bottle back refused the tears drops because they were opened for him in front of the officer; DE 18 (5938), June 29, 2017, noted that Plaintiff refused to get out of bed and use his eyedrops, stating, "Turn my lights out!"; DE 18 (5936), June 29, 2017, noted that Plaintiff purchased artificial tears from the commissary on June 8 and June 14, whereas Plaintiff had tear drops prescribed and had never used them when they were brought to his room by medical staff, and Plaintiff was accusing medical staff of tampering with his medications, whereupon the medical staff did not speak with Plaintiff during this visit and let the SHU Lieutenant do all of the talking because it was concluded that Plaintiff was being "extremely manipulative"; DE 18 (5932), June 30, 2017, noted that Plaintiff submitted a cop out to a SHU officer, who emailed it to medical, wherein Plaintiff was complaining of eye irritation and a rash on his lower back,

whereupon Nurse Ulmer advised the SHU Lieutenant that Plaintiff was given extra time to do sick call that morning and he did not go, and the AHSA, who was also present, instructed the SHU Lieutenant that sick call must be done face to face and not by cop out, but the medical staff, nevertheless, went and examined Plaintiff during executive rounds about the rash on his back; DE 18 (5929), June 30, 2017, noted that, per the HSA, the medical staff would now administer Plaintiff's eyedrops because he continued to empty full eyedrop bottles each time the drops were taken to his room, whereupon Plaintiff was placed in the SHU medical room and, with another nurse and a SHU officer present as witnesses (HSA instructed the SHU Lieutenant that the medical staff was not to be left alone with Plaintiff at any time), the SHU nurse offered to administer the eyedrops twice, but Plaintiff refused; DE 18 (5924), July 5, 2017 (morning), noted that Nurse Ulmer went to Plaintiff's room with a SHU officer, whereupon Plaintiff refused to have the medical staff administer his eyedrops and stated to the officer, "I do not need the extra baggage that is with you this morning," referring to Nurse Ulmer, and refused to sign the refusal form; DE 18 (5923), July 5, 2017 (afternoon), noted that Plaintiff refused to allow the medical staff to administer his eyedrops as ordered, and refused to sign the refusal form; DE 18 (5921), July 6, 2017 (morning), noted that Nurse Ulmer took Plaintiff's eyedrops to the SHU to be administered, the SHU officer brought Plaintiff to the SHU medical room, and, once Plaintiff got to the medical room door, he stated, "Which nurse is it?", whereupon the officer told Plaintiff that it was Nurse Ulmer and Plaintiff stated, "We don't need to go any further," and later, while walking back to his cell, "I need my medication and I was not given it yesterday either," but Plaintiff refused his eyedrops the day prior because he did not have the nurse that he preferred to administer the eyedrops; DE 18 (5920), July 6,

2017 (afternoon), noted that Nurse Ulmer took the prescribed eyedrops to Plaintiff in the SHU, the officer instructed Plaintiff that medical was there with the eyedrops, and Plaintiff stated, "I do need the eye drops but not the problems," whereupon Plaintiff refused to sign the refusal form and asked to speak with the Lieutenant; DE 18 (5919), July 7, 2017, noted that Plaintiff refused his eyedrops, with an officer and second nurse present as witnesses, and Plaintiff refused to sign the refusal form.

Nurse Ulmer testified that each time Plaintiff refused to take his medication, a refusal form was filled out. Sometimes Plaintiff would sign the refusal forms, and sometimes he would not. When asked whether she had an idea about how many refusal forms there were for Plaintiff, Nurse Ulmer testified that the last time she counted it was between seventy and eighty refusals.

Nurse Ulmer explained that the reason she and the other medical staff were directed not to speak with Plaintiff alone was because Plaintiff was manipulative, claiming that he was not receiving the things he asked for—*e.g.*, glasses and medications—even when those things were brought to him. Plaintiff did this both to Nurse Ulmer and to other staff as well. This situation was routinely brought up at the medical staff's morning meetings.

### 3. Jade Lee (Lloyd), RN

Nurse Jade Lloyd[13] is currently employed by Beaufort Jasper Comprehensive Health Services at the Estill office. However, between 2013 and 2017 she was a nurse at FCI Estill. In that capacity she came into contact with Plaintiff while he was an inmate at FCI Estill.

---

[13] For the sake of clarity, the Court will refer to Jade Lee by the surname she possessed at the time the relevant events occurred—namely, "Lloyd."

In DE 17 (5637), a BOP medical record dated March 5, 2016, Nurse Lloyd notes that during her rounds in the SHU, Plaintiff asked her to place his eyedrops in his eyes for him. She informed him that she was not permitted to do so under the orders of the physician, but that she would watch Plaintiff administer the eyedrops himself. Plaintiff was complaining that he could not tell if the drops were going into his eyes and declined Nurse Lloyd's offer to watch him put the drops in. He did not attempt to put the eyedrops in his eyes. Nurse Lloyd considered this a refusal.

In DE 17 (5636), a BOP medical record dated March 6, 2016, Nurse Lloyd notes that Plaintiff stated he had difficulty with the eyedrops because he tended to touch his eye with the bottle. Plaintiff offered to demonstrate how he does the eyedrops. She did not consider this a refusal because he made the attempt. However, she documented that Plaintiff was unwilling to accept any direction concerning placement of the eyedrops.

In DE 17 (5632), a BOP medical record dated March 6, 2016, Nurse Lloyd records during a hunger strike encounter that Plaintiff stated, "I'm ok. I still haven't eaten. I feel sick sometimes. I have dizziness and nausea that comes and goes. Nothing right now. Can you put my eye drops in?" (DE 17 (5632).)

In DE 17 (5603), a BOP medical record dated April 6, 2016, Nurse Lloyd notes that Plaintiff was called to medical and was instructed in the administration of his eyedrops using proper technique. She observed that Plaintiff was argumentative and resistant to instructions. However, Nurse Lloyd stated that if Plaintiff made any effort to attempt putting in his eyedrops, he was not written up for a refusal.

In DE 17 (5601), a BOP medical record dated April 7, 2016, Nurse Lloyd notes that Plaintiff was still resistant to instruction, but was more cooperative showed much

improvement in the administration of his eyedrops. She did not write him up for refusal because he made a good faith effort.

In DE 17 (5600), a BOP medical record dated April 8, 2016, Nurse Lloyd records that Plaintiff was still resistant to instruction, but was improving as time went on. She stated this was the third consecutive day that she taught Plaintiff to administer the eyedrops. She consistently notated improvement in his technique as long as he was willing and cooperative, and listened to the instruction.

In DE 17 (5593–95), a BOP medical record dated April 29, 2016, Nurse Lloyd notes that during an after-hours encounter, Plaintiff said he had been bitten by something at 1:00 p.m. that afternoon and it was still painful. That was the complaint for which she was initially evaluating him. Nurse Lloyd records that Plaintiff then said, "What I really want is for you to do my eye drops." (DE 17 (5593).) This was significant because after hours encounters are performed on the basis of emergency or high priority.

In DE 18 (6046), a BOP medical record dated May 10, 2017, Nurse Lloyd records that Plaintiff arrived to medical for placement of his eyedrops and was instructed to remain waiting, and someone would assist him momentarily. While he was waiting and sitting in a chair closest to the compound side door, a second inmate arrived in a wheelchair, whereupon Plaintiff stated, "man you almost took my foot off with that wheelchair." The second inmate responded, "yeah I knew you could see." Plaintiff then stated, while laughing, "yeah, I can." When Nurse Lloyd called Plaintiff to assist him with his eyedrop placement, he was no longer present in the medical waiting area and was observed walking to the chow hall. (DE 18 (6046).)

Regarding DE 18 (5943), the medical note that documents the previously

62

described incident on June 27, 2017 where Plaintiff squeezed out eyedrop bottles until the medication was running down his face and onto his chest (*see supra* at 48), Nurse Lloyd testified that she made numerous attempts to educate Plaintiff regarding the proper installation of the eyedrops, but he was uncooperative and unwilling to listen to her directions. She further testified that Plaintiff did not even attempt to use the eyedrops properly, "[a]nd instead, he just squeezes the eyedrops until they're empty and says hey, they're empty, you gave me empty bottles."

In DE 18 (5930), a BOP medical record dated June 30, 2017, Nurse Lloyd notes that Plaintiff was pulled to the SHU medical room by a corrections officer and two nurses. The nurses were trying to place Plaintiff's eyedrops for him because Plaintiff "ha[d] consistently wasted prescription eye drops." (DE 18 (5930).) Nurse Lloyd writes, "SHU RN politely offered the installation of prescription eye drops. Inmate is confrontational and refuses eye drops to be placed by SHU RN. SHU RN offered eye drops a second time. Inmate continues to refuse placement by SHU RN." (*Id.*)

Nurse Lloyd was confronted with PE 2336, a BOP medical record dated June 9, 2016, wherein she records Plaintiff reported that he was going through the metal detector, let go of his inmate companion, and ran into the metal detector. She agreed that Plaintiff reported he hit his face, including the bridge of his nose. She confirmed that under her exam comments she noted some swelling to Plaintiff's nose. When asked whether this record recounts Plaintiff injuring himself as a result of walking into a metal detector, Nurse Lloyd stated, "That's correct."

### 4. Kaitlin Loadholt (Rainwater), RN

Nurse Kaitlin Rainwater[14] obtained her nursing degree from the University of South Carolina and subsequently went into the commissioned Public Health Service, which falls under the United States Department of Health and Human Services and the Surgeon General. She worked as a nurse at Memorial Hospital in Savannah, Georgia, and then moved to Hampton Regional Medical Center where she got more hands-on training. Once she commissioned in the Public Health Service she worked at the BOP for thirteen years. She left the BOP recently and is employed by the Immigration Health Service Corps.

During Plaintiff's term at FCI Estill, Nurse Rainwater interacted with him both in a treatment capacity as well as in relation to her role as part of the quality management and infection prevention and control unit. In this role, she contributed to making sure that FCI Estill remained in good standing for internal and external accreditation audits and was doing the things necessary to meet national health care standards.

Nurse Rainwater was assigned to escort the orientation and mobility specialist, Ms. Madison, hired by the BOP to train Plaintiff on the use of the blind-assistance cane. In DE 17 (5586), a BOP medical record dated June 3, 2016, Nurse Rainwater documents the first interaction between Ms. Madison and Plaintiff, which did not go well. Nurse Rainwater states that Plaintiff reached around Ms. Madison's shoulders multiple times when he had been instructed to only hold her by the elbow and was immediately reprimanded and corrected for this inappropriate contact. She further states that Plaintiff made very disparaging comments and stated on multiple occasions that he would never be alone on the compound without his sight because there were "murderers and child

---

[14] For the sake of clarity, the Court will refer to Kaitlin Loadholt by the surname she possessed at the time the relevant events occurred—namely, "Rainwater."

molesters on the compound." Moreover, "During the training there were multiple occasions where a visually impaired person would have been uncomfortable in open areas but Washington displayed no signs of anxiety. At one point Washington jerked the instructor by the elbow to divert from her path of instruction to his. Washington also told the instructor that he had filed multiple PREA complaints and made very negative comments." (DE 17 (5586).) In general, Nurse Rainwater's note describes a course of behavior by Plaintiff that was uncooperative, unwilling to learn or practice new techniques, and repeatedly negative. Nurse Rainwater testified that, as the assigned chaperone, she was uncomfortable multiple times. Ms. Madison had a plan in her mind as to what was most important for Plaintiff to learn, but Plaintiff wanted to do things his way. Nurse Rainwater testified that the staff had worked so hard to get this contractor onto the compound to help Plaintiff and give this training, that they arranged with the Captain's office to clear the compound and ensured that there was no group movement. The one exception was an inmate who was called to medical for a special appointment during that time. That inmate happened to live in Plaintiff's housing unit and offered to take him back if it would be helpful. Nurse Rainwater explained that Ms. Madison came back once, maybe two more times, to attempt to train Plaintiff and the interaction was similarly negative.

In DE 18 (6055), a BOP medical record dated May 9, 2017, Nurse Rainwater documents how Plaintiff became belligerent with the medical staff when called to medical to discuss his eyedrops with the Clinical Director. Nurse Rainwater describes how Plaintiff was hostile and talked over Dr. Lepiane during the entire conversation. Dr. Lepiane informed Plaintiff that there were three pill line opportunities for Plaintiff to attend to

receive his drops, but Plaintiff responded that his inmate companion would not bring him three times and he was not going to deal with certain staff members who he felt caused him trouble in the past. Nurse Rainwater records how Plaintiff ultimately requested his eyedrops back for self-administration, and that she issued the prescribed medications. By her account, at one point Plaintiff was so hostile and loud that she felt the need to open the door to the office in case she and Dr. Lepiane would need assistance. Nurse Rainwater concludes the note as follows, "Prior to the inmate leaving he requested that this RN administer his drops. The inmate allowed me to put the drops in his eyes in accordance with the prescription. One medication is written for right eye only—the inmate stated he puts it in his left as well because he feels he needs it." Nurse Rainwater told Plaintiff that as a nurse, she must follow orders written by a doctor and she would not administer medication that was not ordered, whereupon Plaintiff left the medical department.

In DE 17 (5580), a BOP medical record dated August 31, 2016, Paramedic Wiggins documents Plaintiff's interaction with Ms. Madison when she returned for continued training. Nurse Rainwater reviewed documents like this frequently in her role as quality manager, and she also recalls the scenario. The note describes how Plaintiff rejected Ms. Madison's instructions with statements such as, "I don't like to do it that way, I do what works for me," and was completely uncooperative. After approximately an hour of Ms. Madison trying to secure Plaintiff's cooperation, with him never acknowledging what she was saying and only continuing with things he wanted to talk about, Plaintiff was finally instructed to return to his unit and no training was accomplished. Paramedic Wiggins describes how, when asked directly if he was refusing the training offered,

Plaintiff would not answer the question directly and began talking about other issues, such as how he felt unsafe on the compound. Nurse Rainwater testified that in her experience as a health care provider, people often refuse care in different ways. They do not always say, "I refuse," but sometimes display a general negative attitude and a posture of not wanting to learn, which is a refusal of a sort.

Nurse Rainwater testified that the distance from Plaintiff's housing unit to the dining hall at FCI Estill was approximately half of a football field. She confirmed that Plaintiff's statements to Ms. Madison during their August 2016 interaction about not feeling safe on the compound were similar to the safety concerns he expressed to Ms. Madison during their June 2016 interaction. Nurse Rainwater stated that the reason why they had Paramedic Wiggins be the staff escort during Ms. Madison's second visit was to remove Nurse Rainwater from the scenario, in case she was the barrier to education for whatever reason, and to give Plaintiff the opportunity to work with a different staff member.

As to Plaintiff's hostile interaction with Dr. Lepiane and his specific assertion that he would have difficulty coming to pill line because his inmate companion would not bring him three times per day, Nurse Rainwater testified that whether or not his companion was willing was not relevant to Plaintiff being at pill line. She further testified that if someone needed to be escorted up to medical, they would use ancillary staff, and "that's what we have a second compound officer for." Nurse Rainwater stated that she used to go on the recreation yard and find inmates that missed pill line, so an inmate companion's unwillingness to bring a patient to pill line is not in itself a reason or rationale for a doctor to change what he felt was most effective for the patient's care. When asked whether staff ever brought Plaintiff to pill line, Nurse Rainwater responded, "We had to hunt him on

multiple occasions. Yes, ma'am."

### 5. Stephanie Breland, CPhT

Stephanie Breland has been a Certified Pharmacy Technician ("CPhT") since 1990. She has been employed at FCI Estill for thirteen and a half years. Her job responsibilities include filling prescriptions and performing pill lines. She conducted the pill line during the day, Monday through Friday, and the evening pill line at 1900 hours was handled by the nurses. CPhT Breland was serving at FCI Estill while Plaintiff was housed there.

In DE 17 (5542), a BOP medical record dated November 3, 2016, CPhT Breland notes that Plaintiff refused his medications at pill line. She records that Plaintiff stated he cannot take his medications the way they are prescribed, and that taking them on pill line makes him sick. Plaintiff requested to be taken off pill line and was advised to come to the open house meeting that day to discuss the matter with administrative staff.

In DE 18 (6126), a BOP medical record January 10, 2017, CPhT Breland records that Plaintiff came to the pill line window to get another bottle of Brimonidine eyedrops, stating that he was out. This eyedrop had been filled near the end of November 2016. Dr. Lepiane had rewritten the prescription for two bottles a month on December 22, 2016. CPhT Breland notes that Plaintiff was given another 10ml bottle on that date, which was supposed to last him until the next time to refill his prescription, which was January 18, 2017. CPhT Breland further notes that while Plaintiff was at the window and she was looking at his profile on the computer, Plaintiff told CPhT Breland to look at him. She writes, "when I finally looked at him he turned his bottle upside down and started squeezing it. Clearly he could see that I was looking at him." (DE 18 (6126).) CPhT

Breland testified that she did not talk to Plaintiff further, but simply documented the incident in the medical record.

In DE 18 (6035), a BOP medical record dated June 2, 2017, CPhT Breland documents that all of Plaintiff's medications had been filled on May 25, 2017, the day he came to the pharmacy to request a refill of his eyedrops. She notes that she placed Plaintiff on call out four times since then and he did not show up, nor had he been to the pharmacy to check on his medications. On June 1, 2017, CPhT Breland called Plaintiff's unit for him to come to pharmacy on the next group movement at 9 a.m., but Plaintiff never showed. In DE 18 (6031), a BOP medical record dated June 7, 2017, CPhT Breland documents how Plaintiff continually missed call outs, she called his unit officer to let them know to send Plaintiff to medical, the unit officer stated that Plaintiff was told the last time she called on June 1, 2017 but Plaintiff refused to go to medical, and Plaintiff never showed up on June 7, 2017.

CPhT Breland agreed, under questioning, that DE 18 (6035) does not contain any information about whether an officer brought Plaintiff to pill line, whether an inmate companion was available, or specific reasons why Plaintiff was not at pill line.

### 6. Alexis Chambers, RN

Nurse Alexis Chambers is employed as a nurse with the BOP at FCI Tallahassee. She lives in Tallahassee, Florida. From 2013 to 2017, she was employed at FCI Estill, while Plaintiff was an inmate at that facility. She cared for Plaintiff in her capacity as a nurse on multiple occasions.

In DE 17 (5531), a BOP medical record dated November 10, 2016, Nurse Chambers notes, *inter alia*, that she called Plaintiff to medical to instruct him on using the

ezy-drop guide (the "eyecup" or "cup"), that she provided Plaintiff with five eyecups for use with each individual eyedrop medication, and that Plaintiff demonstrated successful use of the eyedrops with the cup but still stated he could not know how much medication was going into his eye because he cannot feel his eyeball.

Nurse Chambers testified about numerous BOP medical records regarding which she has personal knowledge. The general content and import of those records, as noted therein by Nurse Chambers, is as follows: DE 17 (5522), December 30, 2016, recorded Plaintiff as saying that he has been having eye problems for a long time and that his outside doctors recommended surgery and a consultation with a low-vision specialist; DE 18 (6056–58), May 5, 2017, noted Plaintiff's argumentative interaction with Dr. Lepiane wherein Plaintiff stated that he had no problem with Nurse Chambers, but refused to let anyone else help him or watch him the eyedrops in, and Plaintiff, even after being told he could speak to the HSA about the entire plan of care at 1300 hours, and even after medical staff called Plaintiff's unit to have him report back to medical, did not show up; DE 18 (6030), June 7, 2017, noted Plaintiff refused to take Latanaprost at 1802 and when Nurse Chambers returned to the SHU at 1840, Plaintiff engaged her in the pointless task of filling out a commissary sheet on his behalf only to state after she completed it that he no longer needed it filled out, whereupon Plaintiff refused his medications and refused to sign the refusal paperwork; DE 18 (6025), June 8, 2017, noted Plaintiff refused to take his eyedrop medications and refused to sign the refusal form; DE 18 (6018), June 9, 2017, noted Plaintiff agreed to take all of his eyedrop medications except for Latanaprost, but applied constant squeezing pressure to the bottle of Atropine Sulfate and Timolol Maleate till the drops were running down his face and shirt, after which the bottles were almost

empty even though they had only been used one prior time; DE 18 (6016–17), June 10, 2017, noted Plaintiff was instructed not to waste his eyedrops as he had been doing, but Plaintiff once again, with an officer present as a witness, squeezed the bottle of Brimonidine until the eyedrop solution was running down his face and shirt, completely emptying the bottle, whereupon Nurse Chambers printed a medication summary and read it to Plaintiff at the door of his cell to reeducate Plaintiff on proper use of his medication, but Plaintiff walked away, laid in his bed, and did not respond; DE 18 (6013–14): June 11, 2017, recorded Nurse Chambers called out to Plaintiff several times to come at get his eyedrops, but he would not do it and continued to lay in his bed, when Nurse Chambers asked him to move so that she knew he was alive, Plaintiff made a forceful kick but would not speak to Nurse Chambers; DE 18 (6007), June 13, 2017 noted Nurse Chambers offered Refresh tears and Brimonidine eyedrops to Plaintiff, but he stated "If you not putting them in my eye, I don't want them"; DE 18 (6003), June 14, 2017, noted Plaintiff refused his eyedrops at 0600 pill line; DE 18 (5994), June 15, 2017, noted Plaintiff refused his eyedrops from Nurse Chambers and stated, "Hey, I would like you to bring my eye glasses today," "I don't like nurse [Ulmer] to I didn't take them from her yesterday," and "I feel threatened by her," but when Nurse Chambers inquired why Plaintiff felt threatened or what Nurse Ulmer had done, Plaintiff stated, "I don't have to tell you why I don't like her"; DE 18 (5980), June 19, 2017 (morning), noted Plaintiff refused his eyedrops and continued to state that he was not given his eyeglasses, even though they were offered to him twice the prior week; DE 18 (5979), June 19, 2017 (evening), noted Nurse Chambers offered Plaintiff his 1300 pill line eyedrops, but Plaintiff did not respond and refused to come to the door or answer with a verbal response; DE 18 (5974), June

20, 2017, noted Nurse Chambers offered Plaintiff his eyedrops three times through the flap of the cell door, but Plaintiff would not reach or grab for the eyedrops; DE 18 (5972), June 21, 2017, noted Nurse Chambers offered Plaintiff his medication three times, and although Plaintiff was moving and sat up in bed, he would not speak to Nurse Chambers to accept the medications; DE 18 (5964), June 22, 2017, noted Plaintiff was argumentative and yelling about how he needs and is entitled to two containers of Refresh drops for a single pill line dosage, even though he only requires two drops in each eye and a single container of Refresh drops contains approximately eleven drops; DE 18 (5917), July 10, 2017, noted Plaintiff stated, as Nurse Chambers was attempting to administer his eyedrops for him, "you're too heavy handed," "do you have kids?", and "I just figured that if you're someone's mom you would be more gentle," whereupon Nurse Chambers advised Plaintiff that she would attempt not to touch him at all if he would open his eyes, but Plaintiff refused to open his eyes or place his head back for Nurse Chambers to administer the eyedrops.

When questioned about her November 10, 2016 note (DE 17 (5531), Nurse Chambers stated that she was not sure if that was the first time she attempted to educate Plaintiff on the use of the eyecup. He could have been educated by other nurses on the eyecup as well. She would not describe the training on the eyecup as unsuccessful. When you give an eyedrop to yourself it does not all simply absorb into the eyeball, so the fact that some of the drops ran down Plaintiff's face does not mean it was unsuccessful. Nurse Chambers testified that when Plaintiff was administering the eyedrop with the cup he stated he could see the eyedrop. She further testified that the fact that some of the eyedrops ran down his face was not necessarily a big concern because there was an

excess of eyedrops. In her view the eyedrops were not profusely coming down his face.

When asked whether Plaintiff had a talking watch at the time Nurse Chambers tried to reeducate him on the use of the eyedrops (DE 18 (6016–17)), she testified that he did not. She went on to state that the medical staff went to Plaintiff's door during the times that the eyedrops were to be administered, so although he may not have had a clock, he could rely on the time frame as kept by the nurses.

### 7. Plaintiff's Testimony Regarding FCI Estill

When asked to comment on other witnesses' testimony that Plaintiff intentionally wasted his eyedrops and/or squirted them out and caused them to run down his face for an improper reason, Plaintiff stated that he never purposefully wasted his eyedrops.[15] He further stated, "In all honesty, that situation only happened one time with one nurse—let me correct myself. Excluding the times when I put the drops in and felt it run down my face and stopped, that was often, but not to the extent that we're talking about. The extent that you're talking about is only—only happened once at Estill." Plaintiff went on to assert that the nurses at FCI Estill tried to teach him how to administer the eyedrops on his own and they were not good teachers. This was the third institution where the medical staff tried to teach him, FCI McCreary, FCI Williamsburg, and FCI Estill. They talked him through every single step, "[e]ven the littlest minute thing," which Plaintiff found to be annoying. Then they offered Plaintiff the eyecup to assist him. Plaintiff stated the staff at all institutions confirmed that when they tried to teach him or offered him something to assist, he "showed up" for the lesson. He explained that the eyecup has a hole at the top where you stick the medication bottle in, and it holds the bottle. The eyecup lines up the

---

[15] The Court found this portion of Plaintiff's testimony to be incredible based on the preponderance of the testimony and documentary evidence admitted.

medication with your eye, you squeeze the bottle, and the drop should hit the target.

Plaintiff testified that Nurse Chambers is the one who instructed him on how to use the eyecup. She came down to the unit and to his cell by herself, with no guard or Lieutenant, and took the time to instruct him on how to use it. Plaintiff then asserted that he is a peaceful person and not combative like the BOP witnesses have represented.[16] When the eyecup worked well, Nurse Chambers told Plaintiff to let her know how it was going in a few days, and Plaintiff was "a happy camper." But, according to Plaintiff, it is a problem that the cup is rubber because it starts to lose its rigidity and "wobble" after repeated use, and because the eyedrop bottles are not all the same size and do not all fit in the cup.[17]

Plaintiff testified that Dr. Lepiane was in charge of his care when he was housed at FCI Estill. At the time he was not aware that Dr. Lepiane put in a transfer request on his behalf. Plaintiff testified that, when he got to FCI Estill, they had an inmate companion to assist him, and they had multiple companions for him. Plaintiff asserted that "these inmates caused [him] more injury than they caused help."

Plaintiff did not know, in May 2016, that Dr. Goulas recommended (*see* PE 2305)

---

[16] On this point, the Court found, to quote the Bard, that "the [gentleman] doth protest too much." The preponderance of the evidence supports a finding that Plaintiff was routinely argumentative and unreasonable with his caregivers. His assertion that he is a peaceful person, as it pertains to his behavior toward caregivers that he does not prefer, was incredible.

[17] At this point in Plaintiff's testimony, he began a long, rambling account, spanning multiple pages of the transcript, of how he went back to medical to report to Nurse Chambers that the eyecup was not working as it had initially, and of how it was unfair that he was given an administrative citation (a "shot") for being out of bounds, but his inmate companion who brought him to medical was not. The Court had to *sua sponte* interject and encourage Plaintiff's counsel to ask another question. Whereupon Plaintiff continued right where he left off, asserting that Nurse Chambers came to the SHU to observe him using the medications with the eyecup, that the medication overflowed and ran down his face, that the medication was already close to being empty anyway, and "[j]ust like the BOP," the staff exaggerated the situation and Nurse Chambers wrote him a shot. Plaintiff concluded, "Now, after getting the shot, we ain't doing that no more. That—each shot is a ticket to staying incarcerated longer. So, I'm not doing that anymore. That scenario, where it ran down my face, and she wrote me that shot, was the last time it ever happened. And it only happened with Nurse Chambers and no other nurse, period."

Plaintiff be given assistance placing his eyedrops in his left eye. He stated that after May 2016, he did not get assistance at FCI Estill in the form of someone placing his eyedrops for him. He further stated that he was on a self-administration regimen with his eyedrops from the day that he got to FCI Estill until July 2017, and that he had the same issues with self-administration there as he experienced at previous facilities. Plaintiff testified that he had the same issues getting to pill line at FCI Estill that he experienced at FCI Williamsburg. He asserted that some of the no-shows represented in the MAR were attributable to him not being able to make it to pill line on time and difficulties finding inmate companions that could help him get there. Regarding the refusals in the MAR, Plaintiff asserted that the medical staff misrepresented no-shows as refusals, and that he never refused his medication in his time at the BOP: "I think [Nurse Ulmer] said it was like 80. There might be 80 or 90 no-shows, but there are zero refusals." The Court found Plaintiff's statement that he never refused his medication to be *highly* incredible based on the overwhelming amount of testimonial and documentary evidence to the contrary.

As to Dr. Kammerdiener's recommendation following the diode laser surgery that patient receive assistance instilling his eye drops (*see* PE 2370), Plaintiff stated that at first he did not receive assistance, but eventually he did. He further stated that he received ambulation assistance at FCI Estill. Plaintiff testified that the blind-assistance cane training was not successful. He asserted that part of the reason for the cane training was because of the perception that was created by him walking around the compound with his hand on another man's shoulder, "that maybe we was more partners you know," and that "it made [him] more of a target for sexual innuendos." Plaintiff further asserted that Ms. Madison informed him that she would not be able to change that for him because the

design of the compound at FCI Estill prevented her from fully teaching him the use of the cane. In other words, he would still need personal human assistance. The Court found Plaintiff's self-interested testimony blaming to the ineffectiveness of the cane training on Ms. Madison to be incredible.

Plaintiff stated that while he was at FCI Estill he did not get a consultation with a low-vision specialist, braille materials, a talking watch, or a safe/lock for his personal property. He further stated that he obtained the sunglasses he wore throughout trial in 2011, even before he got to FCI Williamsburg. Counsel placed three pairs of eyeglasses on the projector and represented that Plaintiff had given them to him at the beginning of trial. The glasses were marked as PE 2595 for identification.[18] Plaintiff stated that two of the pairs of glasses were the pairs that Nurse Ulmer testified he was provided in 2017. Plaintiff asserted that the sunglasses he wore throughout trial (which, the Court noted, appeared to be very dark) were the glasses he had when Dr. Nutaitis said he needed a darker pair, "So if they ain't darker than this, then I don't know what to say." The glasses marked as PE 2595 for identification were lighter in tint than the sunglasses worn by Plaintiff.

### 8. Consolidated Findings Regarding FCI Estill

The preponderance of the evidence established that Plaintiff was on a self-administration regimen for his eyedrops when he arrived at FCI Estill. Because Plaintiff was noncompliant with his eyedrops, and in an effort to ensure that Plaintiff was properly applying his eyedrops and not hoarding or wasting them, Dr. Lepiane directed that Plaintiff receive his eyedrops at pill line under the observation of the medical staff. Plaintiff

---

[18] The glasses were initially marked in error as "PE 2594 for identification," but that exhibit slot had already been taken by Dr. Amy Kotecha's curriculum vitae. "PE 2595 for identification" represents the final marking.

routinely refused his eyedrops if they were not provided by his preferred medical staff members and for other unexplained reasons. Later, when it was arranged for a nurse to administer Plaintiff's eyedrops in the SHU, Plaintiff also refused to allow the staff to administer his eyedrops if it was not done by his preferred nurse(s). Plaintiff's refusals, along with his refusals to sign the refusal forms, are comprehensively documented in the records admitted into evidence and confirmed by the testimony.

The preponderance of the evidence shows that Plaintiff was capable of administering his own eyedrops but did not want to do so because he preferred a nurse to do it for him. He had many years of experience administering the eyedrops on his own. The FCI Estill medical staff observed Plaintiff successfully administer the eyedrops on numerous occasions, repeatedly provided him with assistive devices to aid him with the administration, and routinely delivered his medications when he could not come to retrieve them himself. Nevertheless, Plaintiff obstinately refused to use the eyedrops properly, sometimes intentionally wasting the medication by squirting out entire bottles and claiming that the staff had given him empty bottles. Plaintiff also refused to allow various nurses to observe him put the eyedrops in for himself and was often rude and disrespectful to the nursing staff who were attempting to assist him while he was at FCI Estill. The evidence did not show that Plaintiff's outside providers had the same or similar opportunity as the FCI Estill medical staff to observe his ability to administer his eyedrops. Rather, the preponderance of the evidence established that the outside providers' recommendation that Plaintiff receive assistance in administering his eyedrops was based on Plaintiff's subjective reporting to the outside providers during relatively short consultative appointments. On February 22, 2017, Plaintiff had diode laser surgery at the

Storm Clinic to relieve elevated IOP in his left eye and mitigate the further progression of his glaucoma.

There was a discrepancy between the #4 gray tint glasses recommended by the contract optometrist and the #3 gray tint glasses provided to Plaintiff. However, the #3 gray tint glasses are the darkest tint provided by the BOP, as confirmed by the applicable contractor, due to an increased tripping risk presented by the darker tint. As further elucidated in the conclusions of law below, this discrepancy does not arise to the level of a violation of the Rehabilitation Act or the Eighth Amendment under the circumstances. Moreover, Plaintiff possessed dark sunglasses before he ever got to FCI Williamsburg and repeatedly refused the glasses that were offered to help him with his photosensitivity at FCI Estill.

The evidence established that when the FCI Estill medical staff arranged for Plaintiff to receive instruction on the blind-assistance cane, he stubbornly refused to comply with the instructions provided such that the orientation and mobility specialist, Ms. Madison, discontinued the training after only two or three visits. Lastly, the evidence showed that Plaintiff was assigned an inmate companion when he arrived at FCI Estill, and the medical staff took reasonable steps to provide him with replacement companions when Plaintiff's existing companions did not want to work with him because of his unreasonableness and/or because Plaintiff made allegations of abuse against them, which were unsubstantiated.

### D. FCI Edgefield

Plaintiff was transferred to FCI Edgefield on July 12, 2017. In anticipation of Plaintiff's arrival at FCI Edgefield, the medical staff prepared an inmate companion

program to assist Plaintiff with navigating the compound and getting to appointments, programs, and the chow hall. Through the psychology department, at least six inmates were hired and instructed how to assist Plaintiff as inmate companions.

### 1. Rex Blocker, MD

Dr. Rex Blocker graduated medical school in 1998, began serving as a medical doctor with the BOP in 2000, and retired from service in 2019. This was a second career for him, as he taught middle school physical education from 1977 to 1993. Dr. Blocker was the Clinical Director at FCI Edgefield while Plaintiff was housed at that facility, which was July 12, 2017 to February 7, 2018. As Clinical Director, Dr. Blocker supervised the entirety of the medical care provided at FCI Edgefield. It was his responsibility to ensure that the medical staff followed BOP policy.

In Dr. Blocker's experience, a very small percentage of BOP inmates, probably less than one percent, have glaucoma and are legally blind. Dr. Blocker agreed that, to the extent that an outside ophthalmologist made recommendations regarding an inmate's glaucoma that did not conflict with BOP policy, the medical staff would follow those recommendations to be the best of their ability. However, sometimes outside providers recommend things that they believe to be medically necessary, but the BOP cannot provide.

Plaintiff is the only blind inmate that Dr. Blocker can recall from the relevant time period at FCI Edgefield. Dr. Blocker agreed that Plaintiff's blindness is a disability and that his glaucoma is a serious medical condition. When shown PE 2001, the BOP's Revised Medical Classification Criteria ("Revised Criteria"), Dr. Blocker acknowledged that safety and vulnerability are considered part of the functional criteria in determining a

care level assignment for any particular inmate. (*See* PE 2001 at 4.) He agreed that blind inmates are particularly vulnerable in the prison setting. Under the definitions in the Revised Criteria, an inmate who is blind but copes with the general population of the institution with the assistance of an inmate companion would not score as a care Level 3 or 4. Dr. Blocker agreed that a blind inmate who does not so cope "could" classify as a Level 3 or 4. When shown PE 51, the BOP's Program Statement for Medical Designations and Referral Services ("Designations Statement"), Dr. Blocker acknowledge that if proper treatment cannot be provided at the institution where an inmate is located, the inmate can be redesignated and transferred, possibly to a FMC. (PE 51 at 5.)

When Plaintiff arrived at FCI Edgefield, Dr. Blocker sent him to an ophthalmologist in Aiken, South Carolina named Dr. Daniel Smith. In PE 2004, an August 2, 2017 medical note written by Dr. Smith, he indicates that Plaintiff had advanced stage glaucoma in both eyes ("OU" being shorthand for both eyes). Dr. Blocker confirmed that this was a serious medical need. Dr. Smith's August 2 note indicates that Plaintiff was prescribed four different eyedrops for his glaucoma, as well as artificial tears. Dr. Smith also referred Plaintiff to a glaucoma specialist for further treatment. Dr. Blocker could not remember whether Plaintiff was sent to a glaucoma specialist during his time at FCI Edgefield, but agreed that if Plaintiff had seen a glaucoma specialist, there would be a record of it. Dr. Blocker could not say whether Plaintiff saw a low-vision specialist during his time at FCI Edgefield, and had no memory of that occurring. Dr. Blocker did not deal with the issuance of locks, so he could not say whether Plaintiff received an alternative lock or safe meant for visually impaired individuals.

In the appendix to the BOP staff guide for Managing Inmates With Disabilities

("Managing Inmates"), it states that all staff should know that inmates have been provided assistive equipment or devices by medical, such as wheelchairs, walkers, and canes. (PE 2018 at 10.) Dr. Blocker remembers seeing Plaintiff with a blind-assistance cane but is not sure whether it came from FCI Edgefield or Plaintiff's previous institution. He agreed that the cane was something Plaintiff needed to help him move around the compound, and that it would be important for the cane to be full length so that it would work properly. Dr. Blocker does not know if Plaintiff was ever provided with braille materials at FCI Edgefield. He was not familiar with the concept of a talking watch and did not know if Plaintiff had been provided such a watch.

When asked whether an inmate companion could administer medications, Dr. Blocker replied that he would have to check whether that was permitted and did not remember whether there is any regulation or policy that would permit such an arrangement. He did not think that Plaintiff was provided with regular assistance administering his eyedrops at FCI Edgefield, but he had no specific memory on that point. Dr. Blocker affirmed that Plaintiff did not always get his medications as prescribed while at FCI Edgefield.

In PE 2005, a medical note written by Dr. Smith of Aiken Ophthalmology and dated November 30, 2017, Dr. Smith records that Plaintiff complained of not receiving his eyedrops as prescribed. The note states that Plaintiff should be taking four different sets of eyedrops as directed and again refers Plaintiff to a glaucoma specialist, Dr. Fechter. (PE 2005 at 2.) Dr. Blocker does not recall Plaintiff being sent to Dr. Fechter.

In PE 2399, a BOP medical record dated December 1, 2017, Dr. Blocker states that he reviewed Plaintiff's MAR for the prior month. He notes that Plaintiff missed several

doses of eyedrops. For example, Plaintiff was supposed to take Atropine twice daily in both eyes. But the MAR reflected that Plaintiff missed twenty-seven doses of Atropine. Similarly, Plaintiff was supposed to take Brimonidine three times daily in both eyes, but over the prior month he had missed thirty-four doses. Plaintiff was also prescribed Timolol and Latanoprost at that time. When asked whether he failed to check the MAR for those medications, Dr. Blocker stated he did not know and could not remember specifically. When asked to affirm that Plaintiff had been correct in his reporting to Dr. Smith that he was not "receiving" his eyedrops as prescribed, Dr. Blocker questioned whether the issue was that Plaintiff was not "receiving" them, or not "taking" them.

Dr. Blocker testified that the medical staff knew Plaintiff was coming to FCI Edgefield before he arrived. In preparation for Plaintiff's arrival, Dr. Blocker reviewed his medical records to see what was going on with Plaintiff as a patient at that time. Dr. Blocker also had conversations with various departments that provided input. He recalls that there was an inmate companion program set up for Plaintiff, but he was not involved with that program. The psychology department helped set up the companion program for Plaintiff because they had set up companion programs for other inmates in the past. Plaintiff had several inmate companions while at FCI Edgefield. Dr. Blocker was not sure of the reasons that Plaintiff's companions were replaced.

Dr. Blocker testified that if an outside specialist made a recommendation, either he or another provider would review it, and, if possible, comply with what was recommended. If, for some reason, the recommendation could not be followed, then the medical staff would try to determine a workable alternative or substitute. For example, if an outside doctor prescribed a medication that was not in the BOP formulary, then the medical staff

would try to substitute another medication that had equal effects with the same treatment regimen. If an outside doctor recommended that an inmate needed assistance with his ADLs, then the medical department would try to comply with that recommendation as well. For example, if the outside doctor said the inmate needed a lower bunk, that is something medical would attempt to accommodate. Per the Revised Criteria, the BOP defines ADLs as eating, urinating, defecating, bathing (personal hygiene), and dressing/undressing. (PE 2001.) If something was recommended that was against BOP policy, then the medical staff would not be able to implement the recommendation without approval from higher BOP authority, who would review the recommendation in the context of the individual.

At FCI Edgefield, the pill line occurred in the morning, afternoon, and evening. Inmates that needed controlled medications once, twice, or three times a day had those medications distributed by health services staff. If an inmate has a self-carry medication, the medical staff does not document the inmate as having taken it because the inmate is permitted to take the medication back to their unit and use it as directed. So, if FCI Edgefield was keeping a record of how many times Plaintiff missed his medication, it indicates that the medication was being provided via pill line. Medication refusals were an issue with Plaintiff at FCI Edgefield. Dr. Blocker encountered other instances where an inmate refused medication, but they were "very, very seldom." Plaintiff had to the right to refuse his medication and if he refused, the medical staff would indicate to him what the consequences might be if he did not take the medication.

Dr. Blocker testified that, per the Revised Criteria (PE 2001), the Clinical Director does not have the authority in and of himself to redesignate an inmate's care level. Rather,

a redesignation request is sent to the BOP Medical Designations Unit in Grand Prairie, Texas, where a team of administrative personnel, including various health care practitioners, reviews the request and makes the final determination.

DE 18 (5910), a BOP medical record dated July 12, 2017, documents the "14 Day Physician Eval encounter" that Dr. Blocker conducted on the day that Plaintiff was transferred to FCI Edgefield. Dr. Blocker explained that when an inmate with chronic care issues comes to a new facility, this type of evaluation is conducted within fourteen days of the inmate's arrival so that the physician can understand what the inmate needs and familiarize himself with the inmate's treatment plan. The portions of the record that indicate what the patient is reporting are based on the patient's subjective statements during the evaluation. At the time, Plaintiff was on a four-eyedrop regimen as well as refresh drops for dry eyes. Plaintiff's main concern was his fear of being "on the compound" while being legally blind. He expressed fears of harassment and sexual victimization, which he asserted had happened multiple times since he lost his sight. Plaintiff reported not having his eyedrops in the past twenty-four hours, thereby missing multiple scheduled doses. He was also fearful of not being able to maneuver himself around the compound. Dr. Blocker deferred taking Plaintiff's vitals and conducting an exam due to the amount of time spent discussing a plan for accommodating Plaintiff's blindness. During this encounter Dr. Blocker established a doctor/patient rapport with Plaintiff.

In DE 18 (5862–63), a BOP medical record dated September 1, 2017, Dr. Blocker documents that Plaintiff refused his eyedrops on several occasions with complaints regarding the personnel giving the drops. Dr. Blocker testified that if a patient complained

84

about the personnel providing a service to him, the medical staff would discuss the issue in their daily morning meetings to determine whether it was a staff or an inmate problem, and then to see what could be done to alleviate the problem. He further testified that the medical staff at that time included three or four nurses and two or three mid-level providers. The inmate population at FCI Edgefield was approximately 2,100, with forty to sixty percent of those inmates enrolled in chronic care. So, the supply of medical staff assigned to serve that population was certainly not unlimited.

In DE 18 (5860–61), a BOP medical record dated September 7, 2017, Dr. Blocker documents a PREA evaluation encounter that he conducted with Plaintiff. This type of evaluation is performed when an inmate claims that he has been sexually assaulted. Dr. Blocker notes that Plaintiff alleged he was "groped" when he first arrived at FCI Edgefield, with the date of injury being July 12, 2017. The date reported for treatment was September 7. Plaintiff did not provide any information about where the injury happened. Plaintiff reported to a Lieutenant and requested to be placed in the SHU because he feared for his safety. Plaintiff also reported that he was physically assaulted "a couple of days ago." At the HSU, Plaintiff would not give any information regarding the incidents and refused to allow Dr. Blocker to conduct a physical examination. In the "Exam Comments" section of the record, Dr. Blocker notes his observations that while Plaintiff was in the exam room and being escorted out of HSU, Plaintiff showed no evidence of injury, pain, or discomfort. Dr. Blocker testified that if an inmate wanted to be placed in the SHU, that would be a decision for the custody staff not the medical staff.

DE 18 (6265), is a BOP medical treatment refusal form dated July 19, 2017. Nurse Charles Thomas notes that Plaintiff refused to let him administer Plaintiff's eyedrops.

Plaintiff refused to sign the refusal form. DE 18 (6264), is the same form dated July 20, 2017. DE 18 (6258), is the same form dated July 22, 2017. DE 18 (6260), is the same form dated July 23, 2017, which also notes that Plaintiff stated he was refusing to let Nurse Thomas administer his eyedrops because it was not his preferred provider. DE 18 (6262), is the same form dated July 24, 2017, which notes that Plaintiff was refusing because it was not his preferred provider. DE 18 (6253), is the same form dated August 5, 2017, which notes that Plaintiff was refusing because it was not his preferred provider. DE 18 (6237), is a refusal form dated November 7, 2017, in which Dr. Blocker notes that Plaintiff refused to go to a scheduled ophthalmology appointment and refused to sign the refusal form.

In DE 18 (5836), a BOP medical record dated November 7, 2017, Dr. Blocker documents that Plaintiff was scheduled for a follow-up ophthalmology appointment, but Plaintiff refused to go until he received his scheduled eyedrops and his noon meal, whereupon a nurse was called and Plaintiff was given his eyedrops, and Plaintiff was told he would be provided a lunch to eat enroute to his appointment, but Plaintiff refused to agree to this and said he would not go. (*See* DE 18 (6237) (related refusal form).) Dr. Blocker testified that it is not a normal occurrence for a patient to refuse to go on a medical trip.

Dr. Blocker was further questioned about DE 18 (6232),[19] Dr. Smith's November 30, 2017 medical note from Aiken Ophthalmology. The note states, in relevant part: "Patient states that he is not recieving drops like he has been prescribed and he recieves Atropine once daily, Artificial Tears twice daily, and Timolol once daily in both eyes. States

---

[19] DE 18 (6232) is the same as PE 2005, so it was unnecessary for it to be separately admitted.

he is not receiving Latanoprost at all." (PE 2055 (errors in original).) Dr. Blocker confirmed

that, after he received Dr. Smith's note, he reviewed Plaintiff's MAR to determine whether

Plaintiff's assertions were accurate. PE 2399[20] is Dr. Blocker's December 1, 2017

administrative note, in which he documents the results of his MAR review. Dr. Blocker

testified that because Plaintiff was on pill line for his eyedrops at the time, there would be

a record if he missed a dosage. Likewise, if Plaintiff had been missing or refusing doses,

it would be represented on the MAR. Though Plaintiff stated that he was not receiving

Latanaprost at all, Latanaprost was not indicated as a medication that Plaintiff had missed

during Dr. Blocker's review of the MAR. Timolol was also not indicated as a medication

that Plaintiff missed during the relevant time period.

### 2. Charles Thomas, RN

Nurse Charles Thomas resides in Jacksonville, Florida. He is employed with the

U.S. Public Health Service and currently detailed to the ICE Health Service Corps,

Department of Homeland Security. He was formerly employed as a nurse at FCI

Edgefield, while Plaintiff was an inmate there.

Nurse Thomas testified that FCI Edgefield did not have a medical companion

program until Plaintiff was scheduled to come to their facility, but mental health services

did have a companion program. The HSA called Nurse Thomas into her office and told

him about an incoming blind inmate, that they needed to set up a companion program,

and that he would be in charge of putting the program together and running it. There was

a pool of six to eight inmates that had already been vetted through the psychology

department to serve as inmate companions. Nurse Thomas brought those inmates in and

---

[20] DE 18 (5814) is the same as PE 2399 and was not separately admitted.

explained what the process was going to be, that they would be Plaintiff's every-day guides to appointments and help him get around, but would not assist him with his ADLs. Nurse Thomas testified that they trained and instructed the inmates on what their level of involvement would be.

When Plaintiff first came to FCI Edgefield, Nurse Thomas conducted his medical intake and ensure that his basic medical needs were met, and he was set up for any necessary appointments. Nurse Thomas explained the inmate companion program to Plaintiff and that the plan was for his companions to rotate every three hours. He further explained how sick calls, appointments, and pill lines worked at FCI Edgefield. Nurse Thomas testified that this encounter got "a little heated" when he asked Plaintiff his level of vision. Plaintiff was aggravated by the question. Nurse Thomas stated, "He said: I'm blind. I said: Well, what level? Can you see shapes, colors, light? He said I'm blind. And he was loud about it. I said: Well, I just need to know because that's kind of important to talk to the other companions about what you can see and what you can't see. So, he finally said: Well, I can see light. So that's what I wrote down." When Nurse Thomas asked Plaintiff about the blind-assistance cane, he got aggravated again and insisted that of course he knew how to use the cane.

Nurse Thomas testified that Plaintiff preferred to have the female nurses administer his eyedrops. The nursing staff was instructed to administer the eyedrops three times a day according to the prescriptions. But Plaintiff did not like some members of the staff, especially Nurse Thomas, to place the eyedrops. Nurse Thomas testified that he told Plaintiff he could not choose his nurse, and that it was his duty to administer the drops. When Plaintiff observed that Nurse Thomas was on duty, he would state that he

wanted someone else to place the drops, and when Nurse Thomas told Plaintiff that he would be taking care of him, Plaintiff would often just leave. On those occasions, Nurse Thomas would document that Plaintiff refused his medication.

Nurse Thomas stated that everyone started with high hopes for the inmate companion program. Everyone was on board and wanted to help. However, the companion program "quickly went downhill." Nurse Thomas began getting reports from the inmate companions that Plaintiff was extremely disrespectful and rude to them, and that he was mistreating them. The companion program started with six to eight inmates and Nurse Thomas recalls that every one of them either quit based on his actions toward them or said they did not want to continue what they were doing or could not come in for certain work hours because they had a conflict in their schedule. So, the medical staff had to find more people to participate in the companion program. Nurse Thomas stated that Plaintiff was always very well kept, dressed to regulations, and very neat. He never looked disheveled or unkempt.

Nurse Thomas was asked to comment on various BOP medical records that he prepared, as follows: DE 18 (6128–31), July 12, 2017, noted that upon Plaintiff's medical intake interview when he arrived at FCI Edgefield, Nurse Thomas confiscated his medication to go through it, determine whether it was still valid, dispose of any that was no longer good, and reissue medication as necessary from the pharmacy; DE 18 (5905), July 14, 2017, noted Plaintiff wanted to talk about other things at pill line, whereupon Nurse Thomas told Plaintiff that he was only there to administer Plaintiff's eyedrops and that if Plaintiff was not going to have his medication administered then he needed to leave, but Plaintiff would not leave even when Nurse Thomas gave him a direct order, so the

Lieutenant had to come and get Plaintiff; DE 18 (5903), July 19, 2017, noted that during pill line Nurse Thomas instructed Plaintiff to enter the exam room for administration of the eyedrops, but Plaintiff refused; DE 18 (6258–65), July 19, 2017, documented refusal form pertaining to the previously cited incident; DE 18 (5900), July 20, 2017, noted Plaintiff asked who would be doing his eyedrops at the 1500 hours pill line and when he found it would be Nurse Thomas, he left; DE 18 (5898–99), July 22, 2017, same as previous; DE 18 (5896–97), July 23, 2017, same as previous; DE 18 (5895), July 24, 2017, noted that Plaintiff came to medical to receive his morning eyedrops, demanded to talk to the Clinical Director, requested that Dr. Blocker administer his eyedrops instead of Nurse Thomas, and requested a Lieutenant from Dr. Blocker, whereupon a Lieutenant arrived and agreed to stand alongside Nurse Thomas while he administered the eyedrops, but Plaintiff refused and requested to be let out of the medical department because he did not get his preferred provider; DE 18 (6253), August 5, 2017, documented refusal form when Plaintiff refused to let Nurse Thomas administer his eyedrops because it was not his preferred provider; DE 18 (5868), August 19, 2017, noted Plaintiff arrived at morning pill line and, upon approaching the service window, asked if any other nurses were working now, when he was told Nurse Thomas was the only nurse working he exited the medical department with his companion and without receiving his morning medications; DE 18 (5866–67), same as previous.

Nurse Thomas testified that the medical inmate companion program was created for Plaintiff. Nurse Thomas was instructed to create the program by HSA Patina Battle. HSA Battle told Nurse Thomas at the time that Plaintiff had been in other BOP facilities and that he was a noncompliant, difficult patient. She also told Nurse Thomas that Plaintiff

had already brought a lawsuit. The inmate companions were paid to help Plaintiff, but Nurse Thomas was not involved with the payment, only managing the people.

When questioned about the refusal forms he completed (*e.g.*, DE 18 (6258)), Nurse Thomas agreed that Plaintiff did not fill out anything on the forms. When questioned about the warning on the forms that the possible consequences of refusal were, "Eye sight can worsen resulting in loss of vision and even death," Nurse Thomas testified that he understood the suggestion of death is extreme, but if you do not take your medicine you might develop some kind of infection in your eye that could lead to a brain infection, which could kill you. He agreed that in that event, the infection would be causing the death.

### 3. Plaintiff's Testimony Regarding FCI Edgefield

Plaintiff testified that Dr. Blocker was in charge of his care at FCI Edgefield. He does not recall seeing Dr. Smith as an outside provider. He does not remember seeing a glaucoma specialist at any point while he was at FCI Edgefield.

Plaintiff stated that he was not provided a blind-assistance cane while at FCI Edgefield, and that FCI Estill is where he obtained the cane. Plaintiff reverted to a discussion of Ms. Madison's training and asserted, "The second time she came out, Ms. Madison did not end the sessions, my counselor—no, not my counselor. My case manager at Estill is the one who ended the sessions abruptly and immediately for the—I don't know why. I don't know why. I did not get an incident report." The cane Plaintiff had at FCI Edgefield was the same cane he was given at FCI Estill. Plaintiff stated that the cane did not work properly because it was too short for him. He further stated that he never got a properly sized cane.

91

Plaintiff testified that he never received any braille materials, a talking watch, or consultation with a low-vision specialist while at FCI Edgefield. He asserted that one of his inmate companions at FCI Edgefield walked him into the steel gates that surround the metal detector in the middle of the compound, causing him injury, and "[t]imes like that where the inmate companion caused [him] injury, [he] asked for a different companion." He further asserted that, in the process of the prison staff removing one companion and assigning another, he would inform medical staff that it was going to be extremely difficult for him to get to pill line, that he was not refusing and wanted his medication, but without the inmate companion it would be hard to make it there. Plaintiff testified that he never refused his medication at FCI Edgefield. The Court found this assertion to be lacking in credibility based on the weight and volume of contrary evidence that was admitted. Plaintiff stated that he was experiencing eye pain during his time at FCI Edgefield.

### 4. Consolidated Findings Regarding FCI Edgefield

The preponderance of the evidence showed that the medical staff at FCI Edgefield established and operationalized a medical inmate companion program specifically for Plaintiff. At least six inmate companions were vetted, hired, and instructed in advance on how they were to assist Plaintiff. Though the program began with high hopes, many of Plaintiff's inmate companions quit because he mistreated them and they did not want to keep working with him. Plaintiff continued his pattern of refusing his eyedrop medications when they were not provided in the way and by the staff member(s) he desired. Plaintiff also refused a scheduled ophthalmology appointment because he would not depart for the trip without first being given his noon meal, even though he had been assured he would receive the meal while enroute to the appointment.

### E. FCC Butner

#### 1. Larence Sichel, MD

Dr. Lawrence Sichel is currently a medical officer at FCI Butner Medium I. He has been a doctor at FCC Butner for fifteen years. Butner is a Federal Correctional Complex, meaning that there are multiple facilities on the campus. Dr. Sichel has worked at other facilities within FCC Butner, but in his current role, he is responsible for directing all of the medical activities at FCI Butner Medium I. He also follows some patients directly. This includes yearly evaluations for all patients that are in chronic care, and all new inmates coming into the facility. He no longer sees those patients for interim visits, as nurse practitioners now conduct the sick calls and follow-up visits. Prior to a system change, however, he did conduct the interim visits and was following the Level 3 inmates and selected other inmates with more complex issues.

Dr. Sichel is familiar with Plaintiff and his medical condition. Plaintiff was not one of the patients that Dr. followed previously because Plaintiff was care Level 2. Thus, Plaintiff would have been seen by a nurse practitioner with Dr. Sichel's supervision. Dr. Sichel agreed that Plaintiff is legally blind, which is not the same as total blindness, and that people who are legally blind may have some vision that is worth saving. In his time at Butner, Dr. Sichel recalls one other inmate who is visually impaired. Dr. Sichel oversees the care for about 650 inmates at FCI Butner Medium I with approximately 370 of those inmates being in chronic care.

Dr. Sichel testified that, when providing care for disabled inmates, the medical staff tries to individualize care to the needs of the particular inmate. They try to work with the disabled inmate to allow the inmate to access medical care as best as possible. Dr. Sichel

agreed that legal blindness is a form of disability and that the medical staff might have to make arrangements to provide different access to a legally blind inmate.

When an inmate is transferred into the facility, if the inmate has been in the BOP, then Dr. Sichel is able to access the inmate's medical records. He does not typically review all of the records at great depth when the inmate first arrives. When Dr. Sichel sees the inmate for his yearly visit, then Dr. Sichel does a more in-depth review of the records. The depth of Dr. Sichel's medical record review upon arrival varies with the circumstances surrounding each individual inmate. He did not review Plaintiff's records in-depth at the time of transfer because Plaintiff was coming from the low security institution within the Butner complex. Such a case essentially involves a continuation of the care Plaintiff was already receiving, so typically a nurse practitioner would have renewed the medications that Plaintiff was getting at the previous institution and Dr. Sichel would not have had much involvement at the beginning.

Dr. Sichel testified that the medical staff has attempted to provide Plaintiff with an inmate companion to help him get around the complex and do things that he would have trouble doing due to the limitations of his eyesight. Sometimes it is within Dr. Sichel's role to recommend that, and nurse practitioners can recommend that as well. Dr. Sichel does not recall whether he made that recommendation in Plaintiff's case. Plaintiff was referred to an occupational therapist, but Dr. Sichel was not sure whether he or the nurse practitioner made the referral.

In PE 2422, a BOP medical record dated January 3, 2019, Occupational Therapist C. Kaminski recommends that Plaintiff be provided a talking watch and a low-vision lock for his locker. Dr. Sichel has no direct knowledge of whether Plaintiff received those

things. He would not be involved with approving Plaintiff's receipt of those items. He would also not be responsible for approving whether Plaintiff was referred for braille training or received braille materials.

Dr. Sichel agreed that the recommendation to provide Plaintiff with an inmate companion was made in order to help Plaintiff access his care, and to do so safely. That need existed because Plaintiff is legally blind, and Plaintiff was legally blind before entering FCI Butner Medium I. When questioned as to whether he had been made aware that Plaintiff was involved in litigation related to his medical care against the BOP when Plaintiff arrived at Butner, Dr. Sichel responded, "Not initially, no." He stated that he only became aware of the litigation when he was called for a deposition.

Dr. Sichel, from his review of the occupational therapy notes, believes that Plaintiff was offered a blind-assistance cane during his time at Butner. When questioned as to whether the cane would be medically necessary because Plaintiff is legally blind, Dr. Sichel stated, "I think it would be option. I don't think it would be medically necessary."

Dr. Sichel testified that he has dealt with and cared for Plaintiff quite a bit. However, he does not have any personal dealings with whether or not Plaintiff was provided a cane, because that falls under the purview of the occupational therapist. Dr. Sichel saw Plaintiff for a chronic care appointment earlier in the month of trial. They discussed various issues with Plaintiff's medical concerns. In terms of his vision, Plaintiff complained of some soreness in his eyes and reported that he had difficulty putting the ophthalmologic ointment, which had been recommended by the ophthalmologist, into his eyes to keep them moist. So, Dr. Sichel ordered the nurse to put the ointment under Plaintiff's eyelid for him so that he would not have difficulty trying to do it himself. Dr. Sichel was not aware

of any problems between Plaintiff and the medical personnel.

In DE 19 (6404–06), a BOP medical record dated November 9, 2018, Dr. Sichel documents a medication reconciliation that he conducted regarding Plaintiff. In DE 19 (6396),  BOP medical record dated November 16, 2018, Dr. Sichel documents another medication reconciliation that he conducted regarding Plaintiff when he came back from the SHU. In DE 19 (6375), a BOP medical record dated December 24, 2018, Dr. Sichel notes that Plaintiff was recommended for a follow-up appointment with Dr. Firozvi, a glaucoma surgery specialist with the North Carolina Eye, Ear, Nose, and Throat ("NCEENT") practice, who had recommended surgery for left-eye cataract extraction and eye stent placement. Dr. Sichel further notes that Plaintiff had continued to be noncompliant with medical recommendations, refusing to cooperate with a preoperative history and physical, as well as his eyedrops and oral medications. (DE 19 (6375).) Dr. Sichel states, "It would not be safe to proceed with surgery until he is willing to cooperate with medical recommendations." (*Id.*) Dr. Sichel testified that he was very concerned that if Plaintiff had surgery and failed to follow recommendations after surgery it could result in a very bad outcome from surgery.

In DE 20 (6988), a BOP medical record dated March 18, 2019, Dr. Sichel notes that he spoke with the mid-level provider about the fact that there are only three pill lines available at FCI Butner Medium I. Dr. Sichel was concerned that if Plaintiff was using artificial tears at pill line, at the same time as the glaucoma drops, the artificial tears might wash out the prescribed medications. Dr. Sichel notes that it may be better for Plaintiff to use the artificial tears on his own a few hours after the medicated drops. Dr. Sichel further notes that he spoke with the AHSA, who suggested getting Plaintiff an autodrop guide to

help Plaintiff use the eyedrops on his own, and they planned to discuss it with the optometrist the next time she came to their institution. (DE 20 (6988).) Dr. Sichel confirmed that the medical staff was still trying to work with Plaintiff to help him better comply with his treatment.

When questioned about Dr. Firozvi being a glaucoma surgeon, Dr. Sichel explained that she would not be the eye doctor that Plaintiff would see generally for his glaucoma treatment. Rather, Dr. James is the ophthalmologist who comes out to the institution on a regular basis. Dr. James refers to Dr. Firozvi when he thinks there is something more complex going on that is beyond his area of sub-specialization. Plaintiff may have seen Dr. Firozvi twice in the records that Dr. Sichel reviewed, but he was unsure of the last time Plaintiff saw Dr. Firozvi. Dr. James and Dr. Firozvi are colleagues at the same practice, NCEENT.

### 2. Katherine Kaminski, LCDR

Katherine Kaminski is an occupational therapist holding the rank of Lieutenant Commander in the U.S. Public Health Service. She has served as an occupational therapist at FCC Butner since 2013. She has a master's degree in occupational therapy from the UNC Chapel Hill. Her duties include evaluating inmates to see what disabilities they have that may prevent them from completing ADLs on the compound.

In DE 19 (6395), a BOP medical record dated November 21, 2018, LCDR Kaminski notes that Plaintiff was a no-show for his first occupational consultation. She testified that if an inmate does not show up when placed on call out, it is documented, and she reschedules the inmate. This was Plaintiff's first no-show. If there are more than two no-shows, then the individual is discharged from occupational therapy for noncompliance.

The occupational therapists at FCC Butner only see people as a result of referral from a primary care doctor, so not every inmate sees an occupational therapist.

In DE 19 (6388), a BOP medical record dated November 28, 2018, LCDR Kaminski documents that she saw Plaintiff for an initial evaluation. She testified that she had to call him up for his appointment. She did so because other staff in the medical area mentioned that Plaintiff occasionally had trouble coming to call out. LCDR Kaminski stated that an evaluation typically takes about forty-five minutes, but she sat with Plaintiff for about one and a half hours. He appeared to be very irritated. Part of the evaluation is to establish rapport by asking questions about the client's functioning, the reason for the referral, and any goals he might have for working and occupational therapy. LCDR Kaminski stated that Plaintiff provided many vague answers and she found it very challenging to extrapolate useful information to create treatment goals based on his functional concerns. She further stated that Plaintiff used several phrases about which she asked for clarification, but on which she did have a sense of clarity by the end of the evaluation. For example, Plaintiff used the phrase that he "eats a bowl full of stress every day." LCDR Kaminski testified that it is important to build rapport because she needs the client to trust her in the same way she trusts the client's reports and concerns. When LCDR Kaminski asked Plaintiff how his functioning was being impacted by his low vision, Plaintiff replied that he wanted to do what everyone else was doing. LCDR Kaminski understands this sentiment, but from an occupational therapy perspective, in order to come up with a treatment plan and goals, it is helpful to have more specific answers given.

In order to help Plaintiff on an individualized basis LCDR Kaminski tried to clarify what ADLs he needed help with. Plaintiff expressed problems with urinating and

requested a hand-held urinal. LCDR Kaminski asked if sitting down to urinate would be an option and Plaintiff stated he was uncomfortable with that. LCDR Kaminski asked if he was uncomfortable sitting down to defecate and with showering and Plaintiff simply did not answer. When an inmate is in a cell, due to security considerations, the inmate generally does not have privacy when doing those things. Plaintiff expressed a need for a single cell because he could not tell where his belongings were, and LCDR Kaminski testified that this is not a request that occupational therapy would normally entertain. She further testified that up to that point, Plaintiff had done pretty well with having a cellmate. One concern with placing inmates in single cells is that, statistically speaking, the risk of suicide or self-harm increases dramatically. Thus, requests for single cells are not taken lightly. Instead, in low-vision cases like Plaintiff's, occupational therapy tries to work with the client to set up a system to establish a recognizable area within the cell where the client's items might be stored.

LCDR Kaminski understood that Plaintiff had been issued a blind-assistance cane at a previous institution, but he was not using it on the day that she met with him. When she inquired about the cane, Plaintiff said that he had not been trained on it properly, that it was not the correct size for him, and that the compound was not squared off at right angles, so he would be incapable of using the cane on the compound. LCDR Kaminski pointed out to Plaintiff that the community is also not set up at right angles, so in order to help him with his independence and with functional mobility, whether he is incarcerated or out in the community, the expectation would be that he could learn to use the cane to navigate the compound. Based on Plaintiff's presentation at the evaluation, LCDR Kaminski did not see anything about his condition that would prevent him from learning

to use the cane. LCDR Kaminski testified that she has asked Plaintiff on numerous occasions about learning to navigate with the cane at FCC Butner, "and every time he has either not answered the question or he just said I'm not interested in learning." LCDR Kaminski subsequently issued Plaintiff a new cane because she saw that his old one was broken and was not the correct length.

LCDR Kaminski reiterated that throughout the course of her evaluation of Plaintiff, which is documented in DE 19 (6388), it was very difficult to extrapolate useful information to formulate a treatment plan. Her final assessment was that Plaintiff has loss of vision due to end-stage glaucoma and it was very difficult to figure out ways she could help him to establish his independence on the compound in spite of his vision loss. However, because she has worked with other inmates with low vision and blindness, she felt that one way to continue to establish rapport with Plaintiff was to offer some of the adaptive equipment that she has offered in the past to inmates with similar diagnoses. LCDR Kaminski has offered an alternate lock to help such inmates store personal belongings in their locker, a talking watch, and a lighted magnifier as a way to improve the ability to see things at close range. Even if some of these things would not be helpful to Plaintiff, offering them was a way of showing she was trying to provide him assistance so that he may be more willing to work with her in the future. LCDR Kaminski also worked with the primary care provider and the AHSA to consider a referral to a contract low-vision specialist. Such a specialist may have more pieces of adaptive equipment for a client to try while at that specialist's clinic.

LCDR Kaminski testified that during the evaluation she counseled Plaintiff on the need to work with medical providers in order to better manage his concerns. She did this

because she felt that Plaintiff was being very rigid in the way he was thinking about issues. She stated that Plaintiff would repeat a lot of the same statements over and over. She had a concern that, without his willingness to participate in some of the things that health services was offering for his medical care, Plaintiff could be missing out on ways to help himself.

In DE 20 (7003–04), a BOP medical record dated January 3, 2019, LCDR Kaminski documents her follow-up visit with Plaintiff after the initial evaluation. In this visit, LCDR Kaminski wanted to issue some of the adaptive equipment she thought might be helpful for Plaintiff. She communicated to him that she was still working on getting some of the equipment approved so that Plaintiff would not think he had forgotten about it. On this date, LCDR Kaminski issued the lighted magnifier and Plaintiff indicated he was willing to try it. LCDR Kaminski testified that Plaintiff was in an unpleasant mood and required repeated redirection. She observed that Plaintiff wanted to talk more about how he was not getting adequate care, but she was trying to keep the conversation on topic so she could ensure Plaintiff knew how to operate the magnifier if he needed to. At this point, she needed to wait for the additional adaptive equipment to be available so that she could issue it to Plaintiff.

LCDR Kaminski testified that she knew Plaintiff had an inmate companion in the past and she assured him that having adaptive equipment issued to him would not preclude him from having an inmate companion. LCDR Kaminski spoke with the inmate companion program coordinator because she was informed that Plaintiff had been assigned numerous inmate companions and they were quitting. She also followed up with Dr. Sichel and the AHSA, Cheryl Daniel, about a referral to a low-vision specialist,

because such a referral is at their discretion. LCDR Kaminksi explained the reasons why she felt that it would be useful, but they indicated they did not feel it was appropriate at that time. AHSA Daniel disagreed with LCDR Kaminski's recommendation for a referral because Plaintiff had demonstrated continued noncompliance with other aspects of his medical care.

In DE 20 (7005), a BOP medical record dated January 3, 2019, LCDR Kaminski notes that Plaintiff arrived late to call out for the January 3 follow-up appointment. Typically when a client does not show up on time for their call-out, LCDR Kaminski will document it as a no-show. The reason why she noted that Plaintiff was late on this occasion was because she had started a note that he was a no-show and wanted to clarify in the medical record that he did, in fact, show up, just not on time. LCDR Kaminski testified that she does not recall whether Plaintiff had an inmate companion with him at this time, but she believes she has seen him with a companion most times, if not every time.

In DE 20 (6099–7000), a BOP medical note dated January 10, 2019, LCDR Kaminski documents her discharge encounter with Plaintiff. The talking watch came in, so she was set to issue it on that date. The only other piece of adaptive equipment that had not yet been approved or come in was the alternate lock. However, the alternate lock is equipment that must be approved and issued by the lock shop and custody staff. Thus, LCDR Kaminski planned to discharge Plaintiff from occupational therapy because, after issuing the watch, Plaintiff had no other indicated needs with her in the occupational therapy clinic. If Plaintiff had opted to receive more blind-assistance cane training, he would have been retained in treatment. LCDR Kaminski testified that Plaintiff was a little

upset because the talking watch only had the capability of programming one alarm. As you push the buttons, the watch gives instructions on how to set the time and alarm. However, LCDR Kaminski appreciates why that may be challenging for a vision-impaired client. She typically sets the time for the client in advance and offers to set an alarm in person, so that the watch is fully functional when the client leaves the clinic. She also has the client demonstrate that they know which buttons to push on the watch to have the time announced, how to turn off the alarm, and similar functions. She did this with Plaintiff. During the discharge encounter, Plaintiff mentioned that the education department did not have a talk-to-text computer program. LCDR Kaminski directed Plaintiff to take that concern up with the education department, and if they had any questions they could reach out to her. She asked Plaintiff, again, if he would be interested in having additional training to use the cane and he alternately indicated that he was not interested and expressed his view that because the compound was not set up at right angles he would not be able to learn. Plaintiff mentioned to LCDR Kaminski that he did not currently have an inmate companion and that he had been assisted to the clinic by another inmate informally. LCDR Kaminski provided suggestions to Plaintiff on how to make sure he was aware if he was on the call out list.

In DE 20 (6978–79), a BOP medical record dated March 28, 2019, M. Van Sickle, ANP-BC, notes that Plaintiff was seen by the optometrist that day and offered the "Auto Drop" eyedrop guide specially ordered for him, but Plaintiff refused the device and the training of its use by the optometrist. The note further indicates that Plaintiff refused his eyedrops that morning at pill line and that Plaintiff denied then current eye pain. Nurse Practitioner Sickle and LCDR Kaminski spoke that day about a plan to increase Plaintiff's

independence. LCDR Kaminski had offered Plaintiff cane training by a member of the North Carolina School for the Blind, which he refused. In DE 20 (6980), another BOP medical record from the same day, Mala Bailey, OD, documents the aforementioned interaction between Plaintiff and the optometrist. Dr. Bailey describes Plaintiff as being very angry when she offered him the auto-drop device. She records that Plaintiff stated the device was useless for him because he could not see. She further records that Plaintiff kept asking for a pressure check, whereupon Dr. Bailey informed him that there was no consultation written for a pressure check. When handed the device, Plaintiff became very angry and loud and asked what would happen if he was to drop the device and step on it. When Dr. Bailey told Plaintiff that the device would break, he became very angry and stated he was being insulted.

LCDR Kaminski recalls this incident with the auto-drop device because Plaintiff had indicated to her that he was having issues self-administering his eyedrops. The auto-drop device is one of the adaptive equipment pieces that occupational therapy has issued in the past for similar complaints. It is a device that can be fitted to the top of a standard issue eyedrop container. It can control the direction of the eyedrops as well as the flow rate of the eyedrops. LCDR Kaminski had asked Plaintiff if he would be interested in learning how to use the auto-drop device so he could self-administer his eyedrops. She also acknowledged that because he had several medications, it could be difficult for Plaintiff to distinguish between the eyedrop containers. One of the things the occupational therapy department can facilitate for a low-vision client is to provide textured stickers for the bottles so that the client can distinguish between the bottles.

In PE 2454, a BOP medical record dated January 15, 2020, LCDR Kaminski

documents that she provided Plaintiff with a new blind-assistance cane because the one he had been issued previously was broken in half and was no longer serviceable. LCDR Kaminski testified that during this visit she asked Plaintiff if he would like additional training and he indicated he would not. She further testified that she offered Plaintiff training with the cane on four or five occasions. LCDR Kaminski stated that Plaintiff is able to independently fold and unfold the cane but he still does not regularly use it. Typically, when she sees Plaintiff on the compound, he is being guided by an inmate companion.

LCDR Kaminski testified, as represented in a device and equipment log maintained as part of Plaintiff's medical record (PE 2552), that on August 14, 2020 she provided Plaintiff with a new talking watch. Plaintiff had previously come in with the old talking watch and it was not working appropriately. LCDR Kaminski could not find a replacement battery, so she simply issued Plaintiff a new watch.

LCDR Kaminski testified, as represented on a medical duty status form maintained as part of Plaintiff's medical record (PE 2582), that Plaintiff was issued a personal bowl and plate because he reported that eating at main line was very difficult for him. Such medical duty status forms are printed out and provided to the inmate so he can show his custody unit team that he is permitted to have the issued items. These items were issued to Plaintiff to allow him to eat more effectively. On May 6, 2022, LCDR Kaminski wrote an administrative note (PE 2583) about Plaintiff being permitted to eat in his unit, rather than the cafeteria.

LCDR Kaminski testified that as a disabled person goes through life, sometimes their needs change over time. This reality warrants periodically looking at the person's health status to determine if their needs have changed. LCDR Kaminski further testified

that occupational therapy is a bit of a moving target in the prison system because "some of the accommodations that might be reasonable out in the community may not always be safe for a prison environment. And so, sometimes some of the decisions that we make have to be in conjunction with custody in order to ensure any accommodations we make don't disrupt the orderly operations of the institution." LCDR Kaminski stated that if she makes a recommendation, and the security staff of the prison say it poses a problem, she and the security staff will try to find a middle ground.

LCDR Kaminski testified, as reflected in her notes dated May 18, 2022 (PE 2584), that Plaintiff was referred to her by the AHSA to consider how his concerns about eating at main line might be addressed. Plaintiff wanted to continue to obtain his food in his cell, the way the inmates had been fed during the height of the COVID pandemic. Plaintiff expressed that he was having difficulty managing himself at main line because it was noisy and difficult to ascertain what was on his plate at mealtimes. LCDR Kaminski believed there were several scenarios that could address Plaintiff's concerns and documented those options for consideration by custody and food service. LCDR Kaminski stated that her role is to address the specific concerns of the disabled individual, but when it comes to environmental adaptions and modifications, she collaborates with the other stakeholders involved (*e.g.*, custody and food service) in order to find the best solution.

At the time of trial, LCDR Kaminski was not aware whether or not Plaintiff's talking watch was working properly. He had not reported to her that it was not working, so she assumed it was functional.

In PE 2479, dated in June 2020, LCDR Kaminski sent a message in response to

a request from Plaintiff. Plaintiff had still not received an alternative lock[21] and reported to LCDR Kaminski that some of his personal belongings had been stolen. LCDR Kaminski testified that she approved Plaintiff's lock request, but the request was denied by the lock shop. She further testified that special locks had been issued to visually impaired inmates in the past and that Plaintiff never received a special lock.

In PE 2536, a BOP medical record dated May 5, 2021, LCDR Kaminski summarizes Plaintiff's treatment and conditions and recommends, again, that Plaintiff consult with a low-vision specialist.

In PE 2587, a May 20, 2022 email exchange between Plaintiff and LCDR Kaminski, Plaintiff reports that he does not have a companion to assist him with his ambulation and that no one is assigned to assist him with his medication administration. LCDR Kaminski testified that she has a board certification in mental health. Her training and experience in mental health issues helps her understand the psychological aspects of dealing with a disability in a prison environment. She agreed that it is generally true that a person who acquires a disability later in life has a harder time adjusting to the lack of independence the disability brings but stated there is still a healthy range of how well such a person handles the adjustment. She did not agree that fifty percent of people with an acquired disability are hard to work with and never fully accept their occupational therapy training. When confronted with her prior deposition testimony and asked if she wanted to change that answer in court, she explained that she would not necessarily extrapolate her experience as a clinician in the BOP as being common to occupational therapists generally. She testified that working for the BOP and with the population she does

---

[21] The evidence demonstrated that traditional combination locks are standard issue for inmates.

introduces an additional set of challenges to clients who are seeking to come to terms with their disability. She further testified that there is a spectrum of how readily the inmates she works with are able to adjust to their limitations and move forward with their lives. She agreed that Plaintiff is one of those people that is stuck on his loss of independence and therefore struggles to accept training.

As to the permissibility of an alternate lock, LCDR Kaminski testified that each Captain of a BOP facility has discretion regarding what he or she will allow within the facility. As to her renewed recommendation for a consultation with a low-vision specialist (PE 2536), LCDR Kaminski stated she knew that Plaintiff had not adhered to medical recommendations in the past, and had missed some surgical procedures as a result, but she felt that the risks associated with failing to comply with presurgical orders were not the same as Plaintiff missing the opportunity to have a low-vision assessment, and "if he . . . wasn't willing to participate in the evaluation when he was there, that's on him."

### 3. Cheryl Daniel, LPN

Cheryl Daniel, LPN, currently serves as the AHSA at FMC Butner. Prior to that assignment, she was the AHSA at FCI Butner Medium I while Plaintiff was housed there. Prior to becoming an AHSA, Ms. Daniel was a health systems specialist. In that role she worked with the quality management department on accreditation activities and reviews. Part of her duties as an AHSA is to review medical records and make sure the needs of the inmate population are met as far as scheduling and coordination. She is responsible for ensuring that the medical care is carried out and rendered as the clinicians have requested.

AHSA Daniel is familiar with the inmate companion program ("ICP") at FCC Butner.

The ICP is typically at the medical referral center and the staff follows the technical reference manual in establishing that program, which is overseen by the nursing department. At the other institutions on the complex, outside of the medical center, the ICP can be implemented if needed, depending on the needs of the population at each constituent institution.

DE 1 (813–23), entitled "Technical Guidance for the Medical Inmate Companion Program," is guidance specific to creating and establishing a program for the needs of inmates within a BOP medical center. When inmates are at the FMC, they are essentially in a hospital. At the FMC, the inmate companions come from the cadre unit, which is the working unit in the medical center. If an inmate needing a companion is at an FCI, the guidance advises that the program may be altered to meet the level of need and the circumstances present at the FCI. Even at the FMC, an inmate companion would never be charged with administering medication. Inmate companions may never be substituted for nursing assistants or nurses. For example, if an inmate needed assistance with bathing, an inmate companion could assist in setting up the supplies and with coordination, but the medical staff would deliver the services at issue.

In DE 49 (6411–12), a BOP medical record dated October 25, 2018, Nurse Michael Neal notes that Plaintiff was scheduled for cataract surgery on October 29 at an outside facility. AHSA Daniel testified that Nurse Neal coordinated outside trips, consultations, and preoperative requirements for patients at FCC Butner. She further testified that a lot of work goes into executing an outside medical trip, including the initial consultation, the follow-up consultation, review of the documents to determine what the specialist has provided, and utilization review committee for approval. Once the procedure is approved,

the medical staff works with the outside provider to get the appointment scheduled and, if it is a surgical intervention, they must go through the preoperative steps to make sure the patient is safe and clear for surgery—for example, if anesthesia is involved the inmate may need to forego eating for a period of time prior to the procedure. (*See* DE 49 (6411) ("NPO after midnight, prior to the procedure").)

In DE 49 (6410), a BOP medical record dated October 25, 2018, Nurse Practitioner L. Ruffin notes that Plaintiff returned from his NCEENT appointment, wherein he was evaluated for a cataract in his left eye and primary open-angle glaucoma in both eyes. Dr. Firozvi recommended cataract surgery on Plaintiff's left eye and artificial tears, one drop six times daily in both eyes. Nurse Practitioner Ruffin indicates she could not prescribe the artificial tears because of a national shortage at that time. In DE 49 (6409), a BOP medical record dated October 26, 2018, Nurse Practitioner Ruffin documents her attempt to complete Plaintiff's preoperative history and physical examination. Plaintiff was not compliant and did not engage in completing the activity—for example, he refused to give direct answers to questions about possible allergies to things such as Latex. AHSA Daniel testified that without completing the preoperative phase, they could not proceed with the surgical phase. In a situation like this, AHSA Daniel would be notified because the trip would need to be cancelled in a timely fashion to prevent any further cost and to permit other appointments in the community to be scheduled if need be.

In DE 49 (6408), a BOP medical record dated October 26, 2018, Health Information Technician Kymberley notes that Plaintiff's outside trip scheduled for October 29 and 30 was cancelled because Plaintiff refused to cooperate with the preoperative history and physical screening. AHSA Daniel testified that when an inmate is sent out to

a community provider the institution has an obligation to provide written documentation that the inmate has complied with the preoperative procedures. She further testified that it is a collaborative effort including the history and physical being completed by a nurse practitioner/physician assistant/doctor, the nurses completing an EKG where indicated, the laboratory staff collecting the lab results, etc.

In PE 2439, an October 22, 2019 medical note written by a contract staff ophthalmologist at FCC Butner, Dr. Milton James notes that, although surgery was being considered for cataract removal and stent placement, Dr. James and the attending physician agreed surgery was not in Plaintiff's best interest due to his noncompliance with his medications. Because Plaintiff was noncompliant, he may have a poor prognosis from surgical intervention. AHSA Daniel stated that the proposed surgery was never scheduled because of Plaintiff's noncompliance with his medications.

AHSA Daniel testified that when she makes decisions regarding adaptive equipment, the inmate's compliance with medical care is considered. Compliance is taken into consideration on a cost analysis basis, a safety basis, and as part of the total analysis of all factors.

When asked to affirm, in the case of an inmate who has received a recommendation that assistance is required with the administration of the inmate's medication, that it would be the responsibility of the medical staff to determine how that assistance is provided, AHSA Daniel replied, "So, our outside consultants are merely that, they're consultants. It's incumbent upon the attending physicians to review the record and make any determinations whether they agree or disagree with the recommendations from the contract providers."

### 4. Plaintiff's Testimony Regarding FCC Butner

Plaintiff confirmed that in the gap between when he left FCI Edgefield and arrived at FCC Butner, he first went to USP Atlanta, FTC Oklahoma City, FCI Canaan, and FCI Loretto, then back to FCI Canaan, FTC Oklahoma City, and FCI Atlanta. He stated his medical care during these transitions was consistently poor, he was not getting his eyedrops as they were prescribed, and he did not have access to an ophthalmologist.

Plaintiff arrived at FCC Butner in May 2018. He is housed at FCI Butner Medium I but his eye doctor, Dr. James, is at the FMC on the Butner complex. Plaintiff stated that the last time he saw a glaucoma specialist was in October 2018. He further stated that the blind-assistance cane he has at Butner is not the appropriate length. Plaintiff testified that he has not received braille materials at Butner, but he has received a talking watch. However, if you press the buttons on the watch, it tells you that it is not in working order, and Plaintiff asserts he has not received, to date, a talking watch that works. Plaintiff stated that he was put in for a consultation with a low-vision specialist at Butner, but he has not seen one.

Plaintiff testified that he is on pill line for his eyedrops at Butner. He further testified that he has had the same difficulties getting to pill line as he had at past facilities, which has resulted in some no-shows in the MAR, but he has never gone to pill line and told the staff there that he does not want the medicine. That would be too much work because it is a five-minute walk one way. Plaintiff asserted that there have been times when he went to pill line to receive his medication and "staff just refused to give it to me." Plaintiff stated that he has received assistance putting the drops in his eyes at Butner, and that the assistance "has been offered from day one." But he asserted, "sometimes I go to receive

it and some certain staff members just do not do it." The Court found this assertion to be *highly* incredible.

Plaintiff testified that he does not have a safe or a lock for his personal property at Butner. In his view, it is important for him to have a visually impaired lock because, "I'm in prison. It's full of criminals. People do steal. It's to keep your possessions safe, secure. Without the security, somebody will go in your locker and take your items." When asked what happened recently regarding items in his locker, there was a lengthy pause in Plaintiff's testimony and he began crying. Once he recovered his composure, Plaintiff stated that the corrections officers have a right to an check inmate's cell at any time. On a recent occasion an officer searched his cell and told him that the officer found a knife in his locker. Plaintiff stated that both he and his cellmate were written a "one hundred series shot," which is very serious, and placed in the SHU. More concerning to Plaintiff is the fact that, when one inmate puts a knife in another inmate's cell, "it's for one of two reasons: one, they want the inmate to get in trouble; or, two, they telling the inmate that they're going to get them off the compound either through serious harm or death. That's— that's the message that whatever inmate put in my locker had sent out." The shot was eventually expunged from Plaintiff's record. So, in Plaintiff's mind, he was put back on the same yard as someone that wants him off the compound through serious injury or death, and that is what he would have to prepare for when he returned to the facility after trial.

Plaintiff testified that he still has vision left that he wants to save. He asserted that he needs adequate medical care and assistance, including: cataract surgery, assistance administering his eyedrops, and assistance walking on the compound. He stated, "I need it. It's . . . not even whether I want it or not, I can't come out the stand without assistance.

I cannot take one step without assistance. I can't eat without assistance. Sometimes I can't even put my shoes on the right fee without assistance. And I don't even know how that happens. I can't clean my cell. I don't know when my shirt is dirty. I don't know where the shower is unless somebody shows me. I don't know where the toilet is until the Marshal had to show me where the toilet at in this little cell right out here. These things, it's not a matter if I want, it's not even a question of if they want to give them to me. It's needed, period."

### 5. Consolidated Findings Regarding FCC Butner

The preponderance of the evidence demonstrated that the medical staff at FCC Butner sought to provide Plaintiff with extensive treatment, care, and accommodations, but were not infrequently hamstrung by his lack of compliance, cooperation, or interest. Plaintiff was scheduled for cataract surgery on his left eye, but the surgery had to be cancelled because Plaintiff was unwilling to cooperate by providing simple answers during the preoperative history and physical examination. Though reconsidered later, the cataract surgery was never rescheduled because Plaintiff was noncompliant on his medications and the risk of an adverse outcome from surgical intervention was too high. The occupational therapist, LCDR Kaminski, met with Plaintiff several times, but had significant difficulty getting Plaintiff to contemplate, propose, or engage with reasonable goals. LCDR Kaminski arranged for Plaintiff to be provided with a lighted magnifier and a talking watch, and trained Plaintiff to use these things. She further recommended that Plaintiff be provided with an alternative lock, but the recommendation was denied by the security staff, whose judgment takes precedence in matters pertaining to locks. Though LCDR Kaminski provided Plaintiff with a new blind-assistance cane and offered to arrange

additional training on four or five separate occasions, Plaintiff does not regularly use the cane and rejected the training. When the optometrist, Dr. Bailey, offered Plaintiff the auto-drop assistance device to aid with administration of his eyedrops, Plaintiff became belligerent and insisted that he was being insulted.

### F. Miscellaneous Evidence

#### 1. Deborah Washington, PhD

Deborah Washington is originally from Hampton, Virginia. She currently lives in Atlanta. She has an undergraduate degree from Howard University, where she joined the ROTC, and a master's degree from George Washington University. She later got a doctorate degree in theology from the True Bible College and Seminary in Jacksonville, Georgia. Ms. Washington spent ten years in the U.S. Air Force and achieved the rank of Captain. She now runs two small businesses.

Ms. Washington is Plaintiff's older sister, being number four of eight, whereas Plaintiff is number five of eight. She testified that their mother had the children close together, was a stay-at-home mom, nursed them, took care of them, and was very involved in the community. Ms. Washington described her relationship with Plaintiff as "pretty close." They speak about two or three times a month. She described Plaintiff, when he was growing up, as energetic, funny, and a very deep-thinking person.

In addition to talking to Plaintiff on the phone, Ms. Washington has visited him in prison. The last time was prior to COVID, approximately October or November 2019. Prior to COVID she would visit him at least twice a year. At the conclusion of those visits, Ms. Washington has seen the guards put Plaintiff's ID card on the desk rather than hand it back to him, so Plaintiff would have to pat around on the desk looking for the ID. She

testified, "One time I tried to guide his hand but they wouldn't let me do that. And they usually joke even to me, saying he's not blind, he's not blind, is he. You know, and just making fun of it." Ms. Washington stated that it was heartbreaking and questioned, if they were willing to do that in front of her, what they were willing to do behind closed doors.

As to Plaintiff's current health condition, Ms. Washington understands that he is blind in both eyes and that there are levels of blindness. She said there was light coming into his eyes and he does not want to get to the point where it is pitch black.

Prior to incarceration, Plaintiff was a plumber and was very good at his job. Ms. Washington stated that the family still has a family-owned house in Hampton, Virginia, which would be an ideal place for Plaintiff to reside upon his release because of the support network that is there. Another option would be for Plaintiff to be in Atlanta, Georgia, or with his oldest brother in Jacksonville, Florida. Ms. Washington stated that she hopes Plaintiff, because he cannot do plumbing anymore, will qualify for disability income, government housing, and other assistance such as food stamps.

When asked whether Plaintiff was one of the stubborn ones in the family, Ms. Washington responded that he was not. As to the details of his healthcare, Ms. Washington knows that Plaintiff is supposed to be taking eyedrops at certain times, but that is all.

### 2. Karl Leukefeld

Mr. Karl Leukefeld currently serves as the Administrator for the Women and Special Populations Branch of the BOP Central Office. Prior to that position, he was the Disabilities Program Manager for the agency. In that position, it was his responsibility to make sure that the policies and programs of the BOP for disabilities were followed at a

regional and, if necessary, a local level. For example, if an institution reached out for assistance or advice, he would provide that regarding accommodations.

Mr. Leukefeld explained that when an accommodation is needed, if it is a small, the individual staff member who identifies the accommodation can provide it. If a larger accommodation is at issue, it requires a multidisciplinary approach. Usually, the inmate requests the accommodation through an Inmate Request to Staff form ("RTS"). That RTS is then referred to the institution disabilities committee or local disabilities committee, which is led by the associate warden of programs. The members of that committee would normally consist of a representative from health services, psychology services, education, unit management, correctional services, recreation, and anyone else who might be a stakeholder to reviewing the accommodation. Mr. Leukefeld testified that accommodating a visual impairment can be particularly complex, so the committee would meet and discuss how it could be achieved.

There are approximately 158,000 inmates in the BOP nationwide. Of that number, approximately 51,000 have a visual impairment, which ranges from eyeglasses to glaucoma, cataracts, and even complete blindness. At the time of trial, there were thirty-four completely blind inmates in BOP custody, so it is a very small part of the population. The BOP is required to accommodate a full range of disabilities, including mobility issues, hearing impairments, cognitive disabilities, and even some individuals who are quadriplegic. When Mr. Leukefeld was the Disabilities Program Manager, it was part of his job to ensure that the BOP facilities were in compliance with the Rehabilitation Act. In that role, his office put out guidance to help BOP institutions comply. The "Managing Inmates" Guide (PE 2018) was part of that guidance and was provided to staff to help

interpret BOP policy and apply it to day-to-day operations of the institutions where disabled inmates are housed.

Mr. Leukefeld testified that the BOP uses a holistic approach, understanding that a disability is going to impact a majority of the aspects of an inmate's life. The things that need to be accessible for inmates with disabilities include: jobs, education, phone calls, commissary, fingerprinting, drug treatment, religious services, confinement level, visitation programs, anger management, appropriate classification, housing and cell assignment, medical and mental health services, sexual offender treatment programs, work release and early release programs, initial medical and mental health screening, access to toilets/showers/food, and recreation. One of the examples of reasonable accommodations given in the guidance is mobility escorts, which Mr. Leukefeld explained can be something like a wheelchair, cane, or walker, as well as an inmate companion.

Mr. Leukefeld stated that if an inmate is interested in learning braille, they send a RTS, which goes to the disabilities committee to consider whether there is a local contract they could secure to come in and provide the training. Braille materials can be ordered through special purchase, through the commissary, or the institution can provide them as well. Self-taught braille is done through audio learning.

As to the blind-assistance cane, Mr. Leukefeld stated that an institution would provide training to use the cane if an individual needed it or requested it. If there happens to be a subject matter expert on the can at the institution, that person could conduct the training. But the assumption is that the BOP would contract with a subject matter expert to come in and provide the training.

As to dark glasses, Mr. Leukefeld testified that the BOP can provide them or they

can be obtained through special purchase order from the commissary. He was aware that there is a certain tint or level of darkness that is permissible for BOP provided glasses, but he was unsure of the specifics.

As to a talking watch, Mr. Leukefeld stated that is something the BOP has provided in the past, but it would be a local decision as to whether that was made as an accommodation. He affirmed that much of the discretion about whether to provide a particular accommodation in a particular case is left to the local level.

As to a lock, Mr. Leukefeld testified that it could be permissible within the BOP as long as the accommodations committee or primary officer considered it and approved it. He explained that if an inmate is dissatisfied with the response from the local facility, the inmate can us the administrative remedy process—beginning at the local institution, then graduating to the region and the central office—to challenge or review the decision. If the inmate is visually impaired, the staff will assist them in filing administrative remedies.

When asked whether assigning medical staff to assist a visually impaired inmate with using eyedrops would be a reasonable accommodation, Mr. Leukefeld stated that it would be a local decision. He further stated, "But there . . . would be concerns as you mentioned with the community standard of care. Again, we want folks to work at the highest level of their capabilities and their abilities. So the community standard of care in my understanding would not be that an individual would go to, say, a pharmacist or a doctor to have eyedrops put in in several times a day or even once a day, but that they would self-administer." Mr. Leukefeld testified that the Managing Inmates guidance complies with the Rehabilitation Act.

Mr. Leukefeld was the first person to serve in the position of Disabilities Program

Manager, starting in July 2017. He affirmed that the leadership of local institutions are routinely responsible for making accommodation decisions for individual inmates. It is up to those leaders to ask for assistance regarding accommodation decisions if they need it. Mr. Leukefeld is only familiar with Plaintiff through his participation in this case. He does not recall being contacted about Plaintiff prior to that. He confirmed that the Managing Inmates guidance being discussed at trial (PE 2018) is a guide and not the BOP policy itself. He further confirmed that there is no specific policy for blind inmates within the BOP disabilities department.

### 3. Catina Friday

Ms. Catina Friday is employed by the BOP in the office of medical designations. She is the chief of medical designations and transportation, so she supervises the department of medical designations. Ms. Friday has held her position since July 2020, when she replaced Stephanie Williams. Her office manages the initial entry of inmates with medical issues into the BOP system.

If an incoming inmate is flagged for having a medical condition, the matter will be sent to the medical designations office to review and to determine whether the inmate needs to be designated to a Level 3 or Level 4 facility. The medical designations office does not initially have any role regarding the placement of Level 1 and Level 2 inmates. If the office designates an inmate to a medical facility initially, or redesignates an inmate to a care level facility, once the medical condition justifying that designation has been resolved, the inmate is now Level 1 or 2 and Ms. Friday's office sends the inmate back to their parent facility.

Ms. Friday testified that care Level 3 inmates typically have chronic conditions that

are more complex to manage and require more medical resources. Care Level 4 typically denotes inmates that require 24-hour medical care, or some kind of intensive care like dialysis, cancer, or an organ transplant. The question of how long an inmate that has been designated to a medical center or care level facility stays there is decided on a case-by-case basis. There are definitely instances when the inmate reaches his treatment goal and can be reassigned back to his parent facility.

DE 51 is the BOP program statement for "Medical Designations and Referral Services for Federal Prisoners." The medical designations program is designed to manage medical inmates. If an inmate is a Level 1 or Level 2 coming into the BOP and goes to a line confinement facility, then becomes ill in some way that requires extensive care, the BOP prefers that he be sent to a medical referral center rather than a community hospital, if possible.

The factors considered by the medical designations staff in designating a particular person depend on the reason for the designation request. They look at the inmate's medical records to ask whether those records support the request. They also look at custodial records to see how the inmate is functioning on the compound and whether the inmate can perform his ADLs. They also consider any further documentation that might support the request, such as documentation pertaining to comorbidities. The process of considering whether a redesignation is appropriate is essentially the same as the process of deciding the initial designation. However, when it comes to initial designation, the staff usually only has the inmate's presentence investigation report along with any medical documentation the U.S. Marshals might have obtained. Redesignations, on the other hand, deal with inmates already in BOP custody, so the medical designations staff has

the inmates' electronic medical record and custodial record to consider.

When there is a request for redesignation, some things are black and white under the policy, and others are gray. There is also an algorithm. Ms. Friday and her staff always have the discretion to approve a requested designation. However, if they find that something is not adding up in the record, or there are custodial issues at play, or they need more information, then they forward the matter to the Chief of Health Programs (and possibly the Regional Medical Director as well) for review. The Chief of Health Programs can either give the medical designations staff permission to deny the designation request, or can disagree with the staff's proposed course and direct the requested redesignation.

PE 2001 is the algorithm for considering inmate designation questions. It is designed to be a helpful tool, not to give a definite answer in each case. It is an "if this, then that" type flow chart. Ms. Friday reiterated that the medical designations office staff have discretion to approve a redesignation request, but if they do not think that it rises to the level of requiring a Level 3 or 4 facility, then they forward the request to the Chief of Health Programs, who is the one that can give them permission to deny the request. If the medical designations staff needs more information, they sometimes reach out to the facility in question to gain clarity.

If an institution is seeking to redesignate an inmate to a higher care level, there are certain time frames within which the decision must be rendered, based upon the level of urgency or emergency. Blindness in and of itself is not an indicator that an inmate needs to be at a Level 3 or 4 facility. The number of beds available at a higher care level facility is not a consideration when redesignating an inmate. In cases where there is limited bedspace, the inmate would simply be redesignated and placed on a priority list to be

moved into the relevant facility when a bed becomes available. The medical designations office never seeks to remove a person from a particular care level on its own. Rather, the inmate's facility submits a request for redesignation, whether higher or lower. When an inmate's situation changes implicating a designation change, that information is always submitted by the local facility, rather than being sought out by the medical designations office.

Ms. Friday acknowledged that blindness is not explicitly represented in any of the tables on the algorithm (PE 2001), but stated that it is in the verbiage. Counsel sought to lead her through a hypothetical application of the algorithm to show that, under the circumstances present in Plaintiff's case, the algorithm would produce an elevated care level designation. However, the effort was unpersuasive at best, counterproductive at worst.

Ms. Friday testified that she saw a redesignation request specifically involving Plaintiff in 2018. She believes the request came from FCI Loretto, which is in Pennsylvania. Ms. Friday recommended denial because blindness does not necessarily make an inmate a Level 3 or 4, and because Plaintiff was refusing treatment at the time. Ms. Friday forwarded her recommendation to the Chief of Health Programs, Dr. Jeffrey Allen, who disagreed with her assessment and indicated that Plaintiff should be moved to a care Level 2, 3, or 4 facility for management, whichever could best meet Plaintiff's needs. Ms. Friday then designated Plaintiff to FCI Butner Low, which is a Level 3 facility. Plaintiff was at a Level 2 facility prior to that transfer.

Ms. Friday confirmed that Dr. Allen overruled her discretionary decision in Plaintiff's case. She also confirmed that Dr. Allen's decision was within his discretion.

One of the considerations the medical designations staff use in making their discretionary decision is safety/vulnerability. The guidance states that an inmate who is blind *but who copes* with the general population of the institution with the assistance of an inmate companion would not score as a care Level 3 or 4. Ms. Friday affirmed that the intuitive extension of that statement would be that an inmate who is blind and *does not* cope with the general population of the institution could score as a care Level 3 or 4.

### G. Expert Testimony

#### 1. Amy Kotecha, MD

Dr. Amy Kotecha's curriculum vitae (PE 2594) was admitted and she was qualified as an expert in ophthalmology and glaucoma without objection. Dr. Kotecha testified that open angle glaucoma is the most common type, and it is usually caused by elevated eye pressure. The initial and most common treatment is eyedrops to lower the eye pressure. In general, eye pressure levels higher than 20mm of mercury are considered to be dangerous to the health of the optic nerve. When Dr. Kotecha identifies a patient as having glaucoma, in general, her first treatment aims to reduce the patient's eye pressures at least fifteen percent from their baseline.

In the early stages of glaucoma there are no symptoms, and most cases are not painful. There is simply a gradual vision loss that starts in the periphery and expands to the center. The most common cause of glaucoma is heredity. Another cause is idiopathic, meaning the cause is not identifiable. Also, some people get open angle glaucoma in the natural course of aging. Glaucoma does not usually get better over time. Treatment cannot reverse it, but can, in many cases, slow down its progression. Such treatment includes a range of eyedrops that can be prescribed to either reduce the amount of fluid

that is being produced internally in the eye to lower the pressure or increase the drainage internally in the eye to lower the pressure. If prescribed, the patient needs to take the medications. If the patient does not take the medications, they are at risk of negative consequences.

As to surgical options for open angle glaucoma, Dr. Kotecha explained that one of the most common procedures is called a Selective Laser Trabeculoplasty, which targets the drainage area of the eye to increase the fluid outflow and lower the eye pressure. Another common surgical treatment is a Trabeculectomy, in which the surgeon makes a secondary drainage area for fluid in the eye, almost like a little bubble or reservoir on top of the eye where the fluid can accumulate, which lowers pressure internally in the eye. Further surgical options include valves that are inserted and allow for the fluid to drain. In more severe glaucoma cases, diode laser surgery actually lasers the part of the eye that produces the fluid, which helps reduce pressure because it reduces fluid production. The ultimate goal of any of these procedures is to preserve the patient's vision. If a glaucoma patient loses their vision, they cannot get it back. If a patient's medication is not administered the way it is supposed to be, and if a patient does not get surgery when it is medically indicated, it increases the patient's chance of losing vision.

Dr. Kotecha agreed that open angle glaucoma is a "serious medical condition." It risks permanent loss of vision and blindness if not treated appropriately. She explained a series of measurements categorizing visual acuity. Legal blindness is defined as best corrected visual acuity with both eyes together of 20/200 or less. 20/200 visual acuity generally represents a patient being able to see the second line on most traditional ophthalmology charts. The big E on such eye charts correlates with 20/400 visual acuity,

which is less than 20/200 and the next level below the definition of legal blindness. After that, a patient is moved closer to the chart and the measurement is 20/800. Following this, visual acuity is not measured on the eye chart but rather with different methods. For example, the eye doctor or technician will stand one foot away from the patient and ask them to count the number of fingers being held up, then progressively move back foot by foot all the way up to six feet. This is defined as "count-finger acuity." If the patient cannot count fingers, then the evaluator moves to asking whether the patient can see hand motions, which is defined as "hand-motion vision." If the patient cannot see the evaluator's hand moving, then the next step would be to determine whether the patient can see the lights turn on and off, or to shine a flashlight in the patient's eye, which is defined as "light perception." There is one step between hand-motion vision and light perception, which is called "light perception by projection," which means that the patient is able to see light coming from a particular direction. The final stage of visual acuity is "no light perception" or total blindness.

Dr. Kotecha reviewed Plaintiff's medical records as part of her preparation for this case. She testified that he was diagnosed with glaucoma in 2005. She noted, by way of reference to PE 2069 (not admitted), a May 6, 2005 medical record from Premiere Eye Associates, Plaintiff's pressure in his right eye was 41mm of mercury and in his left eye was 20mm of mercury. His visual acuity was measured at 20/200 in his right eye and 20/20 in his left eye. Dr. Kotecha further noted, by way of reference to PE 2070 (not admitted), a May 18, 2005 medical record from Premiere Eye Associates, that Plaintiff was complaining of eye pain and was being treated with medications. Dr. Kotecha would classify Plaintiff's glaucoma as severe in 2005.

In the following years, Plaintiff developed symptoms in his left eye as well. His main symptom is vision loss, both visual acuity and visual field, but he also has episodes of eye pain. Dr. Kotecha recalled that Plaintiff was first transferred to FCI Williamsburg in 2013. Rather than walk through each of Plaintiff's eye doctor appointments from 2005 to 2013, Dr. Kotecha prepared a summary of Plaintiff's intraocular pressures during those years (PE 2563). Any time Plaintiff's eye pressures were repeatedly high in the same eye it means he was at risk for vision loss. Dr. Kotecha testified that Plaintiff's pressures from 2005 to 2012 were problematic because they were "really way too high." The summary shows many pressures in the 39mm to 41mm range, which is very high. The other thing that concerns Dr. Kotecha is the fluctuations in the pressures, a lot of up and down, which is not healthy for the eye.

In PE 2157, a February 16, 2012 operative report, it is shown that Plaintiff had a right-eye valve implanted on that date. This would account for the improvement in pressures in 2012 that is represented in the summary. Plaintiff also had surgery on his left eye, which temporarily got his pressures under control. On many occasions, Plaintiff's eye pressure was out of control despite the use of multiple medications and surgery.

At the time Plaintiff entered FCI Williamsburg in 2013 he had a serious medical condition in each eye and would likely require additional surgeries in the future. His visual acuity was also significantly reduced, but he still had vision worth fighting to save through medical treatment. If treatment stopped, his pressures would have most likely been very high, his vision would be reduced, and it is likely he would have significant ocular pain.

While Plaintiff was at FCI Williamsburg, from August 25, 2013 to August 28, 2015, Dr. Loranth was primarily responsible for Plaintiff's care. Plaintiff was also under the care

of Dr. Nutaitis at the Storm Clinic.

In PE 2256, a January 2, 2014 progress note from Dr. Huey, it is observed that Plaintiff previously had surgeries in both eyes, with valves installed in 2011 and 2012, he had clouding of the lens and his pressure was not at the target range they would like to see in his left eye. Dr. Huey recommended that Plaintiff start eyedrops twice a day in his left eye and an oral medication at 50mg three times a day. Dr. Nutaitis cosigned the note, so it appears that he agreed with this course of treatment. Prison staff, including Dr. Loranth, were made aware that he required these eyedrops.

Dr. Kotecha was asked to comment on Dr. Loranth's August 1, 2014 medical note in which Dr. Loranth concluded that Plaintiff was misusing his eyedrops and suspected that Plaintiff was purposefully manipulating his eye pressures by misusing the drops (PE 2275). Dr. Kotecha testified that, to her knowledge, she has never had a patient that purposely made their eye pressures higher. In the middle of Dr. Loranth's note he states, "It is the same as his statement he is blind. He is not."[22] Dr. Kotecha testified that this statement is in disagreement with her understanding of Plaintiff's visual acuity at this point. She clarified that the definition of legal blindness and the definition of blind are different, and that Plaintiff was "legally blind" not "blind," meaning that he had very low vision. Further down the note, Dr. Loranth stated that Plaintiff was to be put on pill line for

---

[22] In the note, Dr. Loranth states: "This inmate has misu[sed] his eyedrops. T[he] [ph]armacy record shows he needs refills way before the normal refil[l] time. Further there is suspicion that he manipulates the medication to cause his eye pres[s]ures to fluctuate. [H]e then comes to medical and wants eye pressures checked. This is just so strange but this is what he does. It is the same as his stateme[nt] he is blind. He is not. [H]e recognizes people at a distance on t[he] compound. I saw him recognize t[he] Warden at a good 10-15 yards. This inmate will be on pill line for his eye drops. He is totally not responsible to handle this issue himself. If he misses meds then that al[so] can be documented. My op[in]ion is he will late[r] try to sue t[he] BOP (and me) about his eye situation. Frankly, th[is] type of b[e]havior is among the strangest I have seen in my 18 year BOP physician career. My take on all of this and I am putting it in the record." (PE 2275 (bates number 5181).)

his eyedrops. Dr. Kotecha opined that for a patient with glaucoma and, at this point cataracts, it would be helpful for prison staff to administer his eyedrops as prescribed on a routine basis.

In PE 2276, an August 1, 2014 medical note by Nurse Melany Goldstein, Nurse Goldstein notes that Dr. Loranth requested Plaintiff come to pill line four times daily for his eyedrops to be administered by the medical staff. In Dr. Kotecha's opinion, that was a reasonable solution for getting Plaintiff his medication. In PE 2286, an August 28, 2014 medical note by Dr. Nutaitis, Dr. Nutaitis indicated that Plaintiff's intraocular pressure ("IOP") was at target in his right eye and not at target in his left eye. Dr. Kotecha explained that Dr. Nutaitis changed Plaintiff's treatment at that point because the IOP in the left eye was not adequately controlled and seemed to be progressing, placing him at risk of further vision loss. Therefore, Dr. Nutaitis recommended diode laser surgery and a more aggressive strategy with Plaintiff's medications. Dr. Loranth and the medical staff at FCI Williamsburg were made aware of these recommendations. When asked whether Dr. Loranth arranged for Plaintiff's surgery in the coming weeks, Dr. Kotecha answered, "I'm sorry. I'm not aware of that." When asked whether Dr. Loranth arranged for the surgery any time in 2014, Dr. Kotecha stated, "I'm not aware of that either." The next time Plaintiff saw a glaucoma specialist was in May 2015. Dr. Kotecha testified that, in her opinion, the gap in care that followed the August 2014 surgery recommendation constituted a breach in the standard of care owed to Plaintiff.

When asked how, if at all, that gap impacted the progression of Plaintiff's glaucoma, Dr. Kotecha stated that it is difficult to measure, but more likely than not, it contributed to progression and contributed to eye discomfort and pain. When asked

whether the decreased visual acuity from hand-motion vision to light perception in Plaintiff's left eye, and increased pressure in that left eye, would be "due at least in part to Dr. Loranth's delay in getting Mr. Washington back to a glaucoma specialist," Dr. Kotecha answered, "Yes, they would."

In PE 2296, a March 16, 2015 medical note, Dr. Loranth states, "This inmate has []repeated history of lying to staff and abuse of medical care. He will be seen by optometrist f[or] an IOP check next visit. [H]is complaints are taken with a grain of salt." This note was written during the gap in care from August 2014 to May 2015. Dr. Kotecha testified that she reads the note to signify that Dr. Loranth had suspicion or doubt regarding Plaintiff's statements about the status of his vision and his eye. She further testified that she did not see any optometry pressures in Plaintiff's medical record between when this note was written and when Plaintiff was next seen by the ophthalmologist in May 2015. Dr. Kotecha has never written that a patient's complaints should be taken with a grain of salt. When asked whether the pain Plaintiff was experiencing in both eyes at the time he went back to Dr. Nutaitis in May 2015, and the risk of losing more vision, were "likely due to Dr. Loranth's delay in getting Mr. Washington back to Dr. Nutaitis," Dr. Kotecha answered, "They were."

Dr. Kotecha was asked to provide her opinions about Dr. Tremblay's June 10, 2015 letter (PE 2305). She opined that it was very difficult for Plaintiff to complete routine ADLs at this point. She stated that it was very important for Plaintiff to receive his medications as prescribed. Dr. Kotecha further opined that Plaintiff would need assistance to ambulate, and assistance when administering his medications. She stated that she reached these conclusions based on her experience with her own patients and from the

documentation in Plaintiff's medical records of the challenges he was having. Dr. Kotecha believes the things recommended in Dr. Tremblay's letter to be medically necessary.

Dr. Kotecha was asked to comment on Dr. Loranth's June 15, 2015 note (PE 2306), in which Dr. Loranth disagreed with Dr. Tremblay in certain respects. Dr. Kotecha does not think that Dr. Loranth, who was not an ophthalmologist, was qualified to disagree with Dr. Tremblay. In the note, Dr. Loranth wrote that it is true that Plaintiff is "legally blind," but he is not "blind" and he can see many things.[23] In Dr. Kotecha's view, this is not consistent with an individual who can only perceive light perception in one eye and hand motion in another. Dr. Kotecha opined that it was a breach in the standard of care owed to Plaintiff to deprive him of an assistant to administer his eyedrops while he was at FCI Williamsburg.

In a March 4, 2016 medical note (PE 2021), Dr. Lepiane reviews Plaintiff's medical history up to that point. The note states that Plaintiff's visual acuity was light perception in his right eye and hand-motion vision in his left eye. It indicates that Plaintiff's condition was end-stage glaucoma, meaning his glaucoma was severe, and signifying severe visual field loss, often involving the central visual field. The note shows that Plaintiff was prescribed three eyedrop medications at the time, and states Dr. Lepiane's impressions

---

[23] In full, Dr. Loranth's June 15, 2015 note reads: "The letter forwarded by Dr. Tremblay is noted. I do not agree with his assessment of inmate Washington. It is true that inmate Washington is 'legally blind' with vision of less than 20/200 OU it is apparent to us here at FCI WIL that inmate Washington is not 'blind'. He can see many things. The record is replete with staff observations of his ability to see. I myself have seen him walk around trash cans on the floor in the exam room. He has been observed noticing the Warden from over 20 yards away will out on the compound. This letter was written by the MD under the urging of the inmate so that the inmate can further try to manipulate his own requests and demands. Please note that inmate Washington has refused his laser surgery on his last trip out to MUSC. This refusal is just one of many refusals of procedures, non-compliance with medications and verbal abuse of staff on the part of this inmate. I appreciate the concerns of the consultant MD but he is not fully aware of the details of inmate Washington's behavior. We will continue to care for inmate Washington as our professional observations and moral responsibilities dictate." (PE 2306 (bates number 5371) (errors in original).)

that Plaintiff had significant difficulty with ambulation, failed to learn to navigate the compound on his own, and will need training with a white cane walking stick for the blind.[24] Dr. Lepiane states that FCI Estill did not have trained aids or medical inmate companions. Based on these statements, Dr. Kotecha opined that Plaintiff needed an assistant at FCI Estill and that FCI Estill could not provide the sort of assistance needed.

Dr. Kotecha prepared a summary of Plaintiff's IOP measurements during the period when he was housed at FCI Estill. (PE 2563.) She testified that the majority of the pressures in Plaintiff's left eye were too high and uncontrolled, which "can be consistent" with a patient not receiving their eyedrops as prescribed. She further testified that there were also several uncontrolled pressures in Plaintiff's right eye, which "can be consistent" with a patient not receiving their eyedrops as prescribed. The summary reflects, in April 2017, a decrease in Plaintiff's left eye IOP. This generally corresponds to the timing of when Plaintiff received the diode laser surgery that was originally recommended in August 2014.

Dr. Kotecha was questioned about Dr. Kammerdiener's March 2017 letter following the diode laser surgery (PE 2370), which indicates Plaintiff was prescribed five different eyedrops after the surgery. Dr. Kotecha would describe that course of treatment as

---

[24] Dr. Lepiane's March 4, 2016 note is extensive; it states, in relevant part: "Inmate Washington has signifanct difficult with ambulation and had been assigned a guide to help lead him around. Inmate Washington would place his hand in the inmate guide's shoulder and walk along with him. He had a guide at his previous institution at FCI Williamburg and here at FCI Estill. He has failed to learn the compound and navigate on his own. He has claimed a PREA [sexually abusive behavior] allegation At both FCI Williamsburg and again here at FCI Estill. Both of the allegation were not substantiated. Inmate Washington remains in the SHU at this time. We do not have trained aids or medical inmate companion here at FCI Estill. Inmate Washington continue to have significant difficult with ambulation. He cannot navigate the compound here at FCI Estill with assistance. He is now claiming he needs assistance with his medication administration and also with his routine activities of daily living. we do not have the capacity or the means to handle this type of inmate here at FCI Estill." (PE 2021 (bates number 5642) (errors in original).) After listing Plaintiff's then-current medical problems, the note states: "Please note: Inmate Washington is very manipulative and uses his blindness as an excuse to obtain whatever he feel he is entitled to." (*Id.* (errors in original).)

aggressive and necessary. She opined that such a course of treatment is difficult to remember and to perform daily. Dr. Kotecha agreed with Dr. Kammerdiener's recommendation, in the letter, that Plaintiff should have an assistant to administer his eyedrops. She further agreed with Dr. Kammerdiener's recommendation that Plaintiff would require assistance with ambulation.

Dr. Kotecha testified that the recommendations in Dr. Tremblay's 2015 letter and Dr. Kammerdiener's 2017 letter are in agreement with each other. In her review of the medical records from MUSC, she did not notice any inconsistencies among the recommendations made by Plaintiff's various providers. Dr. Kotecha stated that, while under the care of Dr. Lepiane at FCI Estill, Plaintiff had consistently high eye pressures. He had some access to an assistant to administer his eyedrops, but it was not regular and consistent. To the extent that Plaintiff did not have access to such assistance, Dr. Kotecha opined that it was a breach of the standard of care owed to Plaintiff. She also stated that her opinion that Plaintiff needed an assistant to administer his eyedrops applies equally to his time at FCI Edgefield, and that she holds all the opinions she expressed to a reasonable degree of medical certainty.

On cross-examination, Dr. Kotecha conceded that in her expert report she only listed two opinions about the BOP's alleged breach of the standard of care to a reasonable degree of medical certainty: first, that a five-month delay from August 24, 2014, when the diode laser surgery was recommended, through January 25, 2015 was too long given Plaintiff's eye pain and severe aggressive glaucoma, and that this delay contributed to Plaintiff's eye pain; second, that following Dr. Tremblay's June 10, 2015 letter, Plaintiff should have been provided with an assistant to administer his eyedrops, and that his lack

medication compliance contributed, to some extent, to his vision loss.

Dr. Tremblay's letter was significant enough to Dr. Kotecha that she thought it important to reference in one of the opinions in her expert report. She testified that it would not affect her opinion, or change her mind about how much credence to give the letter, if she learned that it was prepared at Plaintiff's behest.

When asked how one is able to quantify an amount of vision loss, Dr. Kotecha first referenced the visual acuity tests she had explained earlier and then said that visual field testing is the other way to measure. Visual field testing is generally done using a Humphrey Visual Field Machine. It shows how much peripheral vision and central vision the patient retains. Dr. Kotecha stated that it is a bit of a subjective test because it depends on how well the patient performs it, but it is the best way, within medically available means, to measure a patient's vision.

Upon questioning, Dr. Kotecha agreed that her opinion that Plaintiff needed help with ambulation was not offered to a reasonable degree of medical certainty. Rather, her testimony was that it is more likely than not that Plaintiff would benefit from ambulation assistance. Dr. Kotecha further agreed that the only opinions she was asserting to a reasonable degree of medical certainty were the two opinions itemized in her report.

Dr. Kotecha agreed that it is very important for a patient to comply with the treatment recommendations of his eye doctor. She acknowledged that Plaintiff's medical records are replete with examples of Plaintiff refusing treatment. She further acknowledged that, in all likelihood, Plaintiff's noncompliance with his treatment played a role in any vision loss that occurred and any pain that Plaintiff suffered. Dr. Kotecha also agreed that she cannot quantify how much Plaintiff's lack of cooperation contributed to

his pain or vision loss. Thus, she could not fix an amount of blame to be assigned to Plaintiff's lack of involvement or lack of compliance for the damage to his eyes. It could be more than fifty percent, Dr. Kotecha could not know that to a reasonable degree of medical certainty.

Dr. Kotecha reviewed Plaintiff's medical records from the time before he was incarcerated, and she confirmed that his eyes were in bad shape before he entered federal prison. He was legally blind prior to 2013. Dr. Kotecha could not point to any specific person at the BOP that breached the standard of care.

On redirect examination, Dr. Kotecha confirmed that she is still of the opinion, to a reasonable degree of medical certainty, that the gap in care after the August 28, 2014 surgery recommendation amounted to a breach of the standard of care, that it contributed to the progression of Plaintiff's glaucoma, and that it contributed to Plaintiff's eye pain and vision loss. She also confirmed that she is still of the opinion, to a reasonable degree of medical certainty, that the lack of regular access to an assistant for eyedrop administration constituted a breach of the standard of care and contributed to Plaintiff's eye pain and vision loss.

Dr. Kotecha testified that when she represented that she is not certain who breached the standard of care, she is not saying that no one breached the standard of care, she is unclear how responsibility is assigned within the BOP. When asked, "[D]id someone within the BOP breach the standard of care?", Dr. Kotecha responded, "Yeah, possibly." When asked, "Did someone or some group within the BOP breach the standard of care as to Mr. Washington?", she responded, "Yes."

On recross-examination, Dr. Kotecha stated that she does not care for patients in

the prison setting. She does care for patients who visit her office from a detention facility. She has never gone into a prison and cared for prisoners there. She is not familiar with the administrative inner workings of a prison. So if there is a delay in a surgery being scheduled, Dr. Kotecha would not know all the factors that come into play with that process.

### 2. Lane Ulrich, MD

The parties stipulated that Dr. Lane Ulrich is an expert in the field of ophthalmology.[25] Dr. Ulrich graduated from medical school in 1992, did training in ophthalmology from 1996 to 2000, and joined the faculty practice at the Medical College of Georgia, Augusta University at that time. He has been employed as an attending or teaching physician since July 2000. Approximately half of Dr. Ulrich's time is devoted to a teaching practice at the Augusta State Medical Prison, a role that he began in 2007. He is very familiar with caring for prisoners. When Dr. Ulrich was first contacted about serving as an expert witness in this case he was initially reluctant, because he is familiar with the delivery of eye care inside the Georgia Department of Corrections and had come across a number of circumstances in which patients were harmed by not receiving the care he said they needed. He felt it necessary to make clear that if it was his impression Plaintiff had received poor care delivery, he would put that in the record, and he could not be expected to change what he saw in order to meet the BOP's goals in this case. After Dr. Ulrich agreed to take the case and reviewed the medical records, his opinion changed dramatically. But even when was still reluctant, Dr. Ulrich understood that the BOP wanted to know if they had mishandled Plaintiff and wanted an unbiased review of the

---

[25] Dr. Ulrich's curriculum vitae was admitted as DE 74.

medical record.

Dr. Ulrich was given approximately 6,000 pages of records to review for this case. He perused all of them but spent more time with some than others because they are more relevant. After that review he composed a lengthy expert report composed of written narrative and appendices that support the opinion he took. Knowing that glaucoma is a progressive disease and that this is a BOP case, Dr. Ulrich considered it relevant to know what Plaintiff's status was when he was first taken into custody. From there, he broke down his analysis into the care that Plaintiff received at the various BOP prisons where Plaintiff was housed.

The records of Plaintiff's pre-federal care start in 2005. It was evident that Plaintiff had already experienced severe vision loss before being incarcerated in the BOP. Dr. Ulrich testified that the doctor-patient relationship requires both a subjective component, such as asking the patient "why are you here today?" and listening to the patient's explanation, as well as an objective component involving tests. Visual acuity and visual field measurements have subjective components, whereas measuring IOP is objective. Any eye doctor conducting an evaluation must put these data points together and decide on an effective course of action for the patient. Dr. Ulrich stated that this is what he did when arriving at his conclusions in this case, and this is what he routinely does in his practice.

Before Dr. Ulrich drew his conclusions, he considered it mission critical to review large swathes of the medical records, because it is possible that some prisons treat prisoners better than other prisons, and it is possible that some recommendations are followed while others are not followed. In putting together a complete picture from the

documents, Dr. Ulrich looked for how Plaintiff responded and whether he was following the recommendations given at the clinical visits. It quickly became Dr. Ulrich's sense that Plaintiff was "prone to be collisional with the recommendations that were made." Dr. Ulrich testified that this was not just his subjective vantage point but based on what outside physicians put in the medical record, using terms such as, "very difficult" and "confrontational" to describe Plaintiff. Those specific terms were used by Dr. Mohay of the University of Louisville, but he saw similar references throughout the record. So, Dr. Ulrich's 20,000 view is that Plaintiff has very serious glaucoma, that he presented into the BOP with that condition, that he was offered much care, and that he permitted some of that care, but has unfortunately continued to slide into a position where he has less and less vision. Through the records, Dr. Ulrich witnessed the BOP doing many, many things to accommodate Plaintiff at all stages of this decline, "many of which are not responded to favorably by Mr. Washington."

Dr. Ulrich testified that glaucoma is a challenging disease because we do not really know what causes it, we just know that it happens. He is currently serving as a co-principal investigator on a National Institute for Health grant, working as a physician alongside other researchers to try to figure out the underlying mechanism of what causes glaucoma. Glaucoma is a condition where the optic nerve slowly dies and you slowly lose peripheral vision. By the time the patient is symptomatic, they have often lost a very significant amount of vision. The patient can still be 20/20, because the central vision is some of the vision that is lost last. Dr. Ulrich used DE 31 through DE 35 for identification as demonstratives to contrast a normal visual field with the effects of glaucoma as it begins to erase a person's vision. A person first develops "islands of vision loss," but there can

be lots of areas where the person can still see. Dr. Ulrich described one example in the demonstratives as representing a person whose top part of vision was lost, but whose bottom part of vision was preserved. That individual should be able to read and ambulate, but would not be able to see trees above them. Using DE 36 and DE 37 for identification, Dr. Ulrich explained that Plaintiff's visual field testing in 2005 showed severe vision loss in his right eye, but still well-preserved vision in his left eye, and in 2007 showed that the vision in Plaintiff's right eye continued to be dramatically, if not fully lost. However, Dr. Ulrich stated that even where visual field testing shows dramatic vision loss, there can still be islands of vision that show up on different testing.

Dr. Ulrich noted that Plaintiff entered BOP custody in 2009 at FCI Greenville, and it was in Plaintiff's favor that he continued to receive care from the same doctors he had seen at the University of Louisville. Dr. Ulrich walked through the types and amount of care that Plaintiff received, including several laser procedures, from 2009 until he arrived at FCI Williamsburg in 2013. Because Dr. Ulrich is very familiar with providing eye care in the prison setting, he understands the complications that can arise when scheduling prisoners for appointments. Missed appointments can result from other inmates' care being of a higher priority, or sometimes the outside physician's office cancelling. However, Dr. Ulrich highlighted various incidents in the medical records where Plaintiff's uncooperative or confrontational conduct derailed his care or prevented appointments from occurring. In one case in 2012, Plaintiff refused to go back to the University of Louisville for a follow-up appointment after surgery on his right eye that had an unexpected and undesirable outcome simply because he did not want the transport officer that had been assigned to take him. Dr. Ulrich stated that Dr. Robinson, an optometrist at

139

FCI McCreary, was a bright spot in Plaintiff's care. The records show that Dr. Robinson was very engaged in Plaintiff's care and took extra efforts to ensure that Plaintiff received care even when Plaintiff's behavior was creating difficulty. The records also show that, while Plaintiff was still at FCI McCreary in 2013, Dr. Mohay, a glaucoma specialist at University of Louisville, made the decision, despite pressure from another ophthalmologist and Dr. Robinson, to only treat Plaintiff medically (*i.e.*, not surgically) because of the risk of an adverse outcome from surgery. Dr. Mohay outlined her recommendation to only treat Plaintiff medically in a letter, a copy of which Plaintiff sought to improperly obtain from Dr. Robinson, who was a staunch advocate for Plaintiff. Dr. Ulrich testified that there were many, many instances in the records of Plaintiff skipping his eyedrops, so he had a history of not getting his medications.

The records showed that shortly after Plaintiff was transferred to FCI Williamsburg, an optometrist named Dr. Wierden reviewed Dr. Mohay's conclusions about foregoing surgery for Plaintiff, and Dr. Wierden generally seemed to agree that doing a surgery might hasten the demise of Plaintiff's residual vision. Dr. Ulrich stated that there were efforts being made to manage Plaintiff's visual problems at the very beginning of his time at FCI Williamsburg. Dr. Ulrich reviewed the records pertaining to Dr. Loranth's care of Plaintiff, and there are some comments made by Dr. Loranth that Dr. Ulrich considers to be unprofessional. However, Dr. Ulrich did not find that Dr. Loranth did anything wrong or failed to do what he was supposed to do as a physician in caring for Plaintiff. Dr. Ulrich concluded that the relationship between Plaintiff and Dr. Loranth soured because Dr. Loranth was not willing to readily accommodate many requests that did not seem necessary. Dr. Ulrich believes Dr. Loranth "took a sterner approach of what is needed,"

and would not provide what was not needed. Dr. Ulrich noted that, from his review of the records, when Plaintiff cannot achieve what he wants, he begins to label parties as a threat to his health, which he did to Dr. Loranth and many of the nurses. Dr. Ulrich further noted, "I believe that Dr. Loranth was aware of some of the style and the traits of Mr. Washington and was going to provide what he needed from an eye care standpoint and a healthcare standpoint, but he wasn't going to just be manipulated."

As to the July 2014 cataract surgery that Dr. Nutaitis performed on Plaintiff's right eye, Dr. Ulrich noted that it "went very difficult. So, just like Dr. Mohay said, we need to stop fiddling around with his eye because we may cause problems, they had a very complicated very difficult surgery, and it didn't go well." Regarding Plaintiff missing his post-operative appointment the next day because of the coat, Dr. Ulrich stated that Plaintiff's arthritis issue should have come behind the fact that he was almost blind and had just undergone a complicated and difficult eye surgery.

Dr. Ulrich testified that the relationship between Plaintiff and Dr. Loranth, as reflected in the records, had not gotten better by early 2015, indeed it never got better. Nevertheless, Dr. Ulrich opined that in the time period between August 2014 and January 2015, there was nothing in the records that reflected the BOP was negligent in their handling of or caring for Plaintiff.

Dr. Ulrich did not prioritize consideration of the smaller prison terms because Plaintiff spent most of his time in the major prison scenarios relevant to this case (*i.e.*, FCI Williamsburg, FCI Estill, FCI Edgefield, and FCC Butner). However, one instance at FCI Atlanta, where Plaintiff was only housed for about twenty-four days, stood out to Dr. Ulrich. Plaintiff presented to get his medications and the nurse offered to let him take his

own eyedrops because he did not want to have to come to pill line. Plaintiff agreed, but then came back the same afternoon, escorted by a companion, and yelled at the nurse for not wanting to do her job. Dr. Ulrich considered this to be disrespectful.

Dr. Ulrich noted a pattern in the records of various BOP staff members observing behavior by Plaintiff that did not make sense for someone who was as blind as Plaintiff was saying that he was. When asked whether there was a difficult relationship between Plaintiff and Nurse Ulmer, Dr. Ulrich stated, "There was a difficult relationship between Mr. Washington and almost everybody throughout the record."

As to Dr. Tremblay's June 10, 2015 letter, Dr. Ulrich concluded, from the records, that Plaintiff would not sign the consent form for his scheduled surgery without leveraging the doctor to provide him with something in return. Dr. Ulrich explained that when you are in a hospital setting, it does not matter whether you are dealing with inmates or patients who are not inmates, you have a time schedule in which you have to move the patients to the operating room, and if they will not sign the consent form, eventually you just have quit and move on. This is what happened with Plaintiff and the medical staff at MUSC.

One thing that stood out to Dr. Ulrich about Plaintiff's time at FCI Estill was Plaintiff's hunger strike. Dr. Ulrich emphasized the fact that, while his specialty is ophthalmology, he is also a medical doctor. The records demonstrated to him that during Plaintiff's hunger strike, Dr. Lepiane was very careful to ensure that Plaintiff's general health stayed on line. The care that Dr. Lepiane extended to Plaintiff's general health, in Dr. Ulrich's view, demonstrates that the BOP was working very hard to take care of Plaintiff even when he was putting himself in difficult scenarios. It showed Dr. Ulrich that the prison staff were doing what they should be doing and not just ignoring Plaintiff.

In the records regarding Plaintiff's interactions with the orientation and mobility specialist, Ms. Madison, Dr. Ulrich observed that Plaintiff did not want to do the training as it was being presented. Plaintiff did not want to follow the advice of someone who was certified to help him in that way, which led Ms. Madison to cease the training because she did not believe Plaintiff was motivated to improve. Dr. Ulrich noted that there was significant effort to recruit someone to help Plaintiff ambulate in the prison and help him be prepared for when he is released from prison, and it ceased after three visits due to Plaintiff's lack of cooperation.

Dr. Ulrich noted that in 2016 Plaintiff began refusing to see ophthalmology in general. There was also an incident where the prison staff discovered a hoard of medication in Plaintiff's room, involving hundreds of pills of many different drug classes. None of the drugs were narcotics, but most of them were prescription medications. Dr. Ulrich understood this to impact the prison doctors such that if all these medications were found in Plaintiff's room, he must not be taking them as prescribed, so the choice to put Plaintiff on pill line for his eyedrops was to make sure his health was preserved.

Dr. Ulrich observed that the records show one of Plaintiff's tendencies was to decide that certain providers were okay for him, and others were not. He had preferred providers. For example, Plaintiff would go to pill line, and if he learned that it was a person that he did not want to give him medication, he would leave. This tendency to only accept medication from preferred providers prevented Plaintiff from receiving medication that was good for him simply because it was not coming from the right person.

As to opportunities for Plaintiff to learn braille, Dr. Ulrich observed that the records demonstrate there were two parts to getting a request for braille approved, the first part

where a physician must affirm that the individual, in this case Plaintiff, does have poor vision and needs this type of assistance, and the second part where the patient has to sign. Dr. Ulrich noted that in one instance, two or three people were very involved in completing the physician part, and had the necessary papers done very quickly, but when it came time for Plaintiff to sign his portion, he did not have a companion and would not come up and sign the form.

As to BOP efforts to provide Plaintiff with a companion, Dr. Ulrich noted that the records demonstrate Plaintiff was initially given a companion to help him learn how to navigate FCI Estill, with the expectation that he would be able to learn the layout of the facility and how to walk to various places in ninety days. However, after Associate Warden Acosta extended the ninety-day period several times, eventually it was determined that Plaintiff could always have a companion. At FCI Edgefield, the staff anticipated Plaintiff's arrival and put together a team of companions, trained them, and made sure that were ready to provide him with consistent assistance. Dr. Ulrich observed that when Plaintiff arrived at FCI Edgefield, "very shortly, all of them were fired by Mr. Washington. And then he wanted three more."

As to Plaintiff's eventual transfer to FCC Butner in 2018, Dr. Ulrich concluded from the records that the transfer was ultimately granted because Plaintiff's personality and style were difficult. In addition to Plaintiff's serious disability, Dr. Ulrich noted that "he also collides with nearly everybody and causes great disruption in the facilities that he's at." Dr. Ulrich concluded that the BOP eventually chose to grant Plaintiff a Level 3 designation for these reasons, even though his visual disability does not strictly satisfy the requirements.

Based on the foundation of all the medical records he reviewed, Dr. Ulrich opined, to a reasonable degree of medical certainty, that the BOP provided to Plaintiff medical care and treatment that met the applicable standard of care throughout the ten years Dr. Ulrich reviewed. As to the period between August 24, 2014 and January 25, 2015, where Plaintiff did not see a glaucoma specialist, Dr. Ulrich did not believe that gap in care caused Plaintiff to suffer additional damage to his vision or that Plaintiff's pain was markedly exacerbated by a lack of visits to eyecare professionals during that time frame. Dr. Ulrich testified that he did not believe it was knowable whether any specific increase in pain or loss of vision was attributable to that gap in care. He further testified, to a reasonable degree of medical certainty, that it is very difficult, especially when a patient is in the end stage of a disease process, as Plaintiff unfortunately is, to measure and detect a worsening of pain or a loss of vision in a meaningful way.

On cross-examination, Dr. Ulrich agreed that Plaintiff has an aggressive form of open-angle glaucoma in both eyes. To the extent he received treatment, it slowed the progression of his disease. When asked to agree that, to the extent there were delays in treatment or gaps in care, that lack of treatment led Plaintiff's disease to progress more quickly than it otherwise would have, Dr. Ulrich stated, "Lack of treatment always does, but his lack of treatment was sometimes self-motivated, and that has to be taken into account here, meaning he did not take his medicine and refused visits, so he harmed himself."

Dr. Ulrich conceded that he never treated Plaintiff personally and that he had only reviewed his own deposition and portions of Dr. Kotecha's deposition. He stated that his opinions in this case are based on the medical records and his professional training and

experience. He is not a low-vision specialist or occupational therapist.

Regarding Plaintiff's visual fields from 2005 and 2007 discussed earlier, Dr. Ulrich stated that ideally you would view visual fields in series. If no series is available, you are limited in the conclusions you can draw, but you can still draw the conclusion that the patient's vision has not improved and will only get worse.

Dr. Ulrich testified that in the prison setting, when he has an opinion about an inmate's care and he communicates that opinion to prison staff, he expects that recommendation to be carried out. From 2007 until sometime in the last year, Dr. Ulrich operated one day per week at the Augusta State Medical Prison. Up until recently, his clinical schedule there was two full days per week. His experience in the prison informs his opinions in this case, and, in particular, about the standard of care that should be applied.

There was a time in the past when Dr. Ulrich resigned from his position at the prison because he felt the standard of care fell below what was adequate. This was in 2004. Dr. Ulrich came back to the prison in 2007 because, by his evaluation, they had fixed the standard of care. His current length of continuous tenure has been since 2007.

Through questioning, counsel sought to undermine Dr. Ulrich's credibility about the appropriate standard of care by demonstrating that a generalist physician at Augusta State Medical Prison, Dr. Young, left the prison in 2018 and lodged certain complaints about the environmental conditions being poor, such as high temperatures in the clinic and garbage being improperly stored in nursing units. This line of questioning did not achieve the desired effect on the Court. Rather, Dr. Ulrich's history of resigning his post at the state prison specifically because of his dissatisfaction with the standard of care

being provided in 2004 and returning to his position only once he determined the standard of care to have been remediated, demonstrated to the Court a studiously conscientious mindset about the standard of ophthalmological care owed to prisoners. Simply put, counsel's cross-examination only reinforced Dr. Ulrich's credibility on the appropriate standard of ophthalmological care in prisons, grounded in his extensive professional experience. Moreover, the Court found that the credibility of Dr. Ulrich's expert opinions was heightened by his comprehensive digestion of the totality of the medical record and the detailed foundation laid in support of those opinions.

Dr. Ulrich testified that the number of ophthalmology visits a given patient needs per year is dependent on his condition. In general, two to three visits per year is a good recommendation, as Dr. Ulrich testified during his deposition. However, there are times when one visit in a given year is sufficient, and other times when there should be six. To generalize the care that should be rendered to a patient into a set number of visits per year would be too rigid. Dr. Ulrich agreed that if two to three visits per year was the recommendation, that would equate to an ophthalmology visit every four to six months. Plaintiff has not always received that frequency of ophthalmology care throughout his time at the BOP.

When confronted with Dr. Nutaitis' August 28, 2014 note (PE 2286), in which he recommends, *inter alia*, that Plaintiff be provided darker glasses and states that his recommendations are medically necessary, Dr. Ulrich stated he does not think dark glasses are medically necessary. He maintains this opinion even though the doctor that actually treated Plaintiff reached a different conclusion. As to the recommendation, in the same note, that Plaintiff receive diode laser surgery, Dr. Ulrich agreed that it was a time-

sensitive surgery and confirmed that there was no evidence Plaintiff had any ophthalmology or optometry visits between August 28, 2014 and May 19, 2015. Dr. Ulrich further agreed that the delay in the recommended surgery could have contributed to Plaintiff's ocular pain and that failing to have the surgery risked continued worsening of the glaucoma damage. Dr. Ulrich confirmed that there is no indication in the record that Plaintiff did anything to delay the diode laser surgery and that Plaintiff was still under the care of Dr. Loranth, who was not qualified to disagree with the ophthalmological opinions of Dr. Nutaitis. He further confirmed that there is nothing in the records indicating Plaintiff would purposefully increase his own eye pressure.

When confronted with Dr. Tremblay's June 10, 2015 letter (PE 2035), Dr. Ulrich agreed that Plaintiff had difficulty with ambulation. Plaintiff also had difficulty with medication administration and with routine daily activities. Dr. Ulrich agreed that Plaintiff needed assistance with ambulation and that this accommodation is medically necessary. When asked whether he would expect general practitioners within the prison system to follow the recommendations of outside ophthalmologists, Dr. Ulrich stated, "Generally. But there has to be some latitude that a doctor who does not work in the prison situation or has not dealt with a certain patient for a prolonged period of time may opt to use . . . in how they respond to recommendations made." While Dr. Loranth disagreed with Dr. Tremblay's assessment, stating in his medical notes that Dr. Tremblay's June 10 letter was written at Plaintiff's urging and in furtherance of Plaintiff's attempts to manipulate his own requests and demands (*see* PE 2306), Dr. Ulrich did not see anything in the record to show that anyone at MUSC disagreed with Dr. Tremblay's letter.

Dr. Ulrich confirmed that there are no records of outside providers stating they

believe Plaintiff can self-administer his eyedrops. However, Dr. Ulrich does not agree that Plaintiff needs assistance administering his medications. Dr. Ulrich testified, "Mr. Washington has been taking eyedrops for years and years and years. And there are people who can take eyedrops even though they don't have vision. It may be difficult for those of us in the room who are still sighted to be given a drop and say here put this in your eye. But when a party is taking three—you know, probably six, seven, eight drops a day or is supposed to be taking those drops and has been doing it for years, it can be done by . . . a non-sighted or a poorly sighted person. So that's why I am reticent just to say yes and talk about changing my answer,[26] because, that's the premise behind why I disagree with the tenor of what's being written by these parties."

Dr. Ulrich agreed that a blind-assistance cane is a reasonable accommodation for a blind inmate and that Plaintiff's ability to ambulate is hindered if a cane is not available. As to braille materials, Dr. Ulrich acknowledged that Plaintiff's request for braille materials and training at FCI Williamsburg was denied multiple times. Dr. Ulrich did not see anything in the records about the rationale behind why the Warden opted to deny the braille requests.

When asked, "Now, Mr. Washington needs assistance with ambulation right?", Dr. Ulrich responded, "Yes. But . . . . He is very routinely observed ambulating in circumstances that don't seem to fit. So, in crowds when the emergency happened . . .

---

[26] The Court notes that Dr. Ulrich's exasperation in this section of his testimony was due to the fact that counsel repeatedly sought to impeach him with prior answers from his deposition and by asking whether Dr. Ulrich wanted to change those answers in court. However, the Court found that, to the extent Dr. Ulrich's answers during trial differed from the answers provided during his deposition, it was largely because he was attempting to provide more complete, nuanced answers at trial, and because counsel's attempted impeachment was often devoid of the context surrounding the question at issue. Accordingly, the Court had to interject more than once and remind counsel that Dr. Ulrich was entitled to explain himself. In any event, the attempted impeachment did not diminish Dr. Ulrich's credibility in the Court's view.

he was observed to move well enough in the crowd that was happening. He gets in and out of places. And so, I think ambulation assistance would be valuable, but I don't think it's been an absolute based upon Mr. Washington's behavior." Dr. Ulrich agreed that Plaintiff should have had an inmate companion at every facility where he was housed since November 2013. Dr. Ulrich had no knowledge about whether any accommodations provided for Plaintiff, including inmate companions, were the result of Plaintiff filing this lawsuit. He affirmed that Plaintiff has a history of running into stationary objects when he is without a companion, but he also noted that Plaintiff has been observed moving around them on his own. Dr. Ulrich agreed that a talking watch is a reasonable accommodation for a visually impaired inmate like Plaintiff.

In PE 2251, a BOP medical record dated November 1, 2013, Dr. Wierden, staff optometrist at FCI Williamsburg, notes that Plaintiff needs a companion and recommends transferring Plaintiff to a more accommodating facility. Based on this record, Dr. Ulrich agreed that Plaintiff's need for a companion was noted at the first BOP facility where he was housed in South Carolina, and very near the time he arrived there. He acknowledged that Plaintiff was not transferred to a more accommodating facility at that time.

Dr. Ulrich acknowledged that Plaintiff has been transferred to different BOP facilities many times over the years, that continuity of care is important, and that continuity of care can be disrupted by transfers within the prison system. He further acknowledged that there is no indication Plaintiff saw an ophthalmologist, optometrist, or low-vision specialist during the numerous transfers he underwent between FCI Edgefield and FCC Butner. Dr. Ulrich stated there is no data as to whether Plaintiff had an inmate companion at the various facilities where he was housed during those transfers.

On redirect examination, Dr. Ulrich testified that, if he knew Plaintiff had demanded or requested the June 10, 2015 letter be written by Dr. Tremblay (*see* DE 16 (5374) (AHSA Whitehurst note indicating that Dr. Tremblay reported as much)), it would change his opinion about the credibility of the letter. When asked how much of Plaintiff's lack of medical treatment or care in the BOP he would attribute to Plaintiff's own doing, Dr. Ulrich stated, "Greater than 50 percent."

On recross-examination, Dr. Ulrich stated, "I believe that the lack of care that was received for [Plaintiff's] glaucoma is more than 50 percent his own choices[.]" He further stated that his notes indicated "no information included" as to whether Plaintiff had any responsibility for the surgery recommended on August 28, 2014 not being scheduled. He has no affirmative knowledge that Plaintiff did anything to delay the surgery.

### 3. Consolidated Findings Regarding Expert Testimony

The expert witnesses disagreed about whether the gap in ophthalmological care that followed the August 2014 recommendation for diode laser surgery constituted a breach of the standard of care. Considering the totality of the circumstances, in particular the fact that Plaintiff unreasonably refused necessary post-operative care following his July 2014 cataract surgery, which was difficult and suffered complications, and the perpetual manner in which Plaintiff undermined, sabotaged, and rejected the treatment that was offered to him, the Court found Dr. Ulrich's opinion to be more persuasive on this point. Moreover, the collective weight of the expert testimony demonstrated that it is extremely difficult, if not impossible, to measure with any accuracy an amount of increased pain or vision loss that might be attributable to that gap in care, given the very advanced progression of Plaintiff's glaucoma at the time and the fact that Plaintiff was

serially noncompliant with his eyedrops during the same period.

The expert witnesses agreed that Plaintiff needs assistance to ambulate but disagreed as to whether Plaintiff needs assistance administering his eyedrops. On the second point, the Court found that the *great* weight of the testimonial and documentary evidence supports Dr. Ulrich's opinion that, for those periods when the BOP medical staff did not administer Plaintiff's eyedrops for him, it was not a breach of the standard of care.

Dr. Kotecha could not quantify how much Plaintiff's own conduct contributed to his eye pain or vision loss, but she conceded it could be more than fifty percent. She also could not point to any specific person at the BOP that breached the standard of care but affirmed only that "someone or some group" within the BOP had done so. Dr. Ulrich opined that Plaintiff, by his own behavior and choices, was more than fifty percent responsible for the lack of treatment and care he experienced during the relevant time period. He further opined that the BOP satisfied the applicable standard of care in the treatment and assistance it provided to Plaintiff over the ten-year period that he reviewed. The Court found Dr. Ulrich's opinions to be significantly more persuasive in these matters and found that his extensive experience providing ophthalmological care in the prison setting granted his expert testimony greater weight and credibility.

## CONCLUSIONS OF LAW

### A. FTCA Claim

Plaintiff filed his Third Amended Complaint on March 27, 2019, and has satisfied the administrative requirements of the FTCA and the Rehabilitation Act. "A plaintiff has an FTCA cause of action against the government only if [the plaintiff] would also have a cause of action under state law against a private person in like circumstances." *Miller v.*

*United States*, 932 F.2d 301, 303 (4th Cir. 1991) (citing 28 U.S.C. § 1346(b); *Corrigan v. United States*, 815 F.2d 954, 955 (4th Cir. 1987)). Under the FTCA, the court must determine liability in accordance with the substantive tort law of the state "where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Accordingly, because Plaintiff alleges a claim for medical malpractice concerning the medical treatment he received while incarcerated at FCI Williamsburg, FCI Estill, and FCI Edgefield, which are all located in South Carolina, the substantive law of South Carolina controls.

To prove negligence in South Carolina, a plaintiff must show: "(1) a duty of care owed by defendant to plaintiff; (2) breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach of duty." *Bloom v. Ravoira*, 529 S.E.2d 710, 712 (S.C. 2000) (citation omitted). Under South Carolina law, to establish a cause of action for medical malpractice, the plaintiff must prove the following facts by a preponderance of the evidence:

> (1) The presence of a doctor-patient relationship between the parties;
>
> (2) Recognized and generally accepted standards, practices, and procedures which are exercised by competent physicians in the same branch of medicine under similar circumstances;
>
> (3) The medical or health professional's negligence, deviating from generally accepted standards, practices, and procedures;
>
> (4) Such negligence being a proximate cause of the plaintiff's injury; and
>
> (5) An injury to the plaintiff.

*Brouwer v. Sisters of Charity Providence Hosps.*, 763 S.E.2d 200, 203 (S.C. 2014) (citation omitted). In addition, the plaintiff "must establish by expert testimony both the standard of care and the defendant's failure to conform to the required standard, unless the subject matter is of common knowledge or experience so that no special learning is

needed to evaluate the defendant's conduct." *Martasin v. Hilton Head Health Sys., L.P.*, 613 S.E.2d 795, 799 (S.C. Ct. App. 2005) (citation omitted). Further,

> Negligence is not actionable unless it is a proximate cause of the injury complained of, and negligence may be deemed a proximate cause only when without such negligence the injury would not have occurred or could have been avoided. When one relies solely upon the opinion of medical experts to establish a causal connection between the alleged negligence and the injury, the experts must, with reasonable certainty, state that in their professional opinion, the injuries complained of most probably resulted from the defendant's negligence.

*Ellis v. Oliver*, 473 S.E.2d 793, 795 (S.C. 1996) (citation omitted). "When [expert testimony] is the only evidence of proximate cause relied upon, it must provide a significant causal link between the alleged negligence and the plaintiff's injuries, rather than a tenuous and hypothetical connection." *Id.* (citation omitted). "To establish negligence, the plaintiff is required to prove the defendant's conduct was one of the proximate causes of the injury, not the sole cause." *Bonaparte v. Floyd*, 354 S.E.2d 40, 48–49 (S.C. Ct. App. 1987) (citing *Hughes v. Children's Clinic, P.A.*, 237 S.E.2d 753 (S.C. 1977)).

The Court finds that Plaintiff failed to prove by a preponderance of the evidence that there was any breach of the standard of care by any of the medical providers at FCI Williamsburg, FCI Estill, or FCI Edgefield.[27] Plaintiff's expert, Dr. Kotecha, testified that she could not attribute negligence to any specific medical provider and only affirmed that,

---

[27] Though a significant amount of evidence was introduced about Plaintiff's treatment, care, and assistance at FCC Butner, his experiences at that facility are not explicitly part of the Third Amended Complaint. (*See* ECF No. 197) This is because the Third Amended Complaint was drafted while Plaintiff was still housed at FTC Oklahoma City (*id.* ¶ 107) and had not yet been transferred to FCC Butner. The gravamen of Plaintiff's Third Amended Complaint and of the trial evidence pertains to Plaintiff's experiences at FCI Williamsburg, FCI Estill, and FCI Edgefield, and the Court has specified these facilities in its findings and conclusions accordingly. However, this should not in any way be construed as an indication that the Court failed to consider Plaintiff's claims with respect to his time at FCC Butner. The Court's holdings on each of Plaintiff's claims apply with equal force to his time at FCC Butner, to the extent he is asserting them as such.

in her view, "someone or some group within the BOP" breached the standard of care. While the parties disagree about whether or not a plaintiff's expert in a medical malpractice action must attribute a breach to a specific individual(s), as opposed to a group, the point is moot. Dr. Kotecha's inability or unwillingness to ascribe responsibility for the alleged breach to any specific person or persons weakened the substantive strength of her conclusions. Her failure to account for Plaintiff's manipulation of Dr. Tremblay's June 10, 2015 letter, on which one of her two main conclusions was largely based, further weakened the weight and persuasiveness of her opinions. On the other hand, the Court found the testimony of Dr. Ulrich, the United States' expert, to be highly credible and persuasive. As a teaching ophthalmologist at a state medical prison, Dr. Ulrich has extensive, highly relevant experience in evaluating and providing care in a correctional setting. Dr. Ulrich concluded that the delay in ophthalmological care following the August 2014 diode laser surgery recommendation was not a breach in the standard of care and did not measurably contribute to Plaintiff's increased pain or vision loss. He further concluded that it was not a breach of the standard of care, during relevant periods, to decline to provide Plaintiff with an assistant to administer his eyedrops. The Court found Dr. Ulrich's conclusions to be more persuasive than Dr. Kotecha's, and more soundly grounded in the totality of the medical record. In sum, and for the foregoing reasons, the Court finds that Plaintiff failed to prove by a preponderance of the evidence that the BOP medical providers breached the standard of care in their treatment of Plaintiff's glaucoma.

However, even if Plaintiff had proven a breach by a preponderance of the evidence, Plaintiff failed to prove that the gap in ophthalmological care from August 2014 to May 2015 and/or the BOP's declination, at various times, to provide him with an

assistant to administer his eyedrops was the proximate cause of the ocular pain and vision loss that he suffered. Specifically, the evidence did not show that the injury—ocular pain and vision loss—would not have occurred without the supposed negligence at issue. *Ellis*, 473 S.E.2d at 795. And Dr. Kotecha's testimony did not establish a "significant causal link" between the alleged negligence and Plaintiff's injuries. *Id*. Given the very advanced stage of Plaintiff's disease, and where Plaintiff, by his own choices, was routinely noncompliant with his medications and repeatedly refused treatment up to and including ophthalmology visits and surgery, it would not be possible to ascribe measurable portions of his eye pain and vision loss to the supposed negligence. It would therefore not be possible to identify such supposed negligence as the proximate cause of Plaintiff's eye pain and vision loss.

Alternatively, Dr. Ulrich testified that Plaintiff was greater than 50 percent responsible for his eye pain and vision loss. Under South Carolina's doctrine of comparative negligence, a plaintiff may only recover damages if his own negligence is not greater than that of the defendant. *Bloom v. Ravoira*, 529 S.E.2d 710, 713 (S.C. 2000). The Court finds, based on the totality of the circumstances and the evidence presented, that Plaintiff's negligence was greater than that of Defendants, and it was more likely than not that his injuries were in essence self-inflicted. Thus, he may not recover under the FTCA.

**B. Rehabilitation Act Claim**

Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). Because the language of Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act ("ADA") "is substantially the same," courts "apply the same analysis to both." *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 n.9 (4th Cir. 1995); *accord A Society Without A Name v. Va.*, 655 F.3d 342, 347 (4th Cir. 2011).

In order to prove a violation of the Rehabilitation Act, Plaintiff must show by a preponderance of the evidence that: (1) he has a disability; (2) he is otherwise qualified to receive the benefits of a public service, program, or activity; and (3) he was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of his disability. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005) (citations omitted). "Despite the overall similarity of § 12132 of Title II of the ADA and § 504 of the Rehabilitation Act, the language of these two statutory provisions regarding the causative link between discrimination and adverse action is significantly dissimilar." *Baird v. Rose*, 192 F.3d 462, 469 (4th Cir. 1999). The ADA applies to programs and services of a public entity, and a plaintiff has the burden of showing that his disability "played a motivating role" in the challenged action. *Id.* at 470. The Rehabilitation Act applies to programs that receive federal financial assistance, and a plaintiff must show that the discrimination occurred "solely by reason of" his disability. *Id.* at 469.

First, as a legally blind individual, Plaintiff was an individual with a disability. Second, Plaintiff must show that he was otherwise qualified to receive the benefits of the public services, programs, or activities. Courts have construed "the benefits of a program

or activity" to include the general rehabilitative and correctional services of state prisons, and have therefore required prisons to make "reasonable accommodations" for an inmate's physical disabilities in their day-to-day operations in order to comply with the mandates of the Rehabilitation Act. *See Torcasio v. Murray,* 862 F. Supp. 1482 (E.D. Va. 1994) (holding that the Rehabilitation Act's reasonable accommodations requirement applied to an obese inmate's claim that the state prison was not adequately equipped to accommodate his disability), *aff'd in part*, *rev'd in part on other grounds*, 57 F.3d 1340 (4th Cir. 1995); *Randolph v. Rodgers,* 170 F.3d 850, 859 (8th Cir.1999); *see also Allen v. Carrington*, No. C/A 4:07-797 DCN, 2009 WL 2877557, at *6 (D.S.C. Aug. 28, 2009), *aff'd*, 372 F. App'x 390 (4th Cir. 2010).

The preponderance of the evidence established that Plaintiff was assigned inmate companions at FCI Williamsburg, FCI Estill, and FCI Edgefield[28] to assist him with ambulating and with navigating the prison compounds. As to FCI Williamsburg, Plaintiff testified he had an inmate companion there "at one point, and then they took the inmate away from [him]." As to FCI Estill, Dr. Lepiane testified that Plaintiff consistently had an inmate to guide him. As to FCI Edgefield, Nurse Thomas testified that the medical staff established a medical inmate companion program with at least six vetted, trained, and hired companions before Plaintiff arrived at the facility and specifically to accommodate Plaintiff. No evidence was introduced, by either party, to show with any precision the specific time periods, within the course of Plaintiff's incarceration, when Plaintiff had or did not have an inmate companion. However, the evidence demonstrated that Plaintiff was provided with an inmate companion for a significant majority of the time period at

---

[28] Again, the preponderance of the evidence demonstrated the same as to FCC Butner. *See supra* at n.27.

issue. It further demonstrated that Plaintiff's own actions significantly contributed to any lack of inmate companions he experienced at various times, by making unsubstantiated allegations of abuse against his companions, by exasperating them with his demands, and by refusing to utilize them. The preponderance of the evidence established that the BOP made reasonable efforts to accommodate Plaintiff's need for an inmate companion.

The preponderance of the evidence showed that Plaintiff had been self-administering his eyedrops for several years while he was legally blind and in BOP custody before he claimed a need for assistance at FCI Williamsburg. Dr. Ulrich testified that even a non-sighted person can self-administer eyedrops successfully. Plaintiff was repeatedly provided training to administer his eyedrops over the course of his incarceration in the BOP. The evidence showed that Plaintiff was provided several "ezy-drop" guides at FCI Estill. He was also offered the opportunity to receive an "auto-drop" assistive device at FCC Butner but refused it. Plaintiff repeatedly demonstrated the ability to administer his own eyedrops, but then refused to do so. He also resisted or refused to accept his medications if his preferred provider was not administering the eyedrops. Plaintiff was placed on the pill line at FCI Williamsburg, FCI Estill, FCI Edgefield, and FCC Butner to accommodate his disability. Plaintiff consistently refused to accept assistance if his preferred provider was not issuing the eye drops. To the extent Plaintiff had a cognizable "need" for assistance with his eyedrops, a proposition that was undermined by the greater weight of the expert testimony in the first instance, the preponderance of the evidence established that the BOP made reasonable efforts to accommodate Plaintiff's need for assistance with his eyedrops, which are typically self-carry medications.

Plaintiff was provided a blind-assistance cane and taught to use it at FCI Estill. The facility contracted with an orientation and mobility specialist, Shirley Madison. Ms. Madison discontinued the training because Plaintiff was resistant to the training, insisted on doing "what worked for him," and declared that he would never walk on the compound without a sight guide. There is scant evidence to support the notion that Plaintiff has even sought to use the cane when he has had one and when it is has been functional. Plaintiff also repeatedly refused further cane training while at FCC Butner, both because he is not interested in learning to use the cane and because he maintains that such training could not be effective because the compound is not constructed at right angles. The preponderance of the evidence established that the BOP made reasonable efforts to accommodate Plaintiff's need for a blind-assistance cane.

Plaintiff was provided with a lighted magnifier and talking watch at FCC Butner. More recently, Plaintiff expressed concerns about eating in the cafeteria due to his disability and further accommodations were provided. The fact that Plaintiff did not have these accommodations until reaching FCC Butner does not show that he was denied reasonable accommodations until FCC Butner, but only that he has been granted *special* accommodations since arriving at FCC Butner. He did not produce any evidence to show that he was denied access to materials or programs that were available to all other inmates because of his disability.

Though braille was mentioned many times throughout the trial, there was little to no *substantive* evidence that Plaintiff has currently requested or is even interested in learning braille. Oblique references (in the foundation for Dr. Ulrich's expert opinions) to a request form(s) that was submitted many years ago and apparently denied for unknown

reasons will not suffice. Nearly every witness that mentioned braille only did so in the process of disclaiming that they had any knowledge whatsoever of whether braille had been provided to Plaintiff (*e.g.*, AHSA Whitehurst, Dr. Lepiane, Nurse Ulmer, Dr. Blocker, Dr. Sichel, etc.). Plaintiff's own testimony about braille was limited to repetitive statements, as to each FCI in turn, that braille was not provided to him there, as if braille was an entitlement that should be expected without even asking for it. Dr. Lepiane testified that Plaintiff never asked for braille and he does not think Plaintiff would have benefited by it. He further testified that if Plaintiff had needed braille, the BOP would have provided it for him, but it did not seem like braille was an interest, desire, or need of Plaintiff's at that time. Suffice it to say, Plaintiff did not establish by a preponderance of the evidence that the BOP failed to reasonably accommodate any supposed need for braille on his part.

As to dark tinted glasses and an alternative lock for the vision-impaired, the preponderance of the evidence established that the things Plaintiff was requesting were validly denied pursuant to BOP policy. Plaintiff was, more than once, provided with the darkest tint glasses permitted by BOP policy, as confirmed by Nurse Ulmer's call to UNICOR. The BOP's declination to break its own policy and provide Plaintiff darker tinted glasses was not a violation of the Rehabilitation Act. LCDR Kaminski's recommendation for an alternative lock was denied for security reasons pursuant to the discretionary authority of the custody personnel at FCC Butner. There was no evidence that Plaintiff even asked for an alternative lock at FCI Williamsburg, FCI Estill, or FCI Edgefield. The BOP's declination to provide Plaintiff an alternative lock based on the security decisions of its custody personnel was not a violation of the Rehabilitation Act.

Plaintiff's claim that he can only be properly housed in a care Level 3 or 4 institution is rejected. Testimony from Catina Friday, Chief of Medical Designations and Transportation for the BOP, established that legal blindness in and of itself does not meet the standard to require such a designation. The fact that BOP officials determined, within their discretion and according to the applicable program statement, that Plaintiff could be placed at a care Level 2, 3, or 4 institution for management of his disease did not violate the Rehabilitation Act.

In sum, the Court finds that the BOP provided reasonable accommodations for Plaintiff's disability, but Plaintiff consistently rejected those reasonable accommodations and interjected unreasonable demands and expectations. Nothing in the evidence or testimony indicates Plaintiff was treated differently or denied access to any programs that were available to other prisoners *because of* his disability. *See Baird*, 192 F.3d at 469 (requiring, for Rehabilitation Act claims, that the discrimination at issue occurred "solely by reason of" the plaintiff's disability).

## C. Eighth Amendment Claim

To state a plausible Eighth Amendment claim for medical indifference or indifference to inmate safety against a governmental actor, a prisoner must demonstrate that a sufficiently serious deprivation occurred resulting "in the denial of the minimal civilized measure of life's necessities," and that the prison employee had a sufficiently culpable state of mind. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations and quotation marks omitted). "Eighth Amendment analysis necessitates inquiry as to whether the prison official[s] acted with a sufficiently culpable state of mind (subjective component) and whether the . . . injury inflicted on the inmate was sufficiently serious (objective

component)." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (citation and quotation marks omitted); *see Hudson v. McMillian*, 503 U.S. 1, 6–10 (1992) (discussing subjective and objective components).

With respect to medical and health needs, a prisoner must show deliberate indifference to a serious need. *Wilson v. Seiter*, 501 U.S. 294 (1991); *Estelle v. Gamble*, 429 U.S. 97 (1976). "To succeed on an Eighth Amendment 'cruel and unusual punishment' claim, a prisoner must prove two elements: (1) that objectively the deprivation of a basic human need was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson*, 501 U.S. at 298). The indifference must be substantial, and inadequate treatment due to negligence or malpractice will not suffice:

> [I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle*, 429 U.S. at 105–06 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).

Plaintiff has not satisfied either prong of his Eighth Amendment deliberate indifference claim. While Plaintiff's medical needs relating to his glaucoma are, of course, serious by any measure, this is not be confused with the objective element of the test, which requires that the *deprivation* of a basic need be sufficiently serious. *See Quinones*,

145 F.3d at 167. The Court has already concluded that the preponderance of the evidence does not demonstrate a breach in the standard of care (*supra* at 152–56), which equates to a finding that there was no deprivation of a basic need, let alone a sufficiently serious one. But even if one were to assume that the gap in ophthalmological care following the August 2014 surgery recommendation, and/or the decision not to permanently assign a BOP staff member(s) to administer Plaintiff's eyedrops for him, was a deprivation of a basic need, Plaintiff has not introduced evidence sufficient to show that the supposed deprivation was "sufficiently serious." The degree to which any such "deprivation" of care contributed to Plaintiff's preexisting, persisting eye pain and aggressive vision loss is unmeasurable, and therefore not knowable (*see supra* at 145, 151–52). If a *de facto* gap in ophthalmological care with indeterminate effects, or a hindrance to the routine administration of glaucoma eyedrops, is all that it takes to state a cognizable constitutional injury in this context, then Plaintiff has, by his own conduct, been inflicting Eighth Amendment violations on himself—in the form of missed appointments, forfeited surgeries, and refused eyedrops—for the entirety of the relevant time period.

Likewise, Plaintiff has not introduced evidence sufficient to show that the prison officials in question had a sufficiently culpable state of mind. *See Quinones*, 145 F.3d at 167. On the contrary! The evidence in this case overwhelmingly establishes that the BOP medical staff at each facility continued to provide conscientious care even when they were justifiably exasperated with Plaintiff's confrontational attitude and self-sabotaging behavior. Plaintiff cannot both set himself on an oppositional, belligerent course with nearly every BOP staff member he meets, and then validly claim that their natural frustration with his conduct amounts to sufficient mental culpability to render them liable

for inflicting cruel and unusual punishment upon him. The evidence in this case does not even come close to showing medical indifference that is so "repugnant to the conscience of mankind" that it offends "evolving standards of decency" in violation of the Eighth Amendment. *Estelle*, 429 U.S. at 106

The preponderance of the evidence showed that the medical care providers at FCI Williamsburg, FCI Estill, and FCI Edgefield[29] made constant and consistent efforts to provide treatment and care to Plaintiff. However, Plaintiff consistently interfered with the delivery of care by refusing to accept care when his preferred provider was not issuing the medication or when his own wishes were not followed.

The Court finds that the medical care providers at FCC Butner have provided sufficient care and have sought to accommodate Plaintiff's changing needs for his severe glaucoma. As such, the preliminary injunction that was put in place is no longer necessary. The preliminary injunction implemented by this Court requiring that Plaintiff be housed at FCC Butner is hereby lifted and Plaintiff's request for a permanent injunction is hereby denied.

## CONCLUSION

Based on the evidence, expert testimony, and after having considered the arguments of counsel, the Court is strongly convinced that Plaintiff has failed to prove the FTCA claim, the Rehabilitation Act claim, and the Eighth Amendment injunctive claim by a preponderance of the evidence. Accordingly, the Court finds in favor of Defendants on Plaintiff's claims against the United States and the BOP pursuant to the FTCA, the Rehabilitation Act, and the Eighth Amendment for injunctive relief. Plaintiff's *Bivens* claims

---

[29] As well as FCC Butner.

were dismissed on August 26, 2022. (ECF No. 320.) Therefore, it is ORDERED that the Court finds for the United States and Bureau of Prisons on all claims. The Clerk is directed to enter judgment for the United States and Bureau of Prisons and to enter judgment for the Individual Defendants, Richard Lepiane, Eve Ulmer, and the Estate of G. Victor Loranth.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

January 31, 2023
Charleston, South Carolina